LEVIN & DICTEROW
William E. Levin, SBN 104631
Steven M. Dicterow, SBN 89371
668 N. Coast Highway, Suite 1264
Laguna Beach, CA 92651
williamlevin@hotmail.com
sdicterow1121@yahoo.com
(949) 613-5131
Attorneys for VBS,
VBS Distribution, Inc., and VBS Television, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VBS DISTRIBUTION, INC., *et al.,* <br><br> VBS, <br><br> v. <br><br> NUTRIVITA LABORATORIES, INC., *et al.,* <br><br> Defendants. | **Case No.8:16-cv-01553-CJC-DFMx** <br><br> Hon. Cormac J. Carney <br><br> **PLAINTIFF VBS DISTRIBUTION, INC.'S AND VBS TELEVISION, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** <br><br> Date: February 12, 2018 <br> Time: 1:30 p..m. <br> Location: Courtroom 9B |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

VBS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

# TABLE OF AUTHORITIES

VBS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

## I.

## **INTRODUCTION**

This Court should deny this motion for summary judgment because the moving parties have not demonstrated that there are no genuine issues of material fact, and that they are entitled to judgment as a matter of law.  To the contrary, Defendants have simply laid out a narrative which – *if* supported by evidence – would be contrary to VBS' ("VBS") contentions.  If anything, they have *confirmed* the need for a trial on the merits of this complex case.

For example, VBS have pled claims for false advertising, and have identified – at least, according to Defendants admission - 12 distinct false statements made by Defendants.  Defendants' Motion addresses only 4 of those statements, claiming (without any support) that VBS "have apparently abandoned their claims as to the other 8 statements."  (Memorandum of Points and Authorities, p. 21. See also, p. 2). VBS have not "abandoned" anything,[1] and Defendants' Motion should be denied for the simple reason that it does not even address many of the claims – and the evidence in support thereof – in this action.

---

[1] Defendants misread and misconstrue Dr. Klein's report. Perhaps they should have retained their own experts. But they did not do, though they VBS would have experts since at least March 2017, and have an additional 30 days under FRCP 26(a)___, to retain any rebuttal expert, if they wished. Also, Defendants cite no law that requires that VBS provide survey evidence on every false advertising claim, or at all, to show they are misleading. That is only necessary if the advertisements are not literally false, as many of Defendants statements are. (See Dkt. 89). And Defendants' fail to deal with the expert reports in their summary judgment motion, perhaps because they are fatal, in and of themselves, to Defendants' summary judgment motion as to damages and the false advertising and related claims. These issues are all discussed, however, in VBS' concurrently filed opposition to the *Daubert* motion. In sum, there is no basis to exclude VBS' expert reports, which are also vital to VBS' case, as  untimely, or based on *Daubert*. In short, Defendants' arguments really go to the weight for the jury to give the expert reports and expert testimony, not its admissibility. See generally,

-1-

Moreover, some of the additional specific false statements about Defendant' Arthro-7 product, are not underlined addressed by Defendants in their motion, such as the new claim, based on discovery, that Arthro-7 also contains too high an amount of lead.[2] This is false advertising and violates such California laws as Prop. 65 requiring disclosure of this material fact in Defendants' marketing and advertising materials.

Even when they have attempted to meet VBS' claims head-on, Defendants have utterly failed to show that there is no genuine issue requiring evaluation by a trier of fact.  For example, VBS alleged, in support of one false advertising claim, that Defendants had advertised their dietary supplement Arthro-7 using the phrase, "100% tu duoc thao thien nhien," which translates to state that the dietary supplement is "100% natural herbal."  VBS have provided *evidence* that the statement was made, *evidence* that it has the English and Vietnamese meaning noted above, and *evidence* that the statement was false because Arthro-7 contains animal products. (ASDF, No.___) Indeed, Defendants' own Arthro-7 marketing manager admitted that the product contains animal products, the foregoing statements are not true, and that the main distributor, Defendant US Doctors, does not make that claim on its packaging and in its marketing materials, because it is

_____

[2]  Defendants failed to produce in discovery, though requested, together with many other key items which are evidence of the materials facts in this case, any documents or information concerning two major lawsuits (Ex. ___ and ___) against them in 2016 and 2017, one of which was for lead content in violation of Prop. 65. (ASDF No. __). Another recent suit was for some of the exact same false advertising statements made by VBS, that the claims made about the health benefits, supposedly based on the clinical studies, are false and misleading.  And that Defendants or a closely related entity, secretly funded and designed the clinical studies, so that they are not "independent" and "neutral." (ASDF No. __, and ___).

false, and would mislead consumers into buying Arthro-7 based on such false claims. (Additional Statement of Disputed Facts (ASDF, No.__).[3]

VBS also relies on the Ninth Circuit Court of Appeal's own *finding* – in the present case--that the statement was not just misleading, but actually false on its face.[4] (ASDF, No. __).  If the Ninth Circuit found, before all of the additional helpful evidence from discovery, that VBS has introduced sufficient evidence that it is likely to prevail at trial, how can Defendants' possibly claim that there is no triable issue of fact for the jury on this false advertising claim? Moreover, the Ninth Circuit's finding that VBS presented sufficient evidence for a jury to find in its favor on this issues (likelihood to prevail on the merits at trial, on a preliminary injunction motion), is law of the case, and must be followed even by Defendants. INSERT CASE LAW.

In addition, VBS has introduced extremely credible evidence on the misleading nature of many of Defendants' false advertising claims, and the profits attributable to these false statements, via the expert witness report of Dr. Robert Klein. (Ex. __)(ASDF, No. __).   Dr, Klein's report is quite damning to the defenses and indubitably establishes VBS' false advertising claims,including the evidence mentioned above, and as shown in VBS' ASDF and SDF. However, the misleading nature, and the importance of Defendants' claims to consumers, is

---

[3] VBS has prepared a Statement of Disputed Material Facts ("SDF), responding to each of the Defendants' 95 alleged "uncontroverted" facts. But many of the disputed material fact issues result from facts that Defendants do NOT include in Defendants Statement of Undisputed Facts ("SUV"). Those facts, numbered __ -___, are in VBS' Additional Statement of Disputed Facts ("ASDF").

[4] *VBS Distribution, Inc. v. Nutrivita Laboratories, Inc.*, 697 Fed.Appx. 543.  VBS Distribution, Inc. v. Nutrivita Laboratories, Inc., 697 Fed.Appx. 543, discussed *infra*. (Dkt. 83).

-3-

supported by ample evidence, even without Dr. Klein's expert report, which Defendants desperately, but VBS submits vainly, seek to exclude.[5]

In this Motion, Defendants have asked the Court to take this claim away from the jury and adjudicate it based on the bare argument that the words "duoc thao," taken out of the sentence, do *not* mean "natural herbal," and that the statement is thus *not* false.  Defendants have not contradicted VBS' position with any competent evidence (they did not, for example, submit any sworn testimony from a translator).  Even if they *had*, though, the result would have been to frame a disputed issue of fact over the meaning of the phrase in question, and how Vietnamese consumers would understand it, which should be determined by the trier of fact.  By no means have they demonstrated an entitlement to judgment as a matter of law, and this Motion should be soundly denied.

Such defects characterize Defendants' entire Motion, as detailed in the balance of this Opposition.  All of VBS' false advertising, and other claims, are based on genuine issues of disputed material fact. Because Defendants bore the burden of demonstrating an entitlement to summary judgment, and because they

---

[5] These arguments about the exclusion of the expert reports are addressed separately in the opposition to the *Daubert* motion and the motion to exclude the reports as untimely. However, Defendants' argument about the expert reports do not negate this strong evidence of VBS' claims and its damages, but really go the weight to be given the expert's testimony and reports.  See generally, 6 *McCarthy on Trademarks and Unfair Competition* § 32.178 (5th ed. Dec. 2017 update) (collecting cases)("Like any scientific method related to statistics in the social sciences, every survey, no matter how carefully constructed, has some potential flaws somewhere. **The proper approach is** to view such evidence with some understanding of the difficult of devising and running a survey and **to use any technical defects only to lessen evidentiary weight, not to reject the results out of hand.**")(footnotes omitted)(emphasis added), *citing, SquirtCo. V Seven-Up Co.*,, 628 F. 2d 1086, 207 USPQ 897, 900 (8th Cir. 1980)("In evaluating survey evidence, technical deficiencies to the weight to be accorded them, rather than to their admissibility."); and *McCarthy, Id.* at §32:170.

VBS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

have not done so, VBS respectfully request that this Court deny this Motion in its entirety.

A separate ground to do so includes Defendants' failure to meet and confer on some of the claims, such as concerning the individual defendants' liability, as discussed below, or for its lead counsel, Joe Trojan's, failure to participate in any of the meet and confers on this or other recent motions, despite this Court's order (Dkt. 119) ("NOTICE by Magistrate Judge Douglas F. McCormick. Effective immediately, lead counsel shall participate in all meet-and-confer discussions.") that he do so[6]. This order and requirement has proved helpful in resolving issues that otherwise would have been litigated, when he does not participate but leaves such conferences solely to his junior associates. The motion as to the individual defendants being granted summary judgment should be denied on this basis alone, as well as its clear lack of merit, bordering on, if not fully achieving, frivolousness at this late stage, based on the discovery completed.

## II.

## THIS COURT SHOULD DENY DEFENDANTS' MOTION ON EACH CHALLENGED CAUSE OF ACTION

### A. This Court Should Deny Summary Judgment as to VBS' Claims for False Advertising.

Defendants acknowledge that "[t]he burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment." (Memorandum, p. 4, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 2556 (1986).) Defendants have not carried that burden with respect to VBS' claims for relief for

---

[6] Defendants may argue that this Order applies only to discovery, but that is not what it says. Regardless, VBS is not asking for a contempt finding, but requests that this Court now make it crystal clear that lead counsel for Defendants' MUST participate in all future meet and confers and "joint" conferences on pre-trial and trial issues, such as the many expected motions in limine, resolution of jury instruction, joint exhibits, and other such issues.

false advertising.  In fact, Defendants' moving papers actually *confirm* that multiple genuine issues of material fact remain open, and summary judgment is entirely improprer for several reasons.

First, Defendants create a strawman argument, never made by VBS, which they then attack, but it is illogical and irrelevant. They say VBS now contends that all of Defendants claims are "misleading, not literally false." (Memorandum, p. 22, lines 2-3). This is not correct, as VBS claims most of the many, many (far more than  the 12 discussed by Defendants) false advertising statements of Defendants are, almost all of them, false on their face. If they are not literally false, then they are misleading in context.

Professor McCarthy, whose treatise Defendants incorrectly cited out of context, says:

ADD QUOTE HERE FROM MCCARTHY

Defendants also make a light paper-weight argument in once sentence, claiming that VBS'  should now be "estopped from asserting" any false advertising claims against Defendants, because, allegedly, Defendants say they have some evidence that VBS misrepresents its own products as "herbal." (Memorandum, p. 22, lines 19-23). This argument, advanced for the first time on a summary judgment motion and never mentioned before to VBS, fails for many reasons.

First, the facts are, at best for Defendants, in dispute as to whether VBS has falsely advertised its own JN-7 Best product. (SDF ¶ __; ASDF ¶ _). To obtain a summary judgment on such an argument, Defendants would first need to prevail at trial on such a claim.

Second, there is no counterclaim against VBS for false advertising or otherwise. (Dkt.  67-1, Amended Answer to SAC; Dkt. 44, Answer to SAC). Third, there is also no affirmative defense based on this argument, despite 29 different affirmative defenses.  There is simply no "estoppel" or "unclean hands" affirmative defense. (*Id.*). And, though Defendants purport to "reserve" the right to amend their

-6-

affirmative defenses, (Dkt. 67-1, Aff. Def. 29), they have not done so. VBS would object at this late date.

The evidence shows that VBS' claim that both parties' products are marketed as "herbal" is not false. VBS does not say that its product is "100% herbal ingredients," as Defendants do, but only, in a recent comparative advertisement about the parties' products as a result of the first litigation between them, that both parties'; products are "herbal."

Indeed, VBS' JN-7 Best is primarily herbal, even though not 100%, so it's ad is far from literally false or otherwise.: QUOTE HERE FROM ANNOUNCEMENT mentioning herbal.

Also, as VBS' CEO testified, in the Buddhist religion, a shark or fish would not considered the same as an "animal," despite however scientific taxonomy or Christianity might classify them. [Nguyen II. Dep., pp. __]. (ASDF ¶___).

Fifth, the lone case Defendants cite is clearly distinguishable, and not controlling as it is not a California or 9th Circuit case. In *FLIR Sys., Inc. v. Sierra Madre, Inc.,* 965 F. Supp. 2d 1184, 1197 (D. Or. 2013), the court stated that: "…[T]he equitable defense of unclean hands would be decided by the Court, and if the jury determined that FLIR did not falsely advertise its E-series cameras' ability to pass a two-meter drop test, a finding of unclean hands would clearly be inappropriate because FLIR did not act inequitably." In *FLIR*, the jury had <u>already</u> decided that both plaintiff (FLIR) and defendant (Fluke) falsely advertised their cameras' ability to pass a two-meter drop test.  Next, it was up to the court to determine, by clear and convincing evidence, that the unclean hands defense was established.  The court notes, however, that: "[H]ad the defendant brought a false advertising claim against plaintiff, a preponderance of the evidence decision by the jury on the falsity of the advertisements would be enough." But, as the court said, "To block [plaintiff's] claim, however, this conduct must be sufficiently egregious by clear and convincing evidence." *Id.* at 1193. That has not been shown here, merely because Defendants'

-7-

found one truthful comparative announcement/ad claiming that both parties' products are "herbal."

The doctrine of unclean hands can only be established by a court based on either a preponderance of the evidence or by clear and convincing evidence.  Unlike *FLIR*, in our case, a jury has not deliberated on whether VBS falsely advertised JN-7 as "herbal."  Nor will it, as Defendants have not  brought a claim against VBS for false advertising, or even asserted an "unclean hands" defense. It is clearly too late to do so now, and would be prejudicial to VBS as discovery has closed, and trial looms.  And, as stated above, such a defense has no factual or legal merit. Therefore, Defendants' "estoppel" argument is improper, and is not evidence on this summary judgment motion.

**1.  Evidence Shows (and the Ninth Circuit Has Already Found) That Defendants Made a False Statement When They Claimed that Arthro 7 is "100% Herbal."**

In their Second Amended Complaint, VBS identified Defendants' assertion that Arthro 7 is "100% herbal" as a false statement.  (Second Amended Complaint ("SAC"). The Ninth Circuit, in its order reversing and remanding this Court's denial of VBS' motion for preliminary injunction,  held that such statement was false on its face: "The district court erred in holding that VBS failed to present sufficient evidence that Nutrivita's advertising was literally false with respect to two of the challenged statements. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)." The Ninth Circuit went on, addressing evidence that has not changed since then:

> "First, Nutrivita's advertising claim that Arthro-7 was "100% herbal" was contradicted by Arthro-7's own ingredient list, which includes animal products; there is no evidence in the record that "herbal" means something other than "of, relating to, or made of herbs," <u>Webster's New International Dictionary</u>  1058 (3rd ed. 1993) in the supplement industry.

1    *VBS Distribution, Inc. v. Nutrivita Laboratories, Inc.*, 697 Fed.Appx. 543.

2      Subsequent evidence, including the deposition of Defendant US Doctors'

3 marketing director, Mina Shariff, confirms that <u>Arthro-7 contains animal products</u>; in

4 fact, Shariff testified that it would be "false advertising" to claim that Arthro-7 is

5 100% herbal, and would mislead consumers. (Shariff Dep., pp. 45-46.) (ASDF

6 ¶___).

7      Shariff also admitted that this is important information—just like Defendants'

8 other false claims-- which causes consumers to buy Arthro-7 products. Without such

9 claims, they would be less likely to buy the product, or would not buy it. (Sharrif

10 Dep., pp. __). ASDF, No. __.  The declaration of Joseph Nguyen, undisputed on

11 these points, also confirms the falsity of this claim, and its high impact on the buying

12 decision of Vietnamese buyers, many of whom are Buddhists who do not eat animal

13 products. (Dkt. __, ¶¶ __)(declaration of Joseph Nguyun in support of preliminary

14 injunction mot[7]ion). Other witnesses have confirmed these same facts. (Ex. __, and

15 ___).

16      Moreover, other Defendant distributors admitted that they use this false

17 language on their Arthro-7 packaging and in advertisements, particularly Defendant

18 Nutrivita, Inc., owned by Defendant Jenny Do. (Ex. __, Do dep.. pp. ___). She

19 admitted that all of her Arthro-7 products, which she obtains for free due to her

20 written agreement (Ex. 155) with Defendant Tuong (Ex. __, Do. dep., pp. __), are

21 marketed and sold to the Vietnamese market place, but are also available to non-

22 Vietnamese customers. (Ex. __, Do. dep., pp. __). One of the ads which appeared in a

23 leading Vietnamese newspaper, ____Viet, Ex. 3 (to the SAC), details the "100%

24 medical herbal" claim.

25      In their Motion, Defendants largely ignore the facts above, opting

26 instead to argue that VBS have used the term "duoc thao" in describing one of their

27

28 [7] According to one article, over 40% of the Vietnamese U.S. population is
Buddhist. (Ex. __). ASDF, No. __.

own products, JN-7.  (Memorandum, p. 22.)  This is a red herring:  in his declaration, Plaintiff Joseph Nguyen (a native Vietnamese speaker) specifically stated that the term "<u>100% tu duoc thao thien nhien</u>" meant  "100% from natural herb."  Rather than attempting to challenge Mr. Nguyen's declaration, Defendants have taken a <u>fragment</u> of the phrase that he cited (the words "duoc thao") and argued that such fragment means "dietary supplement," not "100% herbal," and that VBS have used the words "duoc thao" themselves.  Whether or not "duoc thao," in a vacuum, means "dietary supplement," and whether or not such term was used by VBS, are wholly immaterial questions; neither one of them contradicts Nguyen's testimony that the <u>entire phrase</u> "100% tu duoc thao thien nhien" means "100% from natural herb."

The uncontroverted evidence thus remains that (1) Defendants used a phrase in their advertising of Arthro-7 that states that the product is 100% natural herbal, and (2) Arthro-7 is <u>not</u> 100% natural herbal.  Accordingly, the evidence shows that Defendants indeed made a false statement, and summary judgment should be denied.

### 2.    Defendants Made Another False Statement When They Claimed "Over Eight Million Sold" for Arthro-7.

Defendants also made a false statement regarding Arthro-7 when they advertised that "Over 8 million bottles" have been sold.  (SAC, pp. ___-___.)  VBS have submitted substantial evidence that the statement is untrue.  For example, Defendants <u>admitted</u>, as evidence the Ninth Circuit also cited, that they <u>did not know</u> how many units of Arthro-7 had been sold before Tuong bought the Arthro-7 company in 2005.  (Ex. 131, Tuong J dep., pp. __; *VBS Distribution, Inc., supra,* 697 Fed.Appx. 543.)  (SDF No. __; ASDF No. __). They also admitted this in their memorandum in opposition to VBS' preliminary injunction. (ASDF __). (Ex.__)(QUOTE HERE).

Perhaps that is why the Ninth Circuit, reversing this Court's finding on this particular false advertising claim, stated, in what is now law of the case: "Second,

VBS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

VBS's claim that Nutrivita's advertising statement, "8 Million Bottles Sold," is literally false is essentially undisputed by Nutrivita; indeed, its CEO admitted there was no basis for this claim." (Dkt. 83). *VBS Distribution, Inc., supra,* 697 Fed.Appx. 543.

In their Motion, Defendants attempt to gloss over their admitted ignorance of the volume of Arthro-7 sales by submitting purported "sales records." (Memorandum, pp. ___-___.)  Such "records"  are not only highly suspicious on their face, but also contrary to Defendants' admissions that (1) they do not have any actual sales or purchase records to back up this claim, (2) they never saw such records and do not know if they even ever existed, as to any sales before Defendant Tuong bought the company selling Arthro-7 in 2005. (Ex. __, Alberto Miranda dep., pp. ___; Elaine Phan dep., pp.   __). They rely solely upon an unauthenticated "database" of information inputted by some unknown persons before Tuong bought the Arthro-7 company, and even their current database of Arthro-7 sales is based on an earlier database over which they had no control, and did not acquire when they purchased the company. (Miranda dep., pp. ___; Phan dep., pp. __; Shariff dep., pp. ___). Defendants have failed to authenticate the database or its accuracy, and numerous mistakes in the database and its reports were admitted by Defendants. (Phan dep., pp. ___; Miranda dep., pp. __).

Further evidence that the over 8 million is not true is based on the purported annual sales summaries themselves (Ex. __), which was only produced toward the end of the deponent Miranda's deposition, though requested some five months previously (Ex. __, Doc. Req. Nos. ___, ___, and ____). The purported sales jump from about 200,000 to over $2 million in a single year, then another year or so (SPECIFY THE YEAR AND NOS HERE), then plunge back down again to their normal levels. (Miranda dep., pp. __; Phan dep. , pp. __). While Defendants try to offer an explanation for huge surge in sales, they offer no specific evidence to back up this over tenfold increase in a year. (Miranda dep., pp. __; Phan dep. , pp. __). The

-11-

astronomical jump makes the unsubstantiated purported annual sales suspect on their face, even if there were any "real" records or documents to back them up, but there are not.

Further evidence is contained in the defendants' own prior litigation against BioCell in 20__, in which the Central District of California, Judge Selna, determined that while that Defendants had produced some evidence of close to 8 million in sales, the number was still ___ units less, making it a triable issue for the jury despite Defendants' summary judgment claim. **Ex. 86.** (INSERT QUOTE HERE, AND CASE CITATION ). And there is no indication in that decision that the foregoing evidence had been obtained from discovery that would negate and call into question the over 8 million claim.

Dr. Klein's survey also demonstrates the misleading nature of the false claim that over 8 million units of Arthro-7 have been sold, that it is material, and that it directly influences purchasers' decisions to buy that product. (Ex. _)(QUOTES FROM THE REPORT).   Defendants themselves admitted that the claim that over 8 million units of Arthro-7 have been sold is material, and that purchasers rely upon this claim in deciding to buy Defendants' products. (Ex. __, Mina Shariff dep., pp. ___).

Once again, Defendants' Motion has merely framed a question upon which the parties' evidence differs:  *Were over 8 million botttles of Arthro-7 sold, or not?*  On the record before the Court, there is a genuine issue of fact, and summary judgment is improper. Indeed, on the current record, and given Defendants own admissions that they don't know how many units of Arthro-7 were sold before they bought the company in 2005 (Tuong's own deposition testimony, and Defendants' attorney's admissions in Defendants' memorandum of law (SDF No. __ and ASDF No. __), and failure to produce evidence or underlying records to prove the veracity of their database which admittedly contains many flaws (ASDF No. __), VBS is

-12-

entitled to have Defendants precluded from introducing any evidence that this statement is true.[8]

### 3.   Defendants Failed to Disclose Lead Content in Arthro-7.

In perhaps one of their biggest lies, Defendants' didn't even disclose to their own Arthro-7 marketing manager, that they have been sued by a consumer group in 201_ for failure to warn consumers of, among many other products, Arthro-7, that the products contained excessive levels of lead. According to that lawsuit, which the Arthro-7 marketing manager had never even been informed of – and which goes directly also to Defendants' intent in disregarding all warnings of their false advertising-- the consumer group had Defendants' products tested by leading independent laboratories, and gave Defendants ample written warnings to cure the problem, before filing suit. (ASDF No. ___; Ex. __).

See Ex. __, consumer group lawsuit against Defendants' for failure to disclose lead in violation of Prop. 65, and refer to ¶¶ detailing independent testing showing lead content.

VBS' own lead testing of Defendants' products also confirmed an improper, and non-disclosed, level of lead, which clearly misleads consumers , (Ex. __), as Defendants' marketing manager admitted would be critical to consumers. (SDF No. __; ASDF ___).

### 4.   Defendants' False Claims Concerning Allegedly Independent Clinical Studies, Conducted Improperly on Too Small A Sample, Relied on To Prove Illegal Health Benefits Claims, Are Jury Issues

VBS contend that Defendants made further false statements when they cited alleged "clinical studies" as support for various health benefit claims. These

---

[8] This evidence, and other issues as to which Defendants should not be allowed to present evidence or raise certain issues at trial, will be covered in motions in limine to be heard at the pre-trial conference in this case.

-13-

kinds of claims are also prohibited by the FTC. Specifically, Defendants falsely portrayed certain studies as being independent, with no affilation with, or financial sponsorship by, Defendants.  However, discovery has revealed that Tuong or Robinson, the manufacturer, controlled or influenced the clinical studies, through DRM, apparently not a separate entity but merely a part of Defendant Robinson-Pharma. (ASDF No. __; SDF No. __).

Defendants' involvement is spelled out in detail, including evidentiary allegations, in the class action (not certified later) case, Aren Hatamian et al v. Robinson-Pharma et al, against Defendants filed in 2017 (or 16?) **(Ex. 75),** as to why the clinical studies did not support the asserted benefits, nor their being "clinically proven." For example, DRM apparently had people running or designing the clinical studies in China, but DRM is really part of Robinson, or controlled by Tuong, and doesn't even seem to be a separate Cal. Corp. (See Ex. 75, ¶¶ __ -__). And others independently confirmed DRM's role in these clinical studies in China. The above article on the Supplement-Geek.com web site says in part: "Both the placebo and Arthro-7 were provided by *Robinson Pharma*, the maker of Arthro-7. The study also mentions that 3 of the researchers *"are current or previous employees of **DRM Resources** which sponsored the project."* DRM Resources is a marketing company in California that appears to specialize in the health and wellness industry. Their website is DRMResources.com.

Interestingly, according to Whois.com, the person who registered the DRM Resources website is Tuong Nguyen, the same person who registered both the US Doctors Clinical site and Robinson Pharma site.  Essentially, Robinson Pharma sponsored the study.   (Ex. __). Defendants denied during depositions that DRM is part of Robinson, and claimed that didn't know who owned it, despite overwhelming evidence that Tuong does, and that it is not a separate company, but rather part of Robinson. (Ex. __,  Do dep., pp. __). (ASDF No. __).

-14-

Indeed the class action lawsuit (even if a class action was not later certified, as Defendants now seem to claim though they provided no documents about this suit at all), is itself evidence that the lead plaintiff was, as he claims in the suit, himself mislead by the Arthro-7 clinical testing and related claims. (ASDF __).

Further evidence that Defendants are engaging in false advertising is that the FTC sued Tuong's previous companies for false advertising (**Ex. 84**). Defendant Tuong signed the settlement with the FTC on behalf of all of his companies**, Ex. 85**, p. 29-31)) for a suspended $30 million fine) for EXACTLY the same kinds of things they are doing now, such as:  not disclosing **material connections with product endorsers, like Dr. Hahn**; touting benefits not clinically proven as true, and falsely implying independent groups doing things were actually were not neutral or independent. (**Ex. 85**)(FTC settlement in 2005, permanent injunction still in effect as to Tuong and his companies,[9] shows false advertising per se, violating an FTC permanent injunction against just such false advertising statements). (ASDF No. __).

Indeed, VBS hopes to introduce further proof from the FTC at trial on this violation of its injunction, as there is no indication they are aware of it yet, since the "self-reporting" period for Defendants was only 5 years. (Levin Decl., ¶¶ 4-8; Ex. 85).

Some of the relevant parts of the "Stipulated Final Order for Permanent Injunction and Settlement…" include:

1. Judgment (Ex. 85, p. 14, ¶ XIII(A))("Judgment is hereby entered against the Settling Companies, jointly and severally, in the amount of Thirty Million Dollars ($30,000,000…" (partially suspended on certain conditions)

2. Judgment (Ex. 85, p. 16-17, ¶ XIII(H))("The Settling Companies agree that…if they fail to timely and completely fullfull…other obligations set forth

---

[9] "IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order." (Ex., 85, p. 29).

-15-

in this Judgment, **the facts alleged in the Complaint filed in this matter shall be taken as true, without further proof, in any subsequent litigation filed by the Commission** to enforce its rights pursuant to this Judgment…". (emphasis added).

3. Ex. 85, p. 13, ¶ XI (A-B)("**IT IS FURTHER ORDER** that Settling Companies, **directly or through any corporation, partnership…or other device, and their officers, agents, servants, employees and all persons or entities in active concert or participation with them** who receive actual notice of this Order…are hereby permanently restrained and enjoined from: A. **Misrepresenting that any endorser of the product is not affiliated with or is independent from Settling Parties; and B. Failing to disclose, clearly and prominently, any material connection, where one exists, between Settling Companies and any endorser of the product**.)(emphasis added).[10]

4. Ex. 85, p. 10-11, ¶VI ("IT IS FURTHER ORDERED that Settling Companies … [same language as above] "are hereby permanently restrained and enjoined **from misrepresenting, in any manner, expressly or by implication, that the formula for any product has been tested by scientists, researchers, or other medical professionals and found to be effective**." (emphasis added).

5. Ex. 85, p. 11, ¶ VII ("IT IS FURTHER ORDERED that Settling Companies … [same language as above] "are hereby permanently restrained and enjoined from making **any representation, in any manner, expressly or by implication, including the use of trade names or endorsements, that such**

---

[10] A "**material connection**" was defined as meaning "**any relationship that may materially affect the weight or credibility of the endorsement, including, but not limited to**: where the endorser any direct or indirect ownership interest in any defendant corporation or its subsidiaries or affiliates, or **receives a royalty or percentage of sales of the endorsed product**; or the endorser is an employee, agent … officer, director, or shareholder of any defendant corporation or its subsidiaries or affiliates." (emphasis added).

-16-

**product is effective in the cure, treatment, mitigation, or prevention of any disease unless the claim is true, non-misleading and**, at the time it is made, Settling Companies **possess and rely upon competent and reliable scientific evidence that substantiates the representation**."

6. Ex. 85, p. 11, ¶ VIII ("IT IS FURTHER ORDERED that Settling Companies … [same language as above] "are hereby permanently restrained and enjoined from **misrepresenting, in any manner, expressly or by implication, the existence, contents, validity, results, conclusions, or interpretations of any test or study**." (emphasis added).

7. Ex. 85, p. 12, ¶ VIII ("IT IS FURTHER ORDERED that Settling Companies … [same language as above] "are hereby permanently restrained and enjoined from **misrepresenting, in any manner, expressly or by implication, that:**

   a. **The product has been independently reviewed or evaluated; or**

   b. **Any advertisement for the product is not a paid advertisement.**
   (emphasis added).

A number of the permanent injunction provisions specifically applied to making claims that  various products were "**clinically proven to**…" do such things as "lower" a health condition, "cure" anything, "prevent" health conditions or diseases, "enable" such things as longevity or weight loss. (Ex. 85, pp. 6-10) including ¶ I-V. One provision, ¶ I(D), for example, permanently enjoined any type of representations that a product "Is clinically proven to eliminate or cure allergies…".  One such provision specifically titled "**Use of Endorsements,**" dealt with any type of misrepresentation that the product has been endorsed by any expert or group unless various conditions were met, including that the endorser has the actual expertise represented (here consumers thinks Dr. Hahn, a podiatrist, is actually a medical doctor, though he is not, and that is not being paid for his endorsement, though he is), and the endorsement must be "**substantiated by an objective and valid evaluation or test using procedures generally accepted by experts in the**

-17-

**relevant science or profession to yield accurate and reliable results,** and the
endorser has "a reasonable basis" for the endorsement. Ex. 85, pp. 12-13, ¶ X ).

Defendants have violated all of these injunctive provisions, which, despite
their protests, clearly apply to them. Because they are enjoined by this FTC
permanent injunction from what they are doing, Defendants' obligations not to
engage in false advertising, and the types of things that constitute false advertising,
are legally **heightened and enhanced** They cannot, for example, do things that
others, who were not so enjoined, can do. All of this is a jury issue, including
whether their current Arthro-7 is false advertising in violation of the FTC's
permanent injunction that harms not just consumers, but competitors, like VBS.

Further evidence of this false advertising claim being disputed is set forth in
the ASDF (Nos. ___ __, an d___), including: 1) Dr. Klein's survey; 2) articles
showing the bad reputation of Chinese studies of this type (Carlsen Decl., Ex. __),
which Defendants spin as being more based on the work of a UCLA researcher (Ex.
___); and 3) FTC's rules and regulations, and FDA restrictions, prohibiting dietary
supplement manufactures and distributors from making these kinds of claims. (ASDF
¶___).  The Klein expert report also establishes that the "Clinically Proven" claim is
misleading, as the implication is that the studies were conducted at UCLA, or by a
UCLA researcher, not in China among a very, very small sample of patients. And
Defendants' advertising is also misleading because it fails to disclose that the
"Clinical Proof" was "published" in a pay-to-play online "journal." (ASDF ¶___).

The law is clear that such issues as how clinical studies are conducted,
and then the results marketed, must comply with numerous strict scientic and other
requirements, in order not to constitute false advertising. For example, courts have
consistently found or upheld that double-blind, randomized, placebo-controlled trials
("RCTs") are required to provide adequate substantiation for the truthfulness of
health-related claims..  See, e.g., *Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d at 303
(noting double-blind, placebo-controlled human studies to substantiate health-related

efficacy claims); *Nat'l Urological Group*, 645 F. Supp. 2d at 1202-03 (accepting undisputed expert testimony that erectile dysfunction claims require well-designed, placebo-controlled, randomized, double-blind clinical trials for substantiation); ***FTC v. Braswell*, CV 03-3700 DT, 2005 U.S. Dist. LEXIS 42976, at \*35 (C.D. Cal. Sept. 26, 2005)[11] (by offering unrefuted evidence that the standard to substantiate claims for various health-related products should be double-blind, placebo-controlled tests, Commission offered sufficient evidence to withstand summary judgment**); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1274 (S.D. Fla. 1999) (requiring "a double blind study of the combination of ingredients used in" the defendants' weight loss product for claim substantiation); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1097-98 (9th Cir. 1994) [\*54]  (placebo controlled study needed for hair growth product); *Removatron*, 884 F.2d at 1498-1500 (double-blind clinical test needed for hair removal device performance claims); *FTC v. Sabal*, 32 F. Supp. 2d 1004, 1008-09 (N.D. Ill. 1998) (rejecting a study as inadequate substantiation, in part, because it was not blinded or placebo-controlled); *FTC v. Cal. Pac. Research, Inc.*, No. CV-N-88-602, 1991 U.S. Dist. LEXIS 12967, at \*12-13 (D. Nev. Aug. 27, 1991) (only placebo-controlled, double-blind clinical studies meet "the most fundamental requirements for scientific validity and reliability"); *Schering Corp.*, 118 F.T.C. 1030, 1080, 1115-16 (1991) (Initial Decision) (weight-loss and generalized health

---

[11] Quite ironically, this is the very case against the Defendants' predecessors by the FTC for false advertising of their products, including Arthro-7. (Ex. 84). Defendants Tuong signed the FTC Settlement on behalf of all parties (Ex. 85) prohibiting all such false advertising, but now is right back at it with his new companies. ((ASDF ¶___). The FTC's permanent injunction includes Tuong personally, as an officer and director of the previous enjoined companies, and is being violated by Defendants' actions complained of here. Tuong claimed at his deposition that: 1) this permanent injunction no longer was in force; 2) he and his new companies were not bound by it; and 3) he and his new companies are not violating the FTC injunction. But, 1) it is, 2) they are, and 3) they are. (ASDF ¶___).

benefit claims for a high fiber supplement required "substantiation by two well controlled clinical trials," which were described as double-blind, placebo controlled); Thompson Med. Co., 104 F.T.C. at 822 (requiring "two well-controlled clinical tests" for pain relief claims for a skin cream).

The need for RCTs as substantiation is particularly evident when the advertisements tout medical studies purporting to demonstrate specific benefits. See *QT*, 448 F. Supp. 2d at 962 ("[W]ith medical, health-related claims, a well-conducted, placebo-controlled, randomized, double-blind study, the gold standard, should have been conducted. . . . Defendants would not be required to have a gold-standard study to substantiate the Q-Ray bracelet if they did not make such a strong, medical claim"). Here, Respondents themselves have asserted that one does not know that an antioxidant product is efficacious until one finds "measurements that are medically meaningful" through clinical testing on humans. (See CCFF PP 491, 1122).

Defendants' claims that the specific health and medical claims it makes on its package and in advertising about Arthro-7 are not "mere puffery" or simply "commendatory" language as Defendants contend (Memo, p. 23-24), but specific, factual, and material to consumers, false and misleading statements upon which Defendants' own purchasers admittedly rely in buying Arthro-7 rather than competitors' products, including JN-7 Best (Ex. 175, Shariff dep., pp. ___; Dr. Klein's expert report).

Here, Defendants' contend factually that their recent clinical studies were done properly and actually and properly support the (illegal under FTC and FDA rules, see, e.g., Ex. 187) health benefits claims made in Defendants' advertising. (Memorandum, p. 23-24)(" However, substantial evidence (see, e.g. Dr. Klein's expert report; Ex. 75; negates those assertions, requiring a decision by the fact finder. The fact that Defendants' Arthro-7 contains too high a level of toxic lead as an ingredient (see Ex. 123 and Ex. 76, consumer group lawsuit in which plaintiff did

-20-

its own independent lead testing of many of Defendants' products, including Arthro-7, finding excessive lead, and warned Defendants who failed and refused to comply with Cal. Prop. 65 by warning consumers as legally required of the lead content, and Phan dep., pp. ___).

At trial, VBS expects to present testimony as to these and other details of why the clinical studies are flawed, not independently conducted, the true source concealed by Defendants (DPR, part of Robinson or Tuong controlled or owned), illegal health benefits claims made in violation of FTC and FDA rules, the sample population too small to be relied upon for the findings and the way that Defendants market the clinical studies as "clinically proving" these claims, and that these claims are in violation of the FTC's permanent injunction against Tuong (and his new companies). ((ASDF ¶___; Levin Dec., ¶ 4-7). In fact, VBS hopes to have the FTC provide evidence and testify at the trial, and will be actively seeking their assistance, advice, guidance, and cooperation, including for Defendants' violation of the FTC permanent injunction, with its attendant $30 million fine to Defendants). (*Id.*). <u>After all, Defendants' intentional lies about their products hurt not only their competitors like VBS, but also the consumers who buy them based on such lies.</u>

### 5.    Defendants Falsely Represented That Podiatrist John Hahn Was a Medical Doctor With No Financial Relationship to Arthro-7.

VBS further contend that Defendants have falsely stated that Arthro-7 is endorsed by a medical doctor, John Hahn, who has no financial relationship to Defendants.  In reality, as Defendants admit in their Answer to the SAC (Dkt. 44, ¶ _), Hahn is a compensated "spokesperson" for Arthro-7. VBS have submitted undisputed evidence, in the form of the Klein survey, that consumers of Arthro-7 are misled because they do not know of this compensation and material connection, which, if they knew of it, would substantially decrease their likelihood of buying Arthro-7. (Ex. ___, pp. ___.)

-21-

Defendants have also misled consumers by suggesting that Dr. Hahn is a medical doctor, as opposed to a podiatrist.  (Ex. 140 and Phan Dep., pp. __)    In fact, even some of the Defendants' marketing team members had no clue what the initials, like DPM, meant on the advertising in small letters, or that this means a podiatrist, or that podiatrist was not a medical doctor (Ex. __, Phan dep., pp. __).  If some of Defendants' own Arthro-7 marketing team members don't realize from their ads that Dr. Hahn is not a medical doctor, but a podiatrist, surely a reasonable jury can infer that consumers are actually misled by Defendants' advertising. And Dr. Hahn also has a contract whereby for products he develops for Defendant (they claim he didn't develop Arthro-7 however), he gets percentage of profits, and this connection is disclosed nowhere in the packaging (Ex. 120) or ads (see, e.g., Ex. 3, 4, 5, other ads and website materials, such as Ex. 60-65, 67, 71, 72, 74, 79, 124 ).(ASDF No. __; SDF No.__).

And further evidence about Dr. Hahn, again never disclosed by Defendants, is that he currently is not even licensed as a DPM or a podiatrist in the state where he lives, Oregon, or in California. (ASDF ¶___).  Seems like VBS learns of a new false advertising statement on a regular basis, even without Defendants' cooperation in discovery, which is one reason why the  SAC's false advertising claims were broadly constructed to include not just specific known false or misleading statements, but new ones learned of during discovery or otherwise. (Dkt. __, SAC, ¶¶

None of this new evidence even existed when the Ninth Circuit, upholding this Court's finding that these claims were not false on their face, indicated that VBS needed to develop further evidence to show that the claims were misleading consumers, just as VBS has done. (Dkt. 83): "Nutrivita's advertising statement, "Doctor Recommended," however, is not literally false, and VBS provided no evidence to substantiate its claim that the statement would be misleading to the public."

-22-

Further, the advertisements themselves are evidence of the false and misleading nature of these claims, and non-disclosure of material facts, as the verified SAC (Ex. 92, also Dkt. 39) itself details in terms of specifics set forth in Defendants' own advertisements. (Dkt. 39, ¶¶ __-__, and Ex. 3-5, and see list above), such as the white coat "doctor" looking uniform worn by Hahn, the constant references to his surgical background, and other detailed statements set forth in the SAC. (Dkt. __, para __).  (SDF No. __; ASDF No. __).

The Internet also contains evidence that Arthro-7 advertising about Dr. Hahn is misleading and confusing even to professionals who investigate and review Defendants' Arthro-7 product.  (ASDF No. __). Some of these are attached to the declaration of William Carlsen, the results of recent Internet searches, such as Ex. __. For example,  an article on a web site called Supplement-geek.com at the page: "Arthro-7 And Arthritis: Detailed Review Of Ingredients (UPDATED 2017) Supplement-Geek.com," discloses that the author is confused into thinking that Dr. Hahn may be a medical doctor (M.D.) as shown by this language:

"Who Is Dr. John Hahn, MD, ND? Like Dr. Pavone above, Dr. Hahn is also featured on an Arthro7 infomercial.e is a foot and ankle surgeon. He is also a doctor of naturopathcic medicine (ND)."  However, in fact, Dr. Hahn is only a podiatrist, and not a Medical Doctor, or MD. Further evidence that Defendants are falsely advertising Dr. Hahn and misleading consumers is found in Cal. B&P § _ (Ex. __) which prohibits podiatrists from calling themselves or holding themselves out as medical docters.

Further evidence on this factual issue is the FTC's Regulation (cited in our Appeal brief on the preliminary injunction), Section 255.3 (WILL, CHECK I THOUGHT THIS WAS CFR, WHAT"S THE EACT SOURCE), **Ex. 82** (Note, need Decl. to authenticate this and some other documents) specifically stating the circumstances under which someone is falsely or misleadingly portrayed as a medical

-23-

doctor in an advertisement.  QOUTE HERE. This regulation is directly applicable to Defendants' use of Dr. Hahn in their ads.

In addition, another FTC Regulation, CFR 255 (Ex. __ to __ Carlsen Decl.) is evidence of the misleading, and non-disclosed "material connection" between Dr. Hahn and Defendants, setting forth specific examples, directly on point here, of what type of connections must be disclosed so that an advertisement is not misleading.

Other relevant evidence, and a statutory presumption as a result, is the California statute, Cal. B & P. Code Sec. ___, which provides that a podiatrist cannot hold themselves out to the public as a medical doctor. (ASDF No. ___)

Another example of evidence that consumers are misled about Dr. Hanh is the episode of Jerry Sienfeld, one of the most popular recent television shows of all time, (Get Wikipedia or Internet article) that demonstrates clearly that people do not know whether a podiatrist is a medical doctor, which Defendants seek to capitalize on their misleading advertisements. (Ex. __ to Carlsen Decl.)(containing the audio and visual portion from  that episode depicting Jerry and Elaine arguing over  whether her new boyfriend, a podiatrist, is a medical doctor.

**6.     Other Defendants' False Advertising By Defendants, Not Even Addressed in Their Summary Judgment Motion.**

Other false advertising by Defendants, VBS learned of, or confirmed, in discovery.[12] For example, Defendants misuse of the Arthro-7 trademark itself is

---

[12] Depositions didn't start till Nov. __ due to Defendants' objections to ALL discovery under CCP 2019. ___, AND specific objections (later all but 1 overruled or withdrawn) to each and every of VBS' 78 document requests sent to 5 different Defendants (Ex. __), delaying discovery for some 5 months, from when VBS served the deposition notices and document requests on May 22, 2017 until Oct. 26, 2017, the deadline ordered by Magisrate McCormick for Defendants to fully respond to all discovery requests and produce the requested documents. (ASDF No. __; Levin Decl., __).

misleading and false advertising because they don't own it or have any licenses from the owner, Tuong, to us it, except Defendants U.S. Doctors. As a result of this "naked licensing," the brand itself is probably invalid, and now owned by no one. Nor does Tuong personally exercise any quality control (Phan dep., ___; Do. dep., pp. __). (ASDF No. __).  Nutrivita misrepresents as having or being a laboratory, implying a scientific establishment which it is not. (ASDF No. __). Anything that will help mislead consumers, which, in the case of Arthro-7, is a target customer usually over 60 years old, and includes a submarket, the Vietnamese market in the U.S., where English is either a second language or not spoken. (ASDF No. __). Indeed, many of Defendants' key witnesses, including Tram Ho, Jenny Do, and Tuong Nguyen, insisted on Vietnamese interpreters for their depositions, though evidence shows that they understand and speak English very well, when they want to, such as in business dealings and otherwise. (ASDF No. __).  These are all older Vietnamese Americans who immigrated many  years ago from Vietnam, but unlike VBS' chairman and CEO, Joseph Nguyen, they claim they failed to learn English sufficiently to have their depositions taken in that language.

The lack of disclosure about the lead in Defendants' Arthro-7 and other products, was not known at the time of the SAC, but only independently learned of later.  (Levin Decl., __). These documents and information should have been, but was not, disclosed of during discovery, as VBS requested copies of all such lawsuits, and Magistrate McCormick ordered that any such documents be produced. But Defendants chose to hide these 2016 and 2017 lawsuits from VBS, just as they had done from their own employees in charge of marketing and marketing materials for Arthro-7. (ASDF __, and ____).

### 7.   VBS Were Damaged by Defendants' False Advertising.

There is ample evidence that the parties' are direct competitors, with their respective "herbal" joint compound products, incuding in both: a) the Vietnamese market in the U.S., and 2) the general market for such products. (SDF No. __; ASDF

__). Even Defendant admits that their Arthro-7 and JN-7 Best products are sold in the same actual Vietnamese stores in "Little Saigon" in Orange County, side by side on the same shelves, with no recalled third parties' products on those same shelves. (ASDF No. __). Both are also marketed directly to the Vietnamese market in the U.S. and in both English and U.S. newspapers and magazines, and on both Vietnamese and English television stations. (ASDF __). Both have marketing materials in English and Vietnamese, though VBS' packaging is sold only in English. (ASDF __). Defendant Jenny  Do and her Nutrivita, Inc. Arthro-7 distributor, target solely the Vietnamese market, and Defendant Tuong expressly gives her the Arthro-7 products for free in exchange for her promoting Arthro-7 in the Vietnames market. (Ex. __)(ASDF __). However, both Defendants and VBS do not limit sales or marketing to the Vietnamese market, and also sell more broadly to the general population who purchase this type of joint compound. (ASDF ___).

    So direct and immediate was the impact of VBS' entry into the marketplace with JN-7 Best on Defendants' market, that Defendant Tuong caused one of his non-exclusive licensees, Nutrivita Labs, Inc. to send a demand that VBS immediately stop all sales of JN-7 Best or he would sue them. Not just change the packaging or labels. Not just change the (clearly non-infringing) name JN-7 Best. But stop all sales.  And do it within just 3 days. That's what the demand letter said. (Ex. __). Tuong confirmed in his deposition that was his real purpose in sending the letter and immediately suing VBS. (Tuong II dep., pp. __). Basically, to put a competitor out of its new business of competing with Arthro-7, the largest selling product for at least some of the Defendants. (ASDF, No. __).

    It is clear from the facts and evidence in the record that Defendants sales via false advertising of a directly competing product, one sometimes sold by sold with VBS' competing "herbal" joint compound, in the same Vietnamese marketplace, and to the general population in the U.S. for such products, takes away sales from VBS by diverting them to Defendants. Given Defendants' own admissions that their

-26-

advertising and marketing claims complained of are very important to the consumers decisions to buy Defendants Arthro-7 products',  and Dr. Klein's survey evidence, some of which in the general marketplace, and perhaps all in the vast majority in the Vietnamese marketplace, would otherwise have gone to its direct competitor, VBS. (ASDF __; SDF __). Moreover, VBS does in fact engage in comparative advertising with Defendants, with VBS claiming that its JN-7 Best does not contain the same gelatin and animal products as Arthro-7 due to the former's non-capsule form. (ADSF__; Ex. ___(public announcement calling for direct comparision); Nguyen PI Decl., para. ___).

VBS is also damaged in other ways, including the barrier to entry into both the Vietnamese and general marketplace which Defendants erected by their combination and pattern of unfair competition tactics, including false advertising to obtain and maintain their market share in either the Vietnamese or general markets for Arthro-7 and JN-7 Best "herbal" joint compounds. (ASDF ___; SDF ____).

Defendants cite no law, and there is no legal requirement, that in order to recover any damages, VBS must prove that only it and Defendants are in the marketplace, with no other competitors. Such a theory would essentially eliminate damages in false advertising cases.  Ample case law demonstrates that VBS does not have to show a "but for" or 1:1 relationship of the products sales, in order to recover actual damages for false advertising claims by a direct competitor, let alone to recover Defendants' profits on an unjust enrichment/disgorgement theory.

Defendants' claim that because VBS' sales of JN-7 "increased dramatically during the period that the allegedly false advertising of Arthro-7 took place" is the stuff of nonsense. (Memorandum, p. 24). VBS did not even enter the market with JN-7 Best until about ___, 2013, and Defendants immediately sued them. (ASDF __). Defendants' false advertising occurred long before then, and has continued unabated since then. Nothing has stopped Defendants' false advertising, not FTC lawsuits and permanent injunctions, other lawsuits for the same clinical study

VBS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

misrepresentations (Ex. __, 2016), excessive lead, Ex. __, 2017), or this lawsuit in August 2016 (Dkt. __) or VBS' efforts to obtain cessation of the false advertising before filing this suit (ASDF __; Joseph Nguyen Decl., __). VBS can recover for such damages as lost sales or profits at any time, regardless of whether its sales go up or down in any given year or time period. CITE LAW, including from Einhorn article. Nor, under federal and California law, does Defendants' false advertising need to be the ONLY cause of damages for VBS to recover its damages.

**A.**    **This Court Should Deny Summary Judgment as to VBS' Claim for Trade Dress Infringement.**

Defendants have not carried their burden of "establishing the nonexistence of a 'genuine issue'" with respect to VBS' Seventh and Eighth Counts for Trade Dress Infringement. *See Celotex Corp.*, 477 U.S. at 330.

First, a genuine issue exists with respect to whether the trade dress in question is nonfunctional.  The Ninth Circuit's ruling itself determined that VBS has presented sufficient evidence that it is likely to prevail at trial on this issue and claim. (Dkt. 83). (ASDF ¶___).

Second, a genuine issue exists regarding whether the Infringing Show's trade dress serves a source-identifying role, which, based on the Ninth's Circuit's ruling, which is law of the case, is akin to packaging and can be inherently distinctive. The declarations of Lam, Joseph Nguyen, other VBS employees, in connection with the preliminary injunction motion, and the verified SAC, virtually undisputed on this point and with no contrary evidence of any type presented, clearly lead to a triable issue of fact.

Third, a genuine issue exists regarding whether there is a likelihood of consumer confusion.  No survey is required to prove likelihood of confusion. Here, all the factors under the *AMF v. Sleekcraft* test favor likelihood on this intensely factual consideration, including the evidence showing actual confusion, the essential identity of the trade dresses, the identity of the services (jewelry auction shows on

Vietnamese TV in the same location, about a block from each other, targeted to the same marketplace, the Defendants' undisputed intent and admitted hiring of Tram Ho, the first show's co-host, and VBS' same vendor, the use of the same (trade secret) camera technique, the same background, the same marketing channels, and so forth. Indeed, Jenny Do and KVLA put Tram Ho in charge of creating this "new" infringing Show for Defendants, so she just did exactly what she had been doing at VBS TV and set up the same show, deliberately confusing customers of VBS, for which KVLA and Jenny Do gave her carte blanche. (ASDF ¶___).

> **B.** **Genuine Disputes of Material Fact Exist Regarding VBS'**
> **Claim for Relief for Misappropriation of Trade Secrets.**

Similarly, Defendants have not carried their burden of showing that no genuine issues of fact exist with respect to the Fourth and Fifth Counts for misappropriation of trade secrets. (Memorandum, p. 4, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 2556 (1986).) Defendants have not carried that burden  The SDF and (ASDF ¶___) make this very clear, as does the Ninth Circuit's ruling that VBS is likely to prevail on the merits of these claims at trial, in its Order reversing and remanding the order denying preliminary injunction the trade secret claims on the grounds Defendants still assert, that these are not trade secrets.

> **C.** **Genuine Disputes of Material Fact Exist Regarding VBS'**
> **Claim for Relief for Interference With Contractual Relationships.**
> See SDF and the ASDF throughout.

> **D.** **Genuine Disputes of Material Fact Exist Regarding VBS'**
> **Claim for Relief for Interference With Prospective Economic**
> **Advantage.**

-29-

The facts showing this is a triable issue are set forth in the SDF and the ASDF throughout and also partially discussed in the opposition to Defendants' motion for judgment on the pleadings, and are incorporated herein. (SDF and ASDF ¶___).

It is immaterial whether the "agreements" were verbal or written, but Defendants' "trick" questions during Mr. Joseph's Nguyen's depositions made it unclear whether "agreement" included oral agreements and were construed as meaning solely written agreements by the witness. The facts show such verbal agreements and ongoing valuable economic relationships which would have continued uninterrupted and  long-term, but for Defendants' interference, which included more than the act of interference, but also such tactics as stealing confidential information, and offering slightly more money, knowing what VBS' employees were already being paid. (SDF  and ASDF ¶___).

**E.    <u>Genuine Disputes of Material Fact Exist Regarding VBS'</u>
<u>Claim for Relief for Antitrust Violations</u>.**

The facts and evidence set forth in the SDF and the (ASDF ¶___) clearly show that the fundamental facts relating to the anti-trust claims are substantially in dispute, and are sufficient to establish a conspiracy and the anti-trust violations alleged. The relevant market is defined clearly (and see the proposed TAC which also makes it even clearer than in the SAC, as being the Vietnamese market and what that is, as well as Defendants' attempt to fix prices, and put VBS out of business, by all working together toward that common, in the general marketplace for such "herbal" joint compound products as well as the Vietnamese submarket of that larger market. Dr. Klein's expert report also established the larger market for the parties' products. Of the Vietnamese market, of some 2 million plus living in the U.S. according to the 2010 census and other information (ASDF ¶___), only a much smaller percentage are the requisite age for the target marketplace, according to Defendants' own admissions (ASDF ¶___).

Of those, applying the smaller percentage indicated by Dr. Klein's expert report (approximately 25%) are in the market for joint compounds for arthritis or similar joint pains and ailments. Of that target market of perhaps 500,000 elderly Vietnamese in the U.S. who would buy such products, the relative percentages of the parties, and hence their approximate market share, can be determined by the parties' only sales volume, at least estimated. (ASDF ¶___).

Had Defendants provided their sales figures in a reasonable manner, including the data base reports that Magistrate McCormick ordered the parties to work out from Defendants' data base, the relative market shares, for the Vietnamese submarket, could have been extrapolated, but they did.  (ASDF ¶___). They should be estopped or precluded from arguing that Defendants' market share cannot be proved with reasonable accuracy, since they also falsely claimed there was no Vietnamese marketplace, and failed to prodoce any documents, or provide information requested in interrogatories, as to their market share for either the Vietnamese submarket or the larger general marketplace for such products. (ASDF ¶___).

**G.   Genuine Disputes of Material Fact Exist Regarding VBS' Claim for Relief for Unfair Competition.**

As Defendants raise no additional arguments or discuss any basis for this claim, other than to say "for the same reasons that the above claims fail," (Memorandum, p. 24, lines 7-8), no separate discussion is necessary for the unfair competition claims. For the same reasons VBS' other claims involved disputed genuine issues of material fact for trial, the unfair competition claims do as well.[13]

---

[13] However, as the discussion of the other claims makes clear, VBS' unfair competition claims are not merely "catch-all" claims (Memorandum, p. 25, lines 6-7),nor do Defendants cite any authority or fact or evidence for this proposition. Moreover, the unfair competition claims are separately discussed in connection with the opposition to Defendants co-pending motion for judgment on the pleadings, which VBS did and does request be treated as a motion for summary judgment, with consideration of the disputed material facts set forth in connection with the

-31-

### H. **Genuine Disputes of Material Fact Preclude Defendant Tuong and Jenny Do's Liability for VBS' Claims, and Defendants Never Raised This Issue or Even Requested, or Held, Any Meet and Confer Concerning It Before Filing Summary Judgment On This Ground.**

As discussed above (Introduction), Defendants have raised for the first time in their summary judgment motion on January 12 2018, an argument that Jenny Do and Tuong (nickname Tom) Nguyen, cannot be personally liable on VBS' claims. (Memorandum, p. 25). This Johnny-come-lately claim, with no meet and confer, should not only be completely rejected, but sanctions considered for it even being filed, and at this late stage.

The facts clearly demonstrate the individual liability of these defendants, who personally participated in all the tortious conduct, made the decisions, controlled the other parties' actions, and, though not required for liability, are the alter ego[14] of their companies, which also failed to observe corporate formalities. (ASDF ¶___).

As the Ninth Circuit has said:
> We affirm the district court's holding that Vachani is **personally** liable for Power's actions. A "**corporate** officer or director is, in general, **personally** liable for all torts which he authorizes or directs or in which

---

opposition to this summary judgment motion. Those arguments are incorporated by reference, for the convenience of the Court, rather than repetition of them here.

[14] Moreover, Defendants' argument that Plaintiff has not alleged sufficient facts to show "alter ego" (Memo at 25)] misses the point. When an individual personally participates in the infringement, or controls or directs the infringing acts, he is liable regardless of whether he is the "alter ego" or the corporate veil is pierced. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.* 806 F. 2d 1565, 1578-79 (Fed. Cir. 1986) ([I]t is well settled that corporate officers who actively aid and abet their corporation's infringement may be personally liable for inducing infringement under § 271(b) regardless of whether the corporation is the alter ego of the corporate officer." See also, *Wechsler v. Macke Interne. Trade Inc.* 327 F. Supp. 2d 1139, 1148, (C.D. Cal. 2004); *Wordtech Systems, Inc. v. Integrated Network Solutions, Inc.* 799 F. Supp. 2d 1140, 1145 (E.D. Cal. 2011).

-32-

he participates, notwithstanding that he acted as an agent of the **corporation** and not on his own behalf." *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir.1996) (internal quotation marks omitted). Cases finding "**personal liability** on the part of **corporate** officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct, or the 'central figure' in the challenged **corporate** activity." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 523 n.10 (9th Cir.1989) (internal quotation marks and ellipsis omitted).

*Facebook Inc. v Power Ventures, Inc.,* 2016 WL 3741956, *9 (9th Cir. 2016).

Here, the verified SAC claims, and discovery has proven, that Tuong Nguyen, and Jenny Do, are the guiding spirits and central figures behind their respective but separately controlled corporations, and personally participated in, controlled, and directed, the wrongful acts giving rise to this lawsuit. (ASDF ¶___).  Furthermore, while Defendants now claim that "Tuong…has no affiliation with the [sic] KVLA," (SUV, ¶ 95), this is not only irrelevant to whether Tuong controls the other defendants (besides KVLA and Jenny Do), but also untrue, (SDF, ¶95; ASDF ¶__),  VBS claims, though Defendants deny.

However, solely for purposes of summary judgment on such claims as the conspiracy, anti-trust, and related claims, VBS accepts Defendants' version of the truth, making KVLA, Do, and Nutrivita, Inc., co-conspirators with the other Defendants who are not part of the same economic enterprise, but their own independent economic base, and are not controlled by them, proving the conspiracy and anti-trust claims. (ASDF ¶ 67).

And this disputed relationship, or lack thereof, is also directly relevant to the conspiracy and anti-trust claims, as discussed above, of which Tuong and Do are the architects and planners.

### III. CONCLUSION

-33-

For all of the foregoing reasons, Defendants' summary judgment motion should be denied on all claims, as the material facts are in dispute, and these are issues for the jury to decide.

DATED: January 22, 2018            LEVIN AND DICTEROW

By: */s/ William E. Levin*

William E. Levin
Attorneys for Plaintiff VBS
DISTRIBUTION, INC. AND VBS
TELEVISION, INC.

VBS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT