LEVIN & DICTEROW
William E. Levin, SBN 104631
Steven M. Dicterow, SBN 89371
668 N. Coast Highway, Suite 1264
Laguna Beach, CA 92651
williamlevin@hotmail.com
(949) 613-5131

Attorney for Plaintiffs,
VBS Distribution, Inc., and VBS Television, Inc.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VBS Distribution, Inc., a California corporation, and VBS Television, Inc., a California corporation | **Civil Case No.** **8:16-cv-01553-CJC-DFMx** Hon. Cormac J. Carney |
| Plaintiffs, | |
| v. | **PLAINTIFF VBS DISTRIBUTION, INC. AND VBS TELEVISION, INC.'S THIRD AMENDED COMPLAINT FOR: 1) UNFAIR COMPETITION, 2) FALSE ADVERTISING, 3) THEFT OF TRADE SECRETS, 4) TRADE DRESS INFRINGEMENT, 5) ANTI-TRUST AND RESTRAINT OF TRADE [ALL UNDER FEDERAL AND STATE LAW], , 6) UNFAIR TRADE PRACTICES, 7) INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS, 8) INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS, 9) BREACH OF** |
| Nutrivita Laboratories Inc., a California corporation, Nutrivita, Inc., a California corporation, US Doctors' Clinical, Inc., a California corporation (or dba), Robinson Pharma, Inc., a California corporation, KVLA, Inc., a California corporation, Tuong Nguyen, an individual domiciled in California, Tram Ho, an individual domiciled in | |

California, Jenny Do aka Ngoc Nu,

an individual domiciled in California,

and Does 1-10 Inclusive

      Defendants.

**FIDUCIARY DUTY,  AND 10) CIVIL CONSPIRACY, AND OTHER RELIEF**

**DEMAND FOR JURY TRIAL**

**VERIFICATION OF COMPLAINT**

VBS Distribution, Inc. ("VBS Distribution"), and VBS Television, Inc, ("VBS Television"; collectively or individually referred to as "Plaintiffs") by and through their counsel, alleges for their Complaint against Defendants Nutrivita Laboratories, Inc., Nutrivita, Inc., US Doctors' Clinical, Inc., Robinson Pharma, Inc., KVLA, Inc., Tuong Nguyen, Tram Ho, and Jenny Do ("Defendants") as follows:

## NATURE OF THE ACTION

1.    This is an action for unfair competition under federal and California law, false advertising under federal and California law,  theft of trade secrets under federal and California law,   trade dress infringement under federal and California common  law,  anti-trust and restraint of trade under federal and California law,  and related state claims, based on Defendants' intentional and repeated pattern of unfair competition and false advertising, and the other wrongful acts of Defendants alleged herein.

## THE PARTIES

### Plaintiffs

2.    Plaintiff VBS Television, Inc. is a corporation, organized and existing under the laws of the State of California, and having a principal place of business at 16331 Gothard St., Suite B, Huntington Beach, California 92647.

3.     Plaintiff VBS Distribution, Inc., aka VBS Home Shopping, is a corporation, organized and existing under the laws of the State of California, and having a principal place of business at 16331 Gothard St., Suite B, Huntington Beach, California 92647.

### The Vietnamese Dietary Supplement Defendants ("the Supplement Defendants")

4.     On information and belief, Defendant Nutrivita Laboratories Inc., (hereinafter referred to as "Nutrivita Labs" or sometimes just "Nutrivita"), is a corporation organized and existing under the laws of the state of California, and having a principal place of business at 2781 W. MacArthur Blvd, Suite 305, Santa Ana, California 92704, and does business in this judicial district, including Orange County. Its listed address in the Secretary of State's corporate records is the same address as the address for its registered agent for service of process, Mr. Daniel Do-Khanh, who was also its counsel of record in the first lawsuit (as described below).

5.     On information and belief, Defendant Nutrivita, Inc., (hereinafter referred to sometimes just as "Nutrivita"), is a corporation organized and existing under the laws of the state of California, and having a principal place of business at 7291 Heil Ave., Huntington Beach, California 92647, and does business in this judicial district, including Orange County. Both Nutrivita Labs and Nutrivita, Inc. are sometimes referred to herein collectively as Nutrivita, Defendants during discovery claimed that  these companies, Nutrivita Laboratories, and Nutravita, are entirely unrelated entities, with no economic or other unity or control between them, or between, on the one hand, Jenny Do, KVLA and Nutrivita, Inc., which Jenny Do owns and controls and which are her alter egos, and the other Supplement Defendants, on the other hand, including Tuong Nguyen, Robinson-Pharma, US Doctors' Clinicial, and  Nutrivita Labs.. Its registered agent for service of process is Cindo Ho, who, upon information and belief, is the daughter of Defendant Jenny

Do, who is also the current or past mistress of Defendant Tuong Nguyen. Defendants, including Tuong Nguyen and Jenny Do, previously admitted, numerous times, in their original Answer to the Second Amended Complaint, that Jenny Do was the wife of Tuong Nguyen, then amended their Answer to claim she was not his wife. At their depositions in this case, Tuong Nguyen admitted that he has been been married to a different wife for over 40 years, and blamed his lawyer for the "mistake" of admitting that Jenny Do was his wife currently. It was also admitted that Tuong Nguyen pays the mortgage payment on Jenny's Do's house in Orange County worth approximately $6.5 million in which she lives with her daughter only, allegedly, and that he visits her regularly. Since Jenny Do, Nutrivita, Inc., and KVLA, all claim under penalty of perjury that they are completely separate economically, have separate interests and economic interests and ownership, and are not controlled by, but are independent of, the other Supplement Defendants, they, Jenny Do, Nutrivita, Inc., and KVLA, are identified herein as third party co-conspirators with the other Supplement Defendants, in connection with the conspiracies alleged herein. The conspiracies include, but are not limited to the following concerted actions and plans, and with the specific and general intents to restrain trade in the Vietnamese marketplace, and in the general marketplace, and to erect barrier to entry by VBS into those marketplaces, particularly for the directly competing Arthro-7 and JN-7 Best herbal arthritis joint compound products:

A. To put VBS out of business, and eliminate or take away all of its employees.

B. To prevent VBS from competing in the Vietnamese marketplace, as identified herein (or in the general marketplace for such herbal joint compounds for arthritis directed primarily to the elderly population), specifically including selling the directly competing JN-7 product at all, and-- as admitted by Defendants during discovery to exist and to be a target

marketplace for their Arthro-7 product,  --the Vietnamese marketplace, among others,  a marketplace to which the Supplement Defendants specifically target and identify and advertise including on Vietnamese television across the U.S. and in leading Vietnamese newspapers, and on the front covers and spines and other prominent locations, on Vietnamese telephone directories distributed in large Vietnamese communities like "Little Saigon,"

C. To sue VBS to stop it from directly competing with the Defendants in the Vietnamese marketplace for Arthro-7 and JN-7 Best, or otherwise, including filing claims held to be frivolous, and for the admitted purpose of preventing VBS from selling JN-7 Best products, regardless of packaging or trademark, in direct competition with the Supplement Defendants, and, even as to any non-frivolous claims, filing them primarily as sham litigation for the primary purpose of injuring VBS and penalizing them and restraining trade by VBS' sales of the directly competing herbal product, JN-7 Best. Both parties position themselves in the Vietnamese marketplace, and in the general marketplace, as "herbal" remedies, for the identical health ailment with the directly competing products. While both claim to be herbal remedies, Defendants falsely advertise Arthro-7 as being "100% herbal ingredients," or words to that effect, while VBS does not. The parties engage in direct and implied comparative advertising with each other and their respective Arthro-7 and JN-7 Best products, and Defendants seek via their conspiracy to preclude VBS from engaging in such comparative advertising, or to truthfully point out the true benefits and differences of the parties; products. On information and belief, discovery has not shown any other competitors in the Vietnamese marketplace for these particular products, and though requested to identify the size of the marketplace, and its competitors, and its market

share, during discovery, Defendants failed and refused to do so, though they admitted that the only competitive product they are aware of in the Vietnamese marketplace, which they admit is sold side by side, and to the same consumers, is VBS' product.

D. To sue VBS, and to gather evidence for such a lawsuit, via Defendant KVLA, based on VBS truthfully advertising that it was the prevailing party in the first lawsuit between the parties, after Defendants advertised and promoted on their web site and elsewhere that VBS was sued for infringing on Defendants' rights in the Arthro-7 product, and requesting consumers to directly compare the parties' two products and determine for themselves which product was better for them. Tuong and Ho, for themselves and their respectively controlled and owned companies, admitted during discovery to have planned such a new lawsuit against VBS, and to have taped via KVLA, as evidence for such a suit, the public announcement and advertisement by VBS of the foregoing, and Do in fact caused KVLA to make such a tape, though she failed to produce it in discovery.

E. To fix prices for Arthro-7, both vertically and horizontally, between the manufacturer, and as to all direct distributors of the products, as well apparently as at the retail level, as Defendants admitted during their depositions).

6.     On information and belief, Defendant US Doctors' Clinical, Inc. (hereafter referred to as "US Doctors" or "US Doctors' Clinical"), is, or holds itself out as, a corporation organized and existing under the laws of the state of California, and having a principal place of business in Orange County, which is or was listed as 15568 Brookhurst St., Ste. 374, Westminister, CA 92683, and does business in this judicial district, including Orange County. In the alternative, upon information

and belief, it is a dba and/or trademark for one of the other Defendants herein, or otherwise connected to some of the other Defendants herein. It is or was listed as the distributor for some of the Arthro-7 products sold by Defendants, and is held out by Defendants to be an entirely independent entity from the Defendants.

7.     On information and belief, Defendant Robinson Pharma, Inc. (hereafter referred to as "Robinson Pharma"), is a corporation organized and existing under the laws of the state of California, and having a principal place of business at   3330 South Harbor Blvd., Santa Ana, California 92704, and does business in this judicial district, including Orange County. Robinson Pharma is held out by Defendants to be an entirely independent entity from the Defendants.

8.     On information and belief, Defendant Tuong Nguyen (hereinafter referred to as "Tuong"), is an individual domiciled in California, and residing in this judicial district, and is the primary or sole shareholder and owner and the driving force of some  of the other Vietnamese dietary supplement Defendants, as set forth above,  was but is not currently according to Defendants' claims, of KVLA, , and their chairman, president, and/or chief executive officer, controls them directly, and personally participated in, controlled, and directed, and/or induced, the wrongful acts complained of herein, and is the alter ego of said Defendants or some of them. Defendant Jenny Do-- who, together with her companies KVLA and Nutrivita Inc. which she owns and controls, and which are her alter ego, though these entities are, accordingly to Defendants' testimony, not in economic unity or control with Defendant Tuong and his companies—personally participated in, controlled, directed, and induced, the wrongful acts complained of herein, and she and Tuong are the guiding spirits and central figures in their respective Defendant companies.

9.     In some cases, Defendant Tuong is also the purported sole employee or person most knowledgeable of said defendants (see Ex. 14, and for example,

pages 7 & 50), according to his previous deposition testimony in the first lawsuit between some of the parties hereto ("Tuong deposition"). Attached as **Exhibit 14** are true and correct copies of selected portions of that deposition. (The defendants Nutrivita Laboratories, Nutrivita, Inc., US Doctors' Clinical, Robinson, Jenny Do, and Tuong, are collectively sometimes referred to as "the Vietnamese dietary supplement Defendants" or "the Supplement Defendants.").

## Alternative and Further Conspiracy Allegations About Defendants and Doe Defendants

10.     In the alternative, including but not limited to in connection with the "conspiracy" claim and the claims requiring a "conspiracy, combination, or contract" between the Supplement Defendants some of the named Supplement Defendants are allegedly, Defendants say, not owned or perhaps controlled, directly or indirectly, by Tuong. VBS  believes  some of the Supplement Defendants, based on Defendants' own admissions as stated above during discovery, including Jenny Do, KVLA, and Nutrivita, Inc., have the requisite separate "economic power and separate interests" to conspire with the other Supplement Defendants.

11.     In addition, some of the third party Doe defendants, who have conspired as set forth above and in other ways not revealed to VBS, since Defendants are the sole depositories of the information and oral agreements,  may not be directly controlled by Tuong, such as: 1) DRM Resources, a d/b/a of Alpha Health Research, the allegedly "independent" marketing company identified by Tuong in deposition as handling the marketing for Arthro-7; 2) the "doctor" – Dr. John Hahn -  apparently paid substantially for a long time to endorsee and market Arthro-7, and 3) vendors whom the Show Defendants intentionally usurped from VBS, knowing of the ongoing and valuable economic relationship while VBS' jewelry vendor for the Show who then appear in solicitations to VBS' customers to buy jewelry on the Infringing Show and promoting Arthro-7 to those same VBS

customers at the same time. (Ex. 6, and 17).

12.    Accordingly, VBS reserves the right, and currently conditionally intends, to amend this Complaint to conform to the proof and evidence, including the fruits of such discovery, and to add  additional facts disclosed during discovery. In addition, upon information and belief, Defendant Tram Ho has personally conspired not only with the Show Defendants, but also with the Supplement Defendants, to promote Arthro-7, both on the Infringing Show itself as the Supplement Defendants' primary dietary supplement in the Vietnamese niche marketplace – just as VBS' directly competing joint compound product - JN-7 Best - is its primary dietary supplement in that marketplace—but also by using trade secrets and confidential information stolen from VBS to solicit VBS' customers, with the specific knowledge and intent of both the Show Defendants and the Supplement Defendants,  by promoting  "a gift of a box of Arthro-7…if you purchase a piece of jewelry" [on the infringing Show]." (See Ex. 6 and Ex. 17), and in other ways. Upon information and belief, the conspiracy between Defendant Tram Ho to use VBS' trade secrets to promote Arhro-7 to VBS' customers, to unfairly compete with VBS, to falsely advertise the Supplement Defendants' Arthro-7 product on the Infringing Show itself, including promoting and highlighting the packaging and advertisements featuring the false and misleading statements about Arthro-7, was not only with the Show Defendants, but also with the Supplement Defendants as to the Arthro-7 product, and benefited both the Show Defendants and the Supplement Defendants.

### The Show Defendants

13.    On information and belief, Defendant KVLA, Inc. (hereafter referred to as "KVLA") is a corporation organized and existing under the laws of the state of California, and having a principal place of business at 7291 Heil Avenue, Huntington Beach, California 92647, and does business in this judicial district,

including Orange County. This is the same address as Defendant Nutrivita, Inc.

14.     On information and belief, Defendant Tram Ho (hereinafter referred to as "Tram"), is an individual domiciled in California, and residing in this judicial district, and was solicited to leave VBS to become the Vice-President Marketing of Defendant KVLA,TV Host for the Infringing Show, and Owner and Partner at KVLA, while still under an employment agreement with VBS. Attached hereto as **Exhibit 15** is a true and correct copy of information from the Internet obtained about Tram Ho's position with the Show Defendants. This information also promotes Defendant Tram Ho as having been the Vice President Marketing and TV Host of KVLA from January 2013 through the present which is false as she was the TV Host for VBS' Show during most of that time, and contributes to the confusion in the marketplace as to any affiliation or relationship between the Show and the Infringing Show.

15.     On information and belief, Defendant Jenny Do, also known as Ngoc Nu (hereinafter referred to as "Jenny"), is an individual domiciled in California, and residing in this judicial district, and the current wife of Defendant Tuong. The defendants KVLA, Tuong, Tram, and Jenny, are sometimes hereinafter referred to as "the Show defendants."  Defendants initially admitted that Defendant Jenny Do was the wife of Defendant Tuong, in their first answer to the Second Amended Complaint, then later amended their Answer to deny that Do is Tuong's wife, and denied any formal marriage during discovery, as Tuong claims to have been married to another woman for some 45 years. However, it was admitted during discovery that Tuong has a long-term relationship with Do, and has bought her a house in which she lives, currently worth about $6.5 million, and pays the monthly mortgage payments on that house, and visits her regularly.

16.     Plaintiff is currently unaware of the true names and capacities of all the Defendants sued herein under the names "Does 1 through 10" and therefore

refers to said parties by such fictitious names. Plaintiff is informed and believes that each of the defendants sued under such fictitious names was in some manner responsible for Plaintiff's damages, whether as an agent, employee, partner, joint venturer, assignee, successor, or alter ego to Defendant or in some other capacity. Plaintiff will amend this complaint to allege the true names of the fictitiously named defendants when the same are ascertained. Other allegations concerning some of these Doe Defendants are set forth above. If the deadlines in this case for adding Does have not expired under the Scheduling Order, due to the change in the trial and pre-trial dates, then VBS may amend the complaint to add parties identified during discovery, including other distributors of Arthro-7, the owner of Defendant Robinson-Pharma (Tuong's daughter, by a gift from him of all his stock in the company), Dr. John Hahn, and others.

17.    On information and belief, each of the named Defendants was the agent, principal, employee, representative, or alter ego of the other Defendants and/or acted with one or more of the other Defendants' knowledge, consent and approval, and acted within the course and scope of his agency or representative capacity. As such, each of the named Defendants is responsible for the actions of the other named Defendants, as alleged herein.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this lawsuit under 28 U.S.C. §§  1331, 1337, and 1338 because the suit arises under the unfair competition, false advertising, and trade dress laws of the United States, including 15 U.S.C. §  1125, the trade secrets laws of the United States, 15 U.S.C § 2, the anti-trust and restraint of trade laws of the United States, and pendant jurisdiction of any and all state causes of action under 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over each of the Defendants because, inter alia, on information and belief, each Defendant transacts business in the Central District of California, including in Orange County.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and otherwise because a substantial part of the events or omissions giving rise to these claims for unfair competition, false advertising, theft of trade secrets, trade dress infringement, anti-trust and restraint of trade, and related state claims, occurred in this judicial district, including in Orange County.

21.     On information and belief, each of the Defendants has advertised, sold, and/or distributed the services and products complained of in this Complaint in this judicial district, and engaged in the wrongful acts alleged herein in this judicial district, including in Orange County.

## FACTS

## PLAINTIFF'S ACTIVITIES

22.     Plaintiff VBS Distribution manufactures, markets, and distributes numerous dietary supplement type products primarily aimed at the Vietnamese marketplace, but VBS Distribution marketplace is not limited to the Vietnamese marketplace, particularly including a well-known joint supplement product under the name JN-7 Best, which, on information and belief, has about 10% of the market. Plaintiff's main competitor is the Vietnamese dietary supplement Defendants that have, on information and belief, about 60% of the same market, and discovery does not seem to have disclosed any director competitors in the Vietnamese marketplace other than the parties here, for these specific products.  Upon information and belief, the JN-7 Best product of VBS, and the directly competing Arthro-7 product of the Supplement Defendants, are the respective primary dietary supplement product for both VBS and the Supplement Defendants, and are now heavily promoted and advertised by both on the Show and the Infringing Show, respectively, The general

marketplace for the parties' products is the elderly population in the United States who have need of joint relief of this type, and generally prefer herbal products which do not contain animal products, and the Vietnamese marketplace, which includes primarily such elderly population who need such products and were born in Vietnam and subsequently moved to the United States, or who are of Vietnamese descent, and who may speak primarily Vietnames, or both English and Vietnamese The parties target and market and sell their respective joint compound products to both the Vietnamese marketplace, and to the general marketplace, both as defined above. But for the actions of Defendants complained of herein, VBS' sales of JN-7 Best would, on information and belief, have substantially greater penetration and sales success in both the Vietnamese and the general marketplaces, and would have achieved VBS' planned sales as set forth below, and much greater sales. Upon information and belief, but for Defendants' wrongful acts complained of herein— including but not limited to the filing of the first lawsuit, which Tuong during his deposition in this case has admitted was solely or primarily to stop VBS as a competitor from selling ANY JN-7 Best products, regardless of the packaging, label, or brand name under which sold, was primarily to put VBS out of business, stop VBS from selling a directly competing product in the Vietnamese or general marketplace, and prevent VBS from being a new competitor, particularly but not only for the Vietnamese marketplace—VBS would have achieved its sales goals, and each sale of the falsely advertised Arthro-7 precluded a sale of JN-7 Best in the Vietnamese marketplace in which the parties compete directly, and to a lesser extent, in the general marketplace as well, despite the existence of other competitors. Defendant Tuong has admitted in his first deposition that the Supplement Defendants sell 5-10% of their total Arthro-7 products in and to the Vietnamese marketplace, and some of the Defendants, including Nutrivita, Inc., owned and controlled solely by Defendant Jenny Do and, according to Defendants'

deposition testimony, not by Defendant Tuong or his other companies, tarket and market Arthro-7 directly and solely to the Vietnamese marketplace, including advertisements in Vietnamese in leading Vietnamese newspapers nationwide, and on Defendant KVLA's television station. Defendants have also admitted during discovery that the Arthro-7 and the JN-7 Best products are sold side by side upon the same shelves in such places as Vietnamese marketplaces, with no other competitors products remembered to be on such shelves, and Defendant Tuong, shortly after seeing such direct competition by VBS for the first time, immediately caused a lawsuit to be filed against VBS. That lawsuit included claims which were frivolous or with little or merit, filed and pursued for about two years, solely or primarily to prevent VBS from competing with the sale of JN-7 Best in the Vietnamese and general marketplace for such joint compound products of an herbal nature. Defendants claimed in discovery that they were not aware, before filing suit, of VBS' response to their "cease and desist" letter, which demanded that within 3 days, VBS stop all sales of JN-7 Best, regardless of packaging or brand, just not sell the competing product, although that response agreed to change the packaging complained of, but not the JN-7 Best trademark, and sell the product only in the bottles without the packaging until new packaging (and bottle labels) were ready. Defendants also claimed in discovery they would have filed the lawsuit had they been aware of  VBS' response, but this claim was untrue, as VBS' response was actually received by Defendants (their counsel who filed the suit), at least 2-3 days before the first lawsuit was ever filed. Nor did Defendants drop their frivolous or bad faith claim, for almost two years of litigation, that VBS stop using the trademark JN-7 Best for the directly competing product. But for the lawsuit and the threat of a permanent injunction and damages, VBS would have been able to accomplish its sales goals, and much greater sales, in both the Vietnamese and general marketplaces for the product, which litigation created a substantial and

insurmountable barrier to successful entry into that marketplace, and depleted and drained VBS' working capital for such entry, and usurped the time, resources, and energy of VBS and its principals away from such planned and feasible marketplace entry,  just as Defendants knew and intended.

23.    Prior to the Supplement Defendants' acts complained of herein, VBS planned and intended to sell at least 25,000 units of JN-7 Best per year, including written projections with planned discounted pricing for such retail giants as Walgreens, with whom VBS already has a long and successful commercial relationship for other dietary supplement and other products, but was unable to do so as a direct result of the wrongful acts of the Supplement Defendants complained of herein, and those of the Show defendants who also heavily promote and market Arthro-7 on the Infringing Show.  The Supplement Defendants are the giant company in the Vietnamese marketplace for these supplement products, the proverbial 800 pound gorilla, but that Vietnamese marketplace, where VBS Distribution competes directly with the Supplement Defendants, is only 5-10% of the Supplement Defendants' total sales of Arthro-7 to the non-Vietnamese marketplace (see Exhibit 14) , and the Supplement Defendants have far greater financial resources, strength, and market resources and market share, than VBS, whom the Defendants expressly and specifically plan and intend to put of business or at least the point where they only have several employees left, according to what some of the Defendants have told third parties.

24.    Plaintiff VBS Television is a television broadcast company primarily aimed at the Vietnamese community and is broadcast primarily in the Vietnamese language.  Its services include television entertainment, news, and auction services, and its products advertised and sold through its television network include dietary supplements and jewelry, particularly diamonds. VBS Television is believed to be the most widely viewed Vietnamese television network in the United States.

25.     Both VBS Distribution and VBS Television have the same Chief Executive Officer (CEO) and Chairman, Joseph C. Nguyen (hereinafter "Joseph"), and are closely related corporations, with various licenses and agreements between them, and have their offices at the same address.

26.     As discussed below, the Defendants are direct competitors of Plaintiffs in both of the above described interstate marketplaces, and are the primary competitors of Plaintiffs in these marketplaces, including but not limited to the Vietnamese and other non-Vietnamese consumers for such products and services in Orange County and elsewhere in the United States. Both Defendants and VBS promote and market and advertise their respective television stations and various programs, including the auction show, and the infringing show, complained of herein, as well as their directly competing JN-7 Best and Arthro-7 joint compound dietary supplement products, on their respective television programs, including on and through the Show and the Infringing Show.

### The Show and Plaintiffs' Trade Dress

27.     During 2011, Joseph C. Nguyen ("hereinafter referred to as "Joseph"), on behalf of VBS Distribution, created a commercial television show entitled "DAU GIA TREN TRUYEN HINH" (which in English means "Fight Price on Television"). "DAU GIA TREN TRUYEN HINH" shall hereinafter be referred to as the "Show". The Show is a live auction program, with unique identifying characteristics, which primarily auctions jewelry, particularly diamonds. Some of these unique characteristics include the following: a) the unique style and format of the show, b) its time slot and date selection, each week on alternate weekdays, from 5 to 7 p.m., on Tuesdays and Thursdays, c) the price range for its auctioned items, ranging from about $ 300 to $ 3000,  d) its "least to most expensive" format in which the least expensive items are sold first, ascending to the most expensive items at the end of the show, e) the length of the show, 2 hours, f) its focus on live TV

auctions of jewelry, particularly diamonds, g) its carefully selected vendors, who appear on the show with the show's host, h) unique and proprietary camera angle and special lighting techniques developed by Plaintiffs using an Apple ipad tablet, i) the number and selection of items sold, usually about 30 items [hereinafter "the Show trade dress" or "the trade dress"].

28.    VBS Distribution is the owner of a registered service mark for the Show issued by the United States Patent and Trademark Office, Registration Number 4,440,695, registered on November 26, 2013, a copy of which is attached hereto as **Exhibit 1**, for the mark Fight Price on Television for auction services. This mark has been licensed to VBS Television. Although the Show defendants have used a somewhat similar mark and title for their Infringing show, this Complaint does _not_ assert any separate trademark claims based on such registrations, due to the differences between the titles of the Show and the Infringing Show.

29.    VBS Distribution and Joseph are the owners, and VBS Television the exclusive licensee, of a registered copyright for the Show issued by the United States Copyright office, Registration Number PA1-921-488, on November 13, 2014, a copy of which is attached hereto as **Exhibit 2.** Defendants Tram is shown as the author of "Performer" on the certificate of registration, and Joseph is shown as the author of "text, tv show."  The date of first publication of the Show is listed as September 5, 2011. The Show Defendants constantly change their Infringing Show to copy changes in the Show which VBS makes. Attached hereto as **Exhibit 10** are screen shots of the Show and the Infringing Show, for the Thanksgiving Day Special in November 2016.

30.    The Show's trade dress, as defined above, symbolizes the business goodwill of Plaintiffs, and is an intangible asset of substantial commercial value.

31.    One of the Plaintiff's primary goals has been to build up a strong trade dress that its customers can and will associate with Plaintiff and its innovative format for the Show, its quality products and its stellar customer service.

32.    As a result of Plaintiffs' long usage and extensive advertising and marketing of its trade dress, the consuming public and Plaintiffs' vendors and others, have come to recognize the Show's trade dress in the field of television auctioning of jewelry products to the Vietnamese community in Orange County and elsewhere in the U.S., as symbolizing Plaintiffs' and their reputation as the source of the Show and Plaintiffs' services and goods. The Show's trade dress is both inherently distinctive and has acquired secondary meaning in the marketplace.

33.    Since at least 2011, long prior to the acts of the Defendants herein alleged, Plaintiffs have used their distinctive and unique trade dress alone in connection with the promotion, marketing and advertising of each of its products and services for sale on the Show in the United States, including this District.  More specifically, Plaintiff first began using the trade dress in approximately 2011 in Orange County in interstate commerce.

34.    Sales, advertising and promotion of Plaintiffs' products and services which use their unique and distinctive, and non-functional, trade dress, since inception have been substantial in Plaintiff's niche marketplace.

35.    As a result of such continuous use and extensive sales, advertising and promotion, of the Show and the trade dress by Plaintiffs, their products and services associated with them enjoy recognition and notoriety in the United States in Plaintiffs' niche market place, and are recognized by the consuming public as emanating from Plaintiffs.

### Plaintiff's Confidential Information and Trade Secrets

36.    The Plaintiffs own and possess unique and confidential lists of customers' names, addresses, specific vendor contacts of Plaintiffs and their contact

information, and other contact information which are vital, necessary and critical to the success and profitability of the Show, and which Plaintiffs have taken reasonable measures to keep secret and confidential; including but not limited to the requirement that all people who are exposed to them sign a non-disclosure agreement, and said information is password protected. Such lists and information constitute protectable trade secrets of Plaintiffs, together with the other confidential information described below. If a competitor to the Show possessed such information, the very existence and profitability of the Show could be in jeopardy, and the value of said information and trade secrets would be greatly diminished. The confidential information and trade secrets described herein are valuable to Plaintiffs due to the nature of their being secret. Plaintiffs' valuable and confidential trade secrets also include proprietary camera techniques, marketing strategy, employee information such as personal contact information and salary histories, pricing information and profit margins, concepts, guidelines, procedures, explanations, and documents relating to the foregoing and Plaintiffs' business.

## DEFENDANTS' WRONGFUL ACTIVITIES

### Defendants' Ongoing Pattern of Unfair Competition and Anti-Competitive Conduct

37.    Defendants' actions are a part of a long continuing pattern of unfair and deceptive trade practices, including those already described and described below, which Plaintiffs first noticed  when VBS first began to sell JN-7 Best in competition with Arthro-7 in late 2013, and a part of a specific plan and stated intent to hurt VBS economically and put it out of business.

38.     Upon information and belief, Defendants' long, continuing pattern of unfair and deceptive trade practices and anti-competitive conduct stretches back to at least as early as 1998. Attached hereto as EXHIBT 26 is a complaint filed by the Federal Trade Commission ("FTC") in 2003 against numerous companies believed

to be presently or formerly associated with some or all of the Supplement Defendants for "engaging in deceptive acts or practices and false advertising in connection with" dietary supplements. (Ex. 26, ¶ 1; the "2003 FTC Complaint").

39.    Upon information and belief, Defendant Tuong Nguyen, on behalf of ten (10) of the defendants ("Settling Parties"), stipulated to a thirty million dollar ($30,000,000) settlement with the FTC in 2005 to settle the 2003 FTC Complaint. (EXHIBIT 27, page 14; *id.,* pages 29-30; the "2005 FTC Settlement").

40.    Upon information and belief, The FTC alleged that the Settling Parties made unsubstantiated, deceptive and false claims in advertisements for their dietary supplement products, some of which include:

(a)    falsely or deceptively claiming their products are "clinically" proven (Exhibit 26, ¶¶ 29, 31, 33, 35; Exhibit 27, pages 10-11);

(b)    making numerous false or deceptive claims about their products (Exhibt 26, ¶¶ 29-40; Exhibit 27, pages 6-11);

(c)    using a "Deceptive Format" where they deceptively or falsely advertised that their magazine was "an independent publication and not paid commercial advertising" (Exhibit 26, ¶¶ 41-42; Exhibit 27, pages 12-13);

(d)    deceptively representing that an organization they established was "an independent organization that has expertise in the examination or evaluation of nutritional health products," which they used "for the purpose of selling their products." (Exhibit 26, ¶ 44; Exhibit 27, page 12); and

(e)    failing to disclose material connections between "Expert Endorser Dr. Ronald Lawrence" and defendants. (Exhibit 26, ¶ 45, Exhibit 27, pages 12-13).

41.    Upon information and belief, some or all of the Supplement Defendants are or were partners, subsidiaries, divisions, trade names, officers,

agents, successors, or assigns of some or all of the Settling Parties in the 2005 FTC Settlement.

42.     Tuong and his controlled companies also tried and failed in their attempt to stop VBS from registering its trademark JN-7 Best with the USPTO, actually abandoning it due to the complete dissimilarity of the JN-7 Best mark and the Arthro-7 mark.

43.     Other wrongful acts of these Defendants, all part of **their overall pattern of unfair competition,** are alleged herein, include, as  examples only, a) the filing and maintenance of the first lawsuit after VBS started to compete with Arthro-7 , including groundless copyright claims and serious misrepresentations, b) challenging then abandoning opposition to VBS' JN-7 Best trademark application which was frivolous and without merit, 3) **the repeated and intentional poaching of VBS' employees**, including luring them away with higher compensation and then often firing them shortly thereafter, 4) stealing VBS' trade secrets; 5) copying the Show; 6) copying later changes in the Show;  7) falsely advertising the Arthro-7 product, and 8) locating their offices and television station within a block of VBS,  all pursuant to their stated intention and plan to put VBS out of business and reduce it to several employees including Joseph.

## Wrongful Activities of Nutrivita, US Doctor's
## Clinical and Robinson Pharma

44.     In the Vietnamese dietary supplement Defendants' advertising, marketing, and promotion of their directly competing joint supplement product, Arthro-7, they unambiguously, falsely claim that said product is composed of 100% herbal ingredients while their supplement facts state that one of the ingredients is collagen from chicken and their capsule is made of gelatin which is derived from cows or pigs; making their claim a literal falsity. Their materials state: "100 %

natural" which would be construed and understood by the Vietnamese customers for such products as meaning not containing any animal products. They also state in their advertising and promotional materials: "100% natural herbal" which would also mean no animal products. One of the Vietnamese dietary supplement Defendants' advertisements for their Arthro-7, a copy of which is attached hereto as **Exhibit 3**, states for example that their Arthro7 product is: "100% tu duoc thao thien nhien." (symbols omitted). The English translation of those words is as follows: "tu" means "from." "duoc thao" equals "medical herbal." "Thien nhien" equals "natural." This particular advertisement appeared in a Vietnamese newspaper, Nguaoi Viet, probably the largest in the country, in 2013. [There is no hyphen or "-" before the 7 in this advertisement, although Defendant Nutrivita Labs claimed in the first lawsuit that its trademark was confusingly similar to that of Plaintiff VBS Distribution because they both allegedly contained a "-7"]. Upon information and belief, collagen "comprises 85% to 90% of Arthro-7 product." (Exhibit 48, ¶ 39).

45.    If the Vietnamese customers, particularly those who are Buddhists, knew the true facts, they would be unlikely to purchase said Defendants' products, which would be contrary to their religious and cultural beliefs. Accordingly, these claims are false and misleading, about material facts, including to the Vietnamese customers to which both Plaintiffs and the Vietnamese dietary supplement Defendants' products are largely marketed. This same language and claims have appeared on other brochures, and advertisements, including newspaper advertisements, for said Defendants' products, and continue to do so currently. A copy of several more representative examples of said Defendants' promotional materials and advertisements, also showing the packaging, including boxes, for the Arthro7 products, are attached hereto respectively as **Exhibits 4 and 5**, and these also contain the same and similar literally false claims, as well as the claims set

forth below, about said Defendants' products.

46.     Each recent box, and various widely disseminated advertisements and promotional materials, for Arthro-7, claims that over 8 million bottles (or more) of said product have been sold, whereas pursuant to discovery during the first lawsuit (described below) between Plaintiff VBS Distribution and Defendant Nutrivita Laboratories and Joseph, the Defendants admitted they had  sold only 89,896 bottles or less from 2009 – 2015, and further admitted that they do not know of any basis for the claim of 8 million units or bottles being sold. Next to the statement (see, for example, the box shown on the first page of Exhibit 4): "Over 8 Million Bottles Sold!", appears NUTRIVITA®, which, and in conjunction with other materials, implies and creates the false impression that Defendant Nutrivita has sold over 8 million bottles of these products, when in fact it has not. These statements and claims are false and misleading concerning material facts which would and could significantly affect the consumers' decision to purchase Defendants' products rather than those of their direct competitor, Plaintiff VBS Distribution, and have caused and will continue to cause significant injury and damage to Plaintiffs and consumers, and have resulted in many millions of dollars in revenue to said Defendants, which would not occurred but for the false, misleading, and deceptive advertising and claims made.

47.     Advertisements and marketing and promotional marketing materials for the Arthro-7 product include a strong endorsement from Dr. John Hahn, but do not disclose that he has been paid, or is being paid, for his endorsement although previously Defendants did disclose such payments, which is a material fact to potential purchasers. Dr. Hahn also apparently was paid to write a long article to praise the Artho7 products but those facts are also not disclosed. This is similar behavior to what the 2005 FTC Settlement enjoined. (Exhibit 47).

48.     In fact, the Vietnamese dietary supplement Defendants' products,

brochures, promotional materials, and advertisements, create the impression that Dr. Hahn is a medical doctor (see, for example, Exhibit 3), but in fact he is not. In Exhibit 5, for example, it states, underneath a picture of Dr. John E. Hahn, wearing a traditional white medical doctor's coat with a white shirt and dark tie, in comparatively smaller font, "Board certified foot surgeon." There he states: "I've recommended this product for over 10 years in my clinical practice…. Positive results utilizing Arthro-7 have been supported by a UCLA researcher." Beneath the trademark, it says in large letters "Clinically Tested Formula."

49.    On some of the boxes in which said Defendants' Arthro-7 products are sold, above the quote attributed to Dr. Hahn, it also states prominently in large letters in a set off red color: "Doctor Recommended." On some boxes for the products, there is no indication that "Dr. Hahn" is a "DPM, N.D."  On information and belief, it is or was stated that he is a medical doctor on some boxes, advertisements, and materials. When DPM or ND is indicated, it is in small print which would be overlooked by the average potential consumer, who are misled by the emphasis on doctors.

50.    On some of the Defendants' boxes for their Arthro-7 products, particularly the ones sold with "U.S. Doctor's Clinical®" in large letters at the top on all four sides of the box, the side panel also is about half-filled with a group of "doctors" appearing under the large heading, "Advisory Board Doctors."

51.     The overall result is that many, if not most, potential consumers and consumers for said Defendants' Arthro-7 products, are intentionally deceived or misled into believing that an independent, neutral medical doctor, rather than a paid non-medical doctor, is essentially certifying that Defendants' products are highly effective as supported by medical research, which is not true, and but for such deception, they would not purchase Defendants' products, which compete directly with Plaintiffs' JN-7 Best products.

52.     Defendants' products, packaging, promotional materials, and advertisements, contain other intentionally false and misleading statements. Broader discovery into Defendants' claims in their packaging, promotional materials, and advertising, was not undertaken in the first lawsuit which had a limited scope and nature related only to the alleged infringement of Defendants' purported copyright on their packaging and the trademark and trade dress of same.

53.     Upon information and belief, and based on Defendants' previous admissions and materials disclosed in discovery in the first lawsuit, Dr. John Hahn has in fact been paid, and substantially so, by the Defendants for his endorsement of the Artho7 products, although potential purchasers are not aware of that fact, and have been misled into believing that Dr. Hahn is a neutral and independent treating or prescribing doctor recommending such products, rather than someone being paid to do so. Failure to disclose his material connection to the Arthro-7 product in his paid endorsement is per se deceptive according to The Federal Trade Commission (*see*, for example, FTC Enforcement Policy Statements, see also 16 C.F.R. § 255.5).

54.     Some of the said Defendants' Arthro-7 products state that the product is "Distributed by: U.S. Doctor's Clinicial® 15568 Brookhust St., Suite 374, Westminister, CA 92683 with an 800 phone number and web site." However, upon information and belief, there may be no such company or operational entity, and if so, this statement is also false and misleading, as potential consumers are likely to be misled and deceived into thinking that this fictitious entity is the distributor of these products.

55.     More troubling is that, upon information and belief, Defendants have or are "knowingly and intentionally exposing individuals who use or handle the PRODUCTS," which includes Arthro 7, to lead, "a substance known to the State of California to cause cancer, birth defects, and other reproductive harm." (Exhibit 49, ¶¶ 1, 30-36).

56.     Upon information and belief, Defendants also advertise that Arthro 7 is clinically tested, and clinically-proven to provide a wide variety of joint health benefits, such as promoting overall joint health, lessening joint swelling and stiffness, reduces walking problems, and promotes bone and joint health.

57.     Defendants health benefit claims and clinical testing claims are purportedly based solely on one or two non-independent Chinese clinical trials which do not support any of Defendants claims. (Exhibit 48, ¶¶ 21-36).

58.     These statements and claims are false and misleading as to material facts which would and could significantly affect the consumers' decision to purchase Defendants' products rather than those of their direct competitor, Plaintiffs, and have caused and will continue to cause, injury and damage to Plaintiffs.

59.     Plaintiff affirmatively asserts that Plaintiff is entitled to a presumption of deception based on the Defendants' use of literally false claims in their advertisements.

## Wrongful activities of KVLA, Tram Ho, Tuong Nguyen, and Jenny Do Defendant Tram Ho

60.     On April 19, 2012, Tram Ho came to VBS Television, Inc. to apply for a job. She submitted an employment application and resume which stated she knew nothing about diamonds or auctions. Although Tram Ho had no prior experience with respect to auctions or the sale of jewelry, she was hired on August 13, 2012. One of her assigned jobs assigned was to co-host the Show, and VBS Television trained her in that capacity and taught her how to conduct the Show, including numerous proprietary and trade secrets related to the Show, described below. As a condition precedent to, and of, her employment, she agreed to many things, one of which was confidentiality.

61.     Because Tram Ho was to be the face of the Show that consumers see,

and because of the potential great loss VBS Television could suffer at the hands of someone in Tram Ho's position, as the public face of the Show, VBS Television had placed great trust and confidence in her and pursuant to her hiring, she signed an independent contractor agreement which among other requirements, required Tram Ho to retain the confidentiality of, and  not  disclose, valuable trade secret information including, but not limited to lists, questionnaires, pricing guidelines, concepts, procedures, explanations and writings obtained or used by VBS Television, which if were made known to outsiders would cause substantial loss. No breach of contract claim of any type is asserted in this Complaint against Defendant Tram Ho, and any such breach of claims are expressly disavowed in this lawsuit, and are being pursued, if at all, separately in arbitration based upon Tram Ho's labor claims for allegedly unpaid commissions, which are disputed as without merit.

62.     The first confidentiality agreement with Tram Ho, dated August 13, 2012, a true and correct copy of which is attached as **Exhibit 8**, included the following language, in paragraph 4:

> Consultant agrees that all information provided by the Company including but not limited to, **customer lists**, questionnaires, pricing, guidelines, concepts, procedures, explanation, and writing obtained or used by Consultant **shall be confidential proprietary information of the Company.**
>
> **Consultant agrees to preserve and protect the confidentiality of the proprietary information both during and after the term of the Agreement.**
>
> Consultant shall not disclose information about this work to any third party and **shall not use proprietary information for her own benefit or the benefit of any third party.** (Emphasis added).

VBS' Third Amended Complaint for Unfair Competition - 27

63.     During the subsequent four years, Tram Ho's independent contractor agreement was converted to an employment agreement and renewed on substantially similar terms. Attached hereto as **Exhibit 9** is a true and correct copy of Tram Ho's Employment Agreement dated August 1, 2013, which specifies a "full time and exclusive" term of two years so that "while being employed by VBS, TRAM HO will not work for any other companies or entities." (¶¶ 2, 3, 5). Some of the other terms included the following: Duties, "senior sales person, an anchorwoman and a shows producer." (¶3); job description, "**Solicitor of sponsorship and advertisements for VBS. Anchorwoman to broadcast news. Producer of 'Hue Thuong' show and any future shows when needed.**" (¶ 3) (Emphasis added); "**CONFIDENTIALITY: TRAM HO agreed not to use any VBS's confidential information regarding business strategy, technology, and customers gained through working at VBS for her own benefit or benefit of anyone else except the one of VBS.**" (¶ 6) (Emphasis added); upon termination, "she agreed to comply to the following:… **Returning all documents and properties of VBS.**" (¶ 8)(Emphasis added); California law governs the agreement. (¶ 8).

64.     On or about July 15, 2015, TRAM HO entered into an Employment Agreement with VBS to commence on August 1, 2015 with a one year term, that is, through July 30, 2016. Attached as **Exhibit 13** is a true and correct copy of said Employment Agreement.  Most of the same provisions stated above were included, including confidentiality, exclusive employment, and <u>returning all documents and properties of VBS as part of any termination</u> or "if for any reason [she] decides to leave VBS…" Her job duties were amended as follows:

a)  "**Promoter and coordinator of diamond and jewelry auction programs broadcasting on Tuesdays and Thursdays each week.**

b)  Solicitor of advertisements and sponsorship from businesses.

c)  Anchorwoman for news broadcasting when needed.

d)  Producer of 'Hue Thuong' show.

e) Assisting to produce the ads when needed." (¶3)(emphasis added).

65.    VBS gave Tram Ho discretion in how she exercised her job duties. For example, VBS set objectives for Tram Ho to achieve, but did not micro-manage or dictate how those objectives were to be achieved. Tram Ho did not have a manager above her. VBS relied on Tram Ho to competently perform her job duties with both the training VBS gave her as well as the professional expertise Tram Ho was developing, and developed, by working for VBS.

66.    Sometime during 2015, Tram Ho's employment performance was so poor the VBS Television considered terminating her employment agreement, but instead renegotiated with her in an effort to salvage the situation. VBS and Tram renegotiated Tram's compensation package in hope that she would be motivated to improve. In 2016, VBS agreed to re-negotiate Tram's compensation package after a review period of six months. But when that time came, Tram just walked away. She did not tell VBS why and VBS did not know why. It was only later that VBS realized that it was because she had been conspiring with the Defendants to start a competing copycat show for the Show Defendants and help sell and promote the Supplement Defendants' Arthro-7 product on the Infringing Show, and to help the Supplement Defendants' to promote the directly competing Arthro-7 product to VBS' customers using wrongfully misappropriated customer lists, pursuant to Defendants' stated plan and intention to put VBS out of business.

**The Infringing Show**

67.    To the great surprise of the Plaintiffs, during the spring of 2016, they saw Tram Ho advertising on KVLA, the rival, competitor, television station to VBS Television.  She was advertising a new television show entitled "Diamond at a Surprise Low Price" (hereinafter the "Infringing Show"). At that time, Tram Ho was still an employee of VBS Television and under contract with VBS Television to co-host the Show, which employment was, upon information and belief, known at that time to the Show Defendants.

68.     On or about June 1st, 2016, Defendants aired their first episode of their Infringing Show which was, and still is, essentially identical to VBS' Show. Advertisements for the Infringing Show began airing at least as early as about April 2016.

69.     It is, in most respects and in overall format and appearance, a blatant copy. KVLA produces and televises the Infringing Show, and, upon information and belief, deliberately induced, together and in conspiracy with the other Show Defendants, both Tram Ho, and other desirable employees of VBS Television, including several technicians, to breach their contracts with VBS Television and to instead start to work for KVLA, and to produce and appear in the Infringing Show, and to bring proprietary and confidential information, and trade secrets, of VBS Television, to the Infringing Show and to KVLA, and to use those trade secrets also in promoting the Supplement Defendants' Arthro-7 product.

70.     The Show Defendants first began the process of hiring VBS' key employees in about 2014, starting with one of the technicians, Cuong Nguyen. Defendants later recently accelerated their hiring of Plaintiffs' key employees, and began also poaching Plaintiffs' vendors and customers too. This also continued to occur after Defendant Tram Ho, who was the Show's co-host for about 4 years, started collaborating with Defendants for monetary gain, and apparently as a form of revenge. VBS was unhappy with her production performance. Tram Ho also gave Defendants confidential information of VBS to facilitate the hiring of VBS' key employees.

71.     The Infringing Show is essentially a complete copy of the Show and is intentionally designed and intended to cause confusion to Vietnamese and other viewers so that they are likely to believe that they are watching the Show, or that there is some affiliation, relationship, license, endorsement, or sponsorship between the Infringing Show and the Show, or VBS and the Defendants, and in fact is

actually causing such confusion in many instances.

72.     Among the areas of duplicity are the following: same hostess, same vendors (some), same unique style as provided by the same technician, same time slot of 5:00pm – 7:00 pm, but on Mondays, Wednesdays and Friday, whereas the Show is on Tuesdays and Thursdays, the least to most expensive format, the same auctioning of approximately 30 items each show, the content is virtually identical, and the price range of products is virtually identical ($300 - $3,000), as are various other features of the Infringing Show, which copies the Show closely, and infringes on the Show's trade dress.

73.     The Infringing Show also has Tram Ho as their host, and is confusingly similar and substantially similar to the Show, with vendors who were induced by Defendants to leave the Show and join the Infringing Show, including Ms. Minh Thi Truong of Kim Cuong Jewelry, in Westminister. This would be, for example, like Vanna White and Wheel of Fortune's key sponsors, having been deliberately taken to a new show designed to emulate the original show, while still working with Wheel of Fortune, but changing the name to something like Spin of Luck, and taking a confidential list of Wheel of Fortune's actual viewers and soliciting them to watch the "variation" show. It would be easy for such customers, and others, to believe the first network had some relationship or association with the one on which the very similar show, with the same actors, appeared, or was even produced by the same people, or that the two shows were licensed, affiliated, or somehow related to each other.

## Actual Confusion

74.     Since June 1, 2016, VBS Television's customers and vendors have complained to the Plaintiffs about the copying by KVLA of the Show, complaining that they think the two shows are VBS' and later finding out they are not, and there have been instances of actual confusion between the parties and their respective

businesses, products, and services.

75.     The shows are so confusingly similar or substantially similar that, as a result, many of VBS' customers apparently believe that the Show now airs five days a week; and that the two shows are the same show or alternating versions of the same Show. For example, on November 29, 2016, after their show on Monday November 28, one buyer named Annie called VBS' office about an order she placed on the 28th on the Infringing Show. On the 30th, after their show, a different customer called VBS' office to arrange picking up merchandise she just purchased from Tram Ho and the Infringing Show. These customers are calling VBS' telephone number from the Show, 1-877-998-2788, which is totally different from the Infringing Show's phone number, 1-888-883-6365. Thus, they believe that the two shows are the same or connected, despite the completely different phone numbers for each show.

76.     On information and belief, there is also actual confusion occurring at Defendants' place of business, as to the parties' respective products and services, businesses, and whether there is any affiliation, license, sponsorship, or endorsement between them, though, based on their previous behavior, Defendants will likely conceal such instances of confusion on their end and/or fail to track or document them or deny their existence.

**Intentional Copying and Use of VBS' Trade Secrets and Trade Dress**

77.     In direct violation of her contract and confidential relationship with the Plaintiffs, Tram Ho knowingly misappropriated, converted, and used the customer lists and data bases and other confidential information and trade secrets of VBS Television, and did not return such lists, data bases, or other trade secrets to VBS Television as required by her employment agreement, duty of confidentiality, and other laws. On information and belief, Tram Ho also facilitated the solicitation and recruiting of VBS Television's desirable employees for and with KVLA and other Show Defendants.

78.     One or more of the employees of VBS Television witnessed Tram Ho surreptitiously photocopying the customer lists and/or data base.

79.     On information and belief, Defendants were fully aware, prior to their activities complained of herein, of Plaintiffs and their products, services and marketing activities, and their success and reputation in the foregoing niche Vietnamese marketplace.

80.     Throughout the history of their pattern of copying and unfair competition and infringing upon Plaintiffs' rights, Defendants have made little if any effort to differentiate their show or trade dress in the marketplace from Plaintiff's show and trade dress, but instead have demonstrated their bad faith and intent to confuse customers and potential customers and others in the marketplace into thinking that Defendants are the Plaintiffs or affiliated in some way with them.

81.     Defendants use a confusingly similar trade dress and will continue to do so until and unless enjoined by this Court.

82.     Defendants' concurrent usage of the Infringing Show and the Infringing Trade Dress in the same interstate marketplace for the same business and services, is likely to cause confusion as to the source of the services or the businesses, or an affiliation, license, sponsorship, approval or endorsement between Plaintiffs and their business and services, and Defendants' business and services.

83.     Numerous factors and evidence also indicate that Defendants have intentionally adopted and are using a confusingly similar trade dress for the purpose of causing confusion and trading on Plaintiffs' prior usage, rights, and reputation and goodwill. Because Defendants are in the same geographical area as the Plaintiff and in the same industry, and even wrongfully hired away some of Plaintiffs' key employees before starting their directly, but unfairly, competing show, it is virtually certain that Defendants were aware of Plaintiff's prior use and rights when they began to use a confusingly similar show and trade dress in the same area. For

example, Defendants' have even located their TV station and offices in the same small complex of office buildings in which Plaintiffs were already located, probably a few hundred yards away at most.

84. Defendants' use of the Infringing Show and trade dress constitutes an infringement of Plaintiff's common law and statutory rights under Federal law, including but not limited to Section 43(a) of the Lanham Act, and under California law, unfair competition, and false advertising, and appears to be a deliberate infringement of Plaintiff's rights.

85. Plaintiffs have demanded that Defendants stop the wrongful activities complained of herein. This demand was in an effort to avoid litigation, and Defendants were advised that a lawsuit would be filed if Defendants failed to stop such wrongful activities, and Plaintiffs made a public announcement on their television network that they would be filing a lawsuit based on Defendants' activities if they did not stop. Attached hereto as **Exhibit 18** is a English transation of that public announcement.

86. It seems apparent that Defendants intend to, and will, continue all of their wrongful activities until and unless enjoined by this Court. While Plaintiffs have complained to Defendants of their unfair, infringing, harmful and illegal activities, and issued public warning notices to them, Defendants have willfully failed, and/or refused, to stop their wrongful activities.

87. The Supplement Defendants continue to falsely advertise Arthro-7. The Show Defendants continue to advertise in a manner which deceives VBS Television's customers into thinking the two shows are the same, resulting in various harm to VBS. Show Defendants continue to copy every change made to the Show. When VBS Television made changes to the Show because of the customers' confusion caused by the Infringing Show, the Infringing Show immediately made the same changes. Show Defendants continue, even now after

having received the law suit, to imitate VBS in whatever new moves and changes VBS makes. For example, once in a while, there is a special event such as Thanksgiving. This year, VBS changed to a three hour show with special prices. Show Defendants then also changed to a 3 hour show with special prices. And when VBS uses a new tactic to sell our merchandise, they copy VBS. For example, in order to attract more customers, VBS now quotes the price of the merchandise at the beginning, then suddenly announce that VBS will give buyers a discount price which is lower than the first price. That marketing strategy proved very effective. About a week later, the Infringing Show began doing exactly the same thing. If VBS does anything new or different, the following week Show Defendants do the same. There are many other examples of this pattern of continued copying of changes to the Show.

### The First Pre-emptive Lawsuit as A Part of the Pattern of Unfair Competition and Anti-Competitive Conduct

88.     On October 18, 2013, Nutrivita filed a lawsuit against VBS Distribution ("the first lawsuit"), pleading no less than 13 separate counts of action, virtually throwing in the entire "kitchen sink" of allegations and claims in an attempt to stop VBS from entering or staying in the niche dietary supplement market of which the Supplement Defendants control about 60%. VBS' current market share is about 10%, although it would have been much larger but for that lawsuit, and the chill it placed on VBS' marking activities, and the disrupted plans to sell up to 25,000 units yearly. Upon information and belief, the remaining 30% of the niche dietary supplement market consists of companies with small individual market shares.

89.     Both Arthro-7 and JN-7 Best are intended to promote joint health. Both products are sold online, over the phone, and at retail stores for similar prices all over the United States. Both products advertisements target the Vietnamese

community in the United States. Upon information and belief, because of the similarity of the products, VBS and Defendants are competing for the business of the same group of consumers, the same target market.

90. The Complaint in said lawsuit alleged numerous violations of California and federal law in connection with the manufacture and marketing of the JN 7 Best joint supplement product, which Nutrivita claimed was a copy of their product's packaging, and falsely claimed that such material was copyrighted, and that VBS Distribution's trademark, JN-7 Best, was somehow infringing on the Vietnamese supplement Defendants' trademark Arthro-7.

91. Nutrivita made a litany of allegations, the majority of which were untrue and without merit, and made, upon information and belief, solely or primarily for the specific purpose of precluding competition in an attempt to monopolize, and harassing, or driving out of the small niche marketplace, the Vietnamese dietary supplement Defendants' largest, and new, competitor, Plaintiff VBS Distribution. In fact, said defendants sent a "cease and desist" letter giving **a *per se* unreasonable period of three days to VBS Distribution to stop selling its competing products completely.** Nutrivita did not merely demand that VBS change its packaging or label, but insisted that VBS Distribution, its largest competitor, which had just entered into this niche marketplace, **completely stop selling the competing product at all, under any name or in any packaging**. This demand letter was not only highly anti-competitive or predatory, and the essence of unfair competition, but also illustrated the Vietnamese dietary supplement Defendants' bad faith and ulterior purpose in pursuing litigation.

92. Although almost none of the claims of violations were true, and Nutrivita knew this to be the case, Nutrivita nonetheless filed its largely frivolous and baseless lawsuit, conducted burdensome discovery, subjected VBS Distribution to great expense,  publicly promoted and publicized, including on its web site, the

first lawsuit, and attempted to destroy the business and reputation of the Plaintiffs, Nutrivita was advised repeatedly by the Plaintiff's attorney that the case was without merit, and the reasons for same, from the very start of the lawsuit, yet pursued the first lawsuit for more than two years, past the close of discovery, and up through the eve of trial, requiring Plaintiff VBS Distribution and Joseph to incur the encumbering expense and labor of preparing their pretrial materials and commencing their trial preparation.

93.     On or about December 23, 2015, Nutrivita finally stipulated to a dismissal of the entire case with prejudice. The trial court determined that VBS Distribution and Joseph were the prevailing party, although, on a very incomplete and factually disputed record, declined to award attorneys' fees to VBS Distribution and Joseph. The latter ruling is currently on appeal to the Ninth Circuit, and is not, therefore, at least until the Ninth Circuit rules, *res judicata* or law of the case in any way as to whether Defendants instituted or continued the first lawsuit in bad faith, or for an anti-competitive or ulterior purpose, particularly the copyright claims, the trademark claims, and the federal dilution claims, and the related state claims based upon such claims.

94.     In addition, Plaintiffs believe that the Court may on its own choose to modify its views of whether Nutrivita filed its suit in bad faith (regardless of the results of the pending appeal) based on additional facts in this lawsuit, and those facts and evidence not part of the record in the first lawsuit. These will be made available during this lawsuit, and are also expected to be obtained during discovery in the present case. Discovery was never completed even as to the more limited issues in the first lawsuit.  In large part this was because the Defendant Nutrivita Labs refused to complete discovery, including even the corporate and individual depositions. They also failed to provide the documents requested during discovery, before they ultimately, due to the weakness of their case, dismissed their entire

lawsuit with prejudice.

95.    The dismissal was **not** based on any settlement agreement as none was ever reached. Defendants also falsely claimed in the first lawsuit that VBS Distribution had made changes in their packaging or trademarks only after, and as a result of, the lawsuit being filed. But those claims were not true, as all the changes had been made before the lawsuit was filed. As a factual matter, Plaintiff VBS Distribution made no further changes after the lawsuit was filed or as a result of the lawsuit being filed. Indeed, although Defendants are legally precluded from refiling their claims by virtue of their dismissal with prejudice, Plaintiffs are not in any way precluded, if they so wished, from selling the same packaging on which they were sued, at the present time. But during the day or so that VBS Distribution had to act, and without the benefit of legal representation, Plaintiff VBS Distribution elected to change their packaging even prior to the lawsuit being filed, as Defendants Nutrivita and Tuong were notified before the suit was even filed. Such a voluntary change, to avoid litigation, as a matter of law does not constitute any type of admission of any wrongdoing under federal and state law.

96.    Nor did VBS continue to make the labels for the bottles, even without the packaging, but simply sold off the small quantity of the labeled bottles while the new packaging and labels were being made. Defendant Nutrivita falsely represented in their demand letter that they wanted the cooperation of VBS Distribution to avoid filing a lawsuit, and looked forward to hearing back from VBS in response to the demand.

97.    However, when VBS responded immediately, and changed their packaging --but indicated their intent to sell the remaining bottles, before the new packaging was ready, --Defendants Nutrivita and Tuong did not respond further in any way. They did not indicate that selling the bottles with the same labels but not any boxes, until the new packaging was ready, was still objection, even though VBS

VBS' Third Amended Complaint for Unfair Competition - 38

indicated any further issues would be up to their lawyers. Defendants said nothing further, made no contact, requested no other changes. They simply filed suit a few days after the letter from VBS.

98.    That lawsuit, on information and belief, had already been prepared before receiving any response from VBS. On information and belief, Defendants Nutrivita and Tuong intended to file no matter what response VBS made or what it did. Because, on information and belief, Nutrivita and Tuong's anticompetitive plan, from the beginning, as further demonstrated by their predatory and anticompetitive actions and conduct alleged in this lawsuit, was to take all steps necessary to preclude VBS from competing with them in the marketplace, and thus also denying consumers the benefit of a competitive marketplace.

99.    Because of the financial impact the first lawsuit had on VBS, VBS could not market JN-7 Best and its other products, and as a result the growth of VBS' products was stifled.

100.    Because of the financial impact the first lawsuit had on VBS, VBS was forced to switch from a high-volume manufacturer to a low-volume manufacturer. This switch increased the production costs and largely cut VBS' profits.

101.    Had said Defendants truly wanted any further changes made, such as the bottles' labels, they could and should have contacted VBS Distribution before filing suit, as their demand indicated was their alleged intent, to obtain cooperation and avoid litigation.  If they had, VBS would have agreed to remove the labels, and wait for the new labels and packaging before selling the very small remaining inventory, about 1000 or so bottles. But Defendants' true intent and motivation for filing the suit, and maintaining it for two years through the eve of trial, were not any valid concerns about intellectual property rights. Instead, their true intent in their demand letter was to stop VBS Distribution from selling a competing product at all, and to monopolize the niche market.

102.    Nor is there any reasonable basis to believe that it took Defendants Nutrivita and Tuong two years—and that therefore they did not dismiss their lawsuit for two years-- to learn that VBS Distribution had long ago sold off the small inventory of bottles with the old labels and changed to a new package and label about which these Defendants could not, and did not, complain.

103.    This is only a part of the pattern of unfair competition by the Defendants, and is not necessary to prove the other allegations in this Complaint.

### Plaintiffs' Damages, Restitution, and Economic Harm

104.    Upon information and belief, as a direct and proximate result of Defendant's wrongful activities, Plaintiffs have suffered actual damages in an amount yet to be determined, including but not limited to damages to Plaintiff's reputation, loss of good will, lost sales and revenues, increased consumer search costs, diminution in the value of Plaintiff's business, and lost sales of Plaintiff's related products as a result of Defendants' infringing activities, and subject to proof at trial and future retention of expert witnesses regarding such damages and other damages set forth in this complaint.

105.    Upon information and belief, as a direct and proximate result of Defendants' wrongful activities, Plaintiffs will need to conduct a corrective advertising campaign to alleviate existing and ongoing future confusion in the marketplace, in an amount to be determined, but believed to be in excess of three million dollars, $3,000,000.

106.    Upon information and belief, as a direct and proximate result of Defendants' wrongful activities, Defendants have made gross sales (and profits thereon) from its wrongful activities as alleged herein, which belong in equity and should be turned over to Plaintiffs, both as unjust enrichment from Defendants' wrongful acts, and/or as a measure of Plaintiffs' damages.

107.   Plaintiff believes, based on such items as feedback from its customers, that it has many repeat customers for its products and services.  That is, customers who purchase its products are also likely to purchase other products in the future from Plaintiffs. Similarly, customers who purchased Defendants' products which used the trade dress, perhaps in the belief that they were Plaintiffs' products, are likely to purchase other of defendants' products.  As such, Plaintiffs have lost sales as a direct result of defendants' infringement, because Defendants' customers are likely to purchase other of Defendants' products.  Accordingly, Plaintiffs have additional lost sales as a direct result of Defendants' infringement. Not only would Defendants generate such additional sales of their other products, making additional profits due to the initial infringement, but Plaintiffs would also lose sales of other products it would otherwise have sold the same customer but for the initial infringing sale.   Each sale of a product by Defendants creates a lost sale for Plaintiffs for their products and services, and there is a multiplier effect from each such lost sale for the reasons stated.

108.   As a direct and proximate result of Defendants' wrongful activities, Plaintiffs have been forced to hire attorneys to defend and enforce its rights and to bring the present lawsuit, and to incur costs to prosecute this lawsuit, and has obligated itself to pay attorneys' fees and litigation costs to pursue this lawsuit against Defendants.

109.   Upon information and belief, and subject to discovery and testimony, the foregoing damages will exceed twenty million dollars, $ 20,000,000.

110.   Defendants' acts have caused and will continue to cause irreparable harm to Plaintiff unless restrained by this Court.  Plaintiffs have no adequate remedy at law. Accordingly, Plaintiffs are entitled to an order enjoining and restraining Defendants, during the pendency of this action and permanently thereafter, from manufacturing, distributing, importing, exporting, marketing, offering for sale or

selling the infringing products or services, producing or airing the Infringing Show, continuing to unfairly compete with Plaintiffs, continuing to falsely advertise their products or services, continuing to use Plaintiffs' trade secrets, or to engage in restraint of trade or other anti-monopoly violations,  or otherwise engage in the wrongful acts complained of herein.

111.   Plaintiffs expressly seek restitution from Defendants, including but not limited to the return of property taken from Plaintiffs by Defendants. Such property includes the actual customer lists and information and other confidential and trade secrets and information, and any tangible embodiment of same, whether in computers, hard copies, on cell phones, servers, hard drives, or otherwise contained in any physical embodiment.

112.   Plaintiffs specifically allege that they have suffered economic harm from the wrongful acts of Defendants, including but not limited to Plaintiffs' claim for interference with prospective economic advantage under California law. Such economic harm includes the allegations set forth above as to loss sales, and lost customers, and diverted profits.

113.   The Defendants, upon information and belief, had specific knowledge of Plaintiffs' valuable, ongoing, and established relationships with their vendors, like Star Jewelry who they deliberately induced to switch from the Show to the Infringing Show, and have attempted to deliberately induce other vendors, such as Lam, to leave their established and ongoing economic relationship with Plaintiff and instead switch to be a vendor for Defendants' Infringing Show, and to promote the Supplement Defendants' directly competing Arthro-7 product to Plaintiffs' customers directly via such channels as shown in Exhibit 6 and 17, and on the Infringing Show itself.

114.   Defendants, upon information and belief, had specific knowledge of Plaintiffs' valuable, ongoing, and established relationships with their customers,

like the one shown in Exhibit 6, and Plaintiffs' employees, like Tram Ho and others, who they deliberately induced to switch from the Show to the Infringing Show, and have attempted to deliberately induce such customers and employees to leave their established and ongoing economic relationships with Plaintiffs and instead switch to be customers and employees for Defendants' Infringing Show, and for the competing Arthro-7 product.

115.  Plaintiffs had valuable and ongoing economic relationships with its vendors, customers, and employees, including those with whom there may not have been a specific written or oral contract, and the probability of future economic benefit to the Plaintiffs from such relationships, such as continuing and future sales to such customers, continuing and future profits from such vendors, and continuing and future employment and services from Plaintiffs' employees and independent contracts, in whom Plaintiffs had invested substantial time, training, and other resources, and provided access to confidential and trade secret information and documents.

116.  Defendants' intentional acts, with their knowledge of such relationships, were intended to and did in fact actual disrupt such relationships, and Defendants continue to engage in such actions. Such intentional acts, in addition to the interference itself, include the use of Plaintiffs' confidential information and theft also of its trade secrets, to enable them to engage in such intentional interference, and to solicit Plaintiffs' vendors, customers, and employees, and their creation of an unfairly competing, falsely advertised, and trade dress violation, the Show,  created a specific forum for such vendors, customers, and employees of Plaintiffs to leave Plaintiffs and go to Defendants' Infringing Show, and to allow Defendants to create such a show without the work necessary but for the interference.

117.  Such acts of Defendants have also directly and proximately caused

economic harm to Plaintiffs, in addition to disrupting the relationships,  including but not limited to the loss of Plaintiffs' customers and continuing future sales to such existing customers and profits therefrom, which would have occurred but for the wrongful acts; the loss of Plaintiffs' profits and disruption of its profits and profit margins from its existing vendors, such as Star Jewelry, and customers who were used to placing orders for that vendors' jewelery via the Show and directly through Plaintiffs; and the valuable sales and profits, and work performance, from the loss of Plaintiff's established employees and independent contractors who, but for the interference, would have continued to generate future sales, profits, and services and performance for Plaintiffs. Instead, Plaintiffs also suffered the economic harm of lost time and delay to find and hire new vendors and employees, and to find new customers to replace those who had been improperly usurped, with attendant costs and lost profits and sales.

118.   In addition, the sales and profits which Plaintiffs would have otherwise made from such vendors, customers, and employees, were illegally diverted to Defendants, including for both the Infringing Show and the Arthro-7 product. Such diverted sales and profits should be returned to Plaintiffs as the true owner thereof, both as damages, and as a form of restitution of Plaintiffs' property which was acquired by Defendants' wrongful acts, including the interference with relationships, the false advertising, the theft of trade secrets, the trade dress infringement, and the unfair competition. Plaintiffs had an ownership interest in their intellectual property, such as their trade secrets, and their trade dress,  which Defendants usurped and profited from directly by their wrongful acts complained of herein.

## CLAIMS FOR RELIEF

### Count 1 – As to All Defendants

#### (Unfair Competition under the Lanham Act)

119.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 108 of the Complaint as though fully set forth herein.

120.   Defendants' above described actions and wrongful activities constitute unfair competition with Plaintiffs, and an ongoing pattern of unfair competition, all to the damage of Plaintiffs as alleged herein.

121.   Defendants' wrongful use of the infringing show and trade dress falsely indicates to consumers that Defendant's products and services originate from, are approved by, are sponsored by, are licensed by, or are affiliated with Plaintiffs or are otherwise associated with their services or products.

122.   Defendants' wrongful use of the Infringing Show and trade dress in the manner described above is likely to cause and has in fact caused confusion, is likely to cause and in fact has caused initial interest confusion, is likely to cause and in fact has caused mistake, and/or is likely to deceive and has in fact deceived customers and potential customers of the parties by suggesting some affiliation, connection, or association of Defendant with Plaintiff.

123.   Defendants' actions, as set forth above, constitute trademark infringement of a non-federally registered trade dress, and constitute unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125, all to the damage of Plaintiffs as described herein and previously alleged.

### Count 2 – As To All Defendants

### (False Advertising Under the Lanham Act)

124.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 113 of the Complaint as though fully set forth herein.

125.   Defendants' actions, as set forth above, constitute false and deceptive advertising in violation of the Lanham Act, 15 U.S.C. § 1125, all to the damage of Plaintiffs as described herein.

126.   This complaint, and this claim, includes several distinct types of false

advertising, none of which require any type of conspiracy to be actionable under the Lanham Act.

127.   The Show Defendants engage in false advertising by virtue of their confusingly similar Infringing Show, which creates the false or misleading belief that there is some affiliation, license, sponsorship, or endorsement between VBS and the Show Defendants, or their products or services.

128.   The Supplement Defendants, on the other hand, falsely advertise their Arthro-7 product by virtue of the false claims they make about their own product. Their promoting of their falsely advertised product on the Infringing Show, and in promotional to VBS' customers of the Infringing Show, also is false advertising because it creates a false or misleading belief that there is some affiliation, license, sponsorship, or endorsement between VBS and the Show Defendants, the Supplement Defendants, or their products or services. But there is no claim the trade dress of the Arthro-7 and JN-7 Best products are confusingly similar by themselves.

## Count 3- As to All Defendants

## (Unfair Competition, False Advertising, and Unfair and Deceptive Trade Practices - California Common Law)

129.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 118 of the Complaint as though fully set forth herein.

130.   Defendants' acts, as set forth above, constitute unfair competition, unfair and deceptive practices, and false advertising under the common law of the State of California, and false advertising under Cal. Bus. & Profession Code § 17500 et seq. all to the damage of Plaintiffs as previously alleged. No claim is alleged under the California UCL, Cal. & Bus. Code § 17200 et seq, for the reasons set forth in the Court's Dec. 1, 2016 Order, though Plaintiffs respectfully request that they be allowed at least one attempt to cure the defects concerning restitution set forth in the Court's Order, and to  seek injunctive relief even if restitution were

not being alleged.

## Count 4 – As to the Show Defendants
### (Theft of Trade Secrets under Federal Law)

131.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 120 of the Complaint as though fully set forth herein.

132.   Defendants' above described actions and wrongful activities constitute theft of Plaintiffs' trade secrets under the new federal Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq*,, all to the damage of Plaintiffs as alleged herein.

## Count 5 –As to the Show Defendants
### (Theft of Trade Secrets under California Law)

133.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 123 of the Complaint as though fully set forth herein.

134.   Defendants' above described actions and wrongful activities constitute willful and malicious misappropriation of Plaintiffs' trade secrets under California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq*., all to the damage of Plaintiffs as alleged herein.

135.

## Count 6 –As to the Show Defendants
### (Trade Dress Infringement under Federal Law)

136.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 129 of the Complaint as though fully set forth herein.

137.   Defendants' above described actions and wrongful activities constitute infringement of Plaintiffs' trade dress in the Show, in violation of the Lanham Act, 15 U.S.C. § 1125, all to the damage of Plaintiffs as alleged herein.

## Count 7 –As to the Show Defendants
### (Trade Dress Infringement under California Law)

138.   Plaintiffs repeat and incorporate by reference the statements and

allegations in paragraphs 1 to 131 of the Complaint as though fully set forth herein.

139.   Defendants' above described actions and wrongful activities constitute infringement of Plaintiffs' trade dress in the Show, in violation of California common law, all to the damage of Plaintiffs as alleged herein.

140.   Such claims are allowed under California common law. See, e.g., Alchemy II, Inc. v. Yes! Entm't Corp., 844 F. Supp. 560 (C.D. Cal. 1994) (Claim 6 is common law trade dress infringement). James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc., No. SACV 11-1309-DOC ANX, 2013 WL 655314, at *12 (C.D. Cal. Feb. 21, 2013) (recognizes claim under common law, though claim dismissed for failure to oppose dismissal).  Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1112 (9th Cir. 2010) (recognizes common law trade dress infringement). Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1045 (9th Cir. 1998) (recognizes common law trade dress infringement). See generally, W. Levin, 1 Trade Dress Protection §10:9.

141.   Such claims are also allowed California's unfair competition law (UCL), Cal. Bus. & Prof. Code §§ 17200 et seq., as a form of unfair competition, including seeking injunctive relief even if no restitution is sought, although restitution is sought in this Complaint, including, for example, return of the customer lists and information and other confidential information taken and used by the Defendants. However, since the UCL claim was dismissed with prejudice on the first motion to dismiss, with no leave to amend adding restitution as a specific remedy and additional facts, Plaintiffs are expressly not now relying upon Cal. Bus. & Prof. Code §§ 17200 et. seq for this claim, but expressly reserve all rights to later change that ruling, or not, at the appropriate time, or to amend the pleadings to conform to the proof in this case.

## Count 8 –As to the Vietnamese Dietary Supplement Defendants
### (Anti-Trust and Restraint of Trade under Federal Law)

142.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 135 of the Complaint as though fully set forth herein.

143.   Defendants' above described actions and wrongful activities affecting interstate commerce, and hindering competition in the interstate markets defined herein constitute anti-trust violations and restraint of trade, in violation of federal law, 15 U.S.C. §§ 1, and 2, all to the damage of Plaintiffs as alleged herein.

### Count 9 –As to the Vietnamese Dietary Supplement Defendants
### (Anti-Trust and Restraint of Trade under California Law)

144.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 137 of the Complaint as though fully set forth herein.

145.   Defendants' above described actions and wrongful activities hindering competition in the markets defined herein constitute anti-trust violations and restraint of trade, in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, and California common law all to the damage of Plaintiffs as alleged herein.

### Count 10 –As to the Show Defendants
### (Interference with Contractual Relationships under California Law)

146.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 138 of the Complaint as though fully set forth herein.

147.   Defendants' above described actions and wrongful activities constitute wrongful intentional interference with contractual relationships of Plaintiffs with its vendors, including Star Jewelry and Lam, and its numerous employees, including Tram Ho and other employees "poached" by the Show Defendants while subject to employment agreements with VBS, in violation of California law, all to the damage of Plaintiffs as alleged herein.

### Count 11 –As to the Show Defendants
### (Interference with Prospective Economic Advantage under California Law)

148.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 141 of the Complaint as though fully set forth herein.

149.   Defendants' above described actions and wrongful activities constitute wrongful intentional interference with prospective economic advantage of Plaintiffs, including its vendors for the Show, and its relationships with its employees, in violation of California law, all to the damage of Plaintiffs as alleged herein.

## Count 12 –As to All Defendants
### (Civil Conspiracy under California Law)

150.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 143 of the Complaint as though fully set forth herein.

151.   Defendants' above described actions and wrongful activities constitute a civil conspiracy to commit in cooperation with each other the other torts and illegal activities alleged herein, or some of them, in violation of California law, all to the damage of Plaintiffs as alleged herein. Plaintiffs have delineated  above the participation of the Supplement Defendants and Doe Defendants in this conspiracy, in addition to the  actions of the Show Defendants.

## Count 13 –As to Defendant Tram Ho
### (Breach of Fiduciary Duties under California Law)

152.   Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 145 of the Complaint as though fully set forth herein.

153.   Defendant's above described actions and wrongful activities constitute a violation of her fiduciary duty of trust, confidence, and loyalty owed to Plaintiffs, including her fiduciary duty as an employee, independent contractor for Plaintiffs, and as co-host of the Show, all in positions of heightened trust and confidence, in violation of California law, all to the damage of Plaintiffs as alleged herein.

## INJUNCTIVE RELIEF

1.      Plaintiffs seeks to enjoin,  permanently, Defendants and their agents and representatives from each and every one of the wrongful activities alleged herein, including but not limited to falsely advertising, unfair competing, stealing or misappropriating Plaintiffs' trade secrets, using Plaintiffs' trade dress, or copying its products or services, or infringing on or using Plaintiffs' Show, or any other wrongful activities of the type alleged herein during the pendency of this action.

## DAMAGES AND RESTITUTION

2.      Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 to 147 of the Complaint as though fully set forth herein.

3.      As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer until Defendants are enjoined, the following damages, and those alleged above and below:

    A.      Actual damages, including but not limited to loss of sales, and reputation damages, in an amount to be determined at trial and after discovery and testimony, but believed to be in amount of not less than twenty million dollars, $20,000,000.

    B.      Enhanced damages for willful infringement, including up to three times Plaintiffs' actual damages (treble damages).

    C.      Defendants' sales and profits as a measure of Plaintiffs' damages, in an amount to be determined at trial and after discovery and testimony, but believed to be in amount of not less than twenty million dollars, $20,000,000.

4.      Upon information and belief, Defendants knew that its unauthorized use of the trade dress, the Infringing Show, and the false advertising and unfair competition as to their directly competing products, would result in an undue benefit to Defendants.

5.      Defendants' unauthorized and confusingly similar use of the Plaintiffs'

intellectual property, and their unfair competition, false advertising, and other wrongful acts, unjustly enriches Defendants at the expense of Plaintiffs' reputation and goodwill, in an amount to be determined at trial and subject to discovery and testimony, but believed to be in amount of not less than twenty million dollars, $20,000,000.

6.     The cost of a corrective advertising campaign in an amount to be determined at trial and subject to discovery and testimony, but believes to be in amount not less than three million dollars, $ 3,000,000.

## ATTORNEY FEES

7.     This is an exceptional case, and one of willful, deliberate, or intentional infringement, such that Plaintiffs are entitled to an award of attorney fees under the Lanham Act,  15 U.S.C. § 1117(a), and other relevant federal and California statutory law, which, through trial, are expected to exceed one million dollars, $1,000,000.

## PUNITIVE DAMAGES

8.     Plaintiffs are entitled to punitive damages under California law as a result of Defendants' wrongful acts as alleged herein, which are fraudulent, malicious, and oppressive, and with reckless disregard for the rights of Plaintiffs, in violation of Cal. Civil Code § 3294, which are expected to be sought in an amount of at least $ 70,000,000 (seventy million dollars).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that this Court grant judgment against Defendants for the following relief:

A.          Defendants, their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, be temporarily restrained, and permanently enjoined from its continuing wrongful acts,

including but not limited to the following:

    i.            Using the Infringing Show or trade dress, or any other confusingly similar designation, or any confusingly similar trade dress, in connection with their products, or related goods or services, or infringing upon Plaintiffs' trade dress.

    ii.           Competing unfairly with Plaintiffs in any manner, including continuing to falsely advertise untrue and misleading facts and statements and claims about their products.

    iii.         Conspiring with, aiding, assisting, or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (1) and (2) above.

    B.           Defendants, their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, deliver for destruction, or show proof of destruction of, any and all products, labels, signs, prints, packages, wrappers, receptacles, and advertisements, and any other materials in its possession or control that depict or reference the infringing trade dress or any other confusingly or substantially similar trade dress, and any materials or articles used for making or reproducing the same, as provided by 15 U.S.C. § 1118.

    C.           Defendants file with the court and serves on Plaintiffs, within 30 days after the entry and service on Defendants of an injunction, a report in writing and attested to under penalty of perjury setting forth in detail the manner and form in which Defendants have complied with the provisions of subparagraphs (A) and (B) above.

    D.           Plaintiffs recover all damages it has sustained as a result of Defendants' infringement and unfair competition and other wrongful activities.

    E.           Plaintiffs be awarded treble damages under 17 U.S.C. § 1117(b) for willful infringement up the statutory maximum of $ 150,000 per work or the

maximum allowed by law, or actual damages to the extent higher.

  F.   Plaintiffs be awarded punitive damages under California law.

  G.   An accounting be directed to determine Defendants' profits resulting from its infringement and unfair competition and that the profits be paid over to Plaintiffs, increased as the court determines is appropriate to the circumstances of this case.

  H.   Plaintiffs be awarded statutory damages under 15 U.S.C. § 1117(d).

  I.   The court declare this case an exceptional case of willful, deliberate, or intentional infringement, and award Plaintiff its reasonable attorney fees for prosecuting this action pursuant to 15 U.S.C. § 1117(a), and as the prevailing party on the claims, and as otherwise allowed by law.

  J.   Plaintiff recover its costs of this action and pre-judgment and post-judgment interest, and attorneys' fees, to the fullest extent allowed by law.

  K.   Defendants be required to recall all inventory of infringing products or services.

  L.   Plaintiffs receive all other relief that the Court deems just and appropriate.

<u>DEMAND FOR JURY TRIAL</u>

  Plaintiffs hereby demand a trial by the jury on its claims herein and all issues and claims so triable in this action.

        Respectfully submitted,

Dated:   April 16, 2018

        LEVIN AND DICTEROW

        By /s/ William E. Levin

William E. Levin
Attorneys for Plaintiff,
VBS DISTRIBUTION, INC. AND VBS
TELEVISION, INC.

**Exhibits to Third Amended Complaint**

| Exhibit No. | Description |
|---|---|
| 1 | Registration Number 4,440,695, registered on November 26, 2013, in the United States Patent and Trademark Office for the mark Fight Price on Television for auction services. |
| 2 | The registered copyright for the Show issued by the United States Copyright office, Registration Number PA1-921-488, on November 13, 2014. |
| 3 | One of the Vietnamese dietary supplement Defendants' advertisements for their Arthro-7, which appeared in a Vietnamese newspaper, Nguaoi Viet, probably the largest in the country, in 2013. It states example that Defendants' Arthro7 product is: "100% tu duoc thao thien nhien." (symbols omitted). The English translation of those words is as follows: "tu" means "from." "duoc thao equals "medical herbal." "Thien nhien" equals "natural." |
| 4 | Another representative example of the Vietnamese dietary supplement Defendants' promotional materials and advertisements, also showing the packaging , including boxes, for the Arthro7 products. |
| 5 | Another representative example of the Vietnamese dietary supplement Defendants' promotional materials and advertisements, also showing the packaging , including boxes, for the Arthro7 products. |

VBS' Third Amended Complaint for Unfair Competition - 56

| | |
|---|---|
| 6 | An English translation of a text message sent from Defendant Tram Ho (Bich Tram, in the message) to no less than 13 unknown recipients. Advertising the Infringing Show and its products. |
| 7 | English translation, and Vietnamese language, document describing the fines and revocation of operating license which were imposed on Defendant Robinson Pharma. |
| 8 | Independent Contractor Agreement between VBS Television and Tram Ho dated August 13, 2012. |
| 9 | Employment Agreement between VBS Television and Tram Ho dated August 1, 2013. |
| 10 | Screen shots of the Show and the Infringing Show, for Thanksgiving Day Special. |
| 11 | Auction Commission Lists dated January 21, 2016 for Phung Diamond Jewelry and January 19, 2016 for Aleksei & Co jewelry (redacted customer information). |
| 12 | Representative page from Master Customer List. |
| 13 | Agreement between VBS Television and Tram Ho dated July 15, 2015. |
| 14 | Various pages from Tuong Nguyen's previous deposition transcript of September 25, 2015 in the first lawsuit. |
| 15 | Information about Tram Ho on Internet and her position with KVLA. |

VBS' Third Amended Complaint for Unfair Competition - 57

| 16 | Employment agreement between VBS and  Madelyn Huynh with any confidential information about her or her employment redacted. |
|----|----|
| 17 | The Vietnamese version of Exhibit 6, showing the text message from Tram Ho on July 6, 2016 to VBS' customer Yen Tran, and 12 other recipients, and her customer ID No. and information from VBS database. |
| 18 | Redacted Lam contract for auction services – Aleskei & Co. |
| 19 | Public announcement and demand from VBS. |
| 20 | Screen-shot from TV channel 57.7 – Dai Phat Jewelry. |
| 21 | Screen-shots from TV channels 57.4 – Diamond King. |
| 22 | N/A |
| 23 | Screen-shots of VBS' Show on TV channel 57.6. |
| 24 | Screen-shot from KVLA infringing show demonstrating bidding. |
| 25 | Redacted Tram Ho application for employment. Dated April 19, 2012. |
| 46 | 2003 FTC Complaint against companies that may be connected to Defendants. *Federal Trade Commission v. Glenn Braswell, et al.*, Case No. CV-03-3700-DT (C.D. Cal. 2003). |

VBS' Third Amended Complaint for Unfair Competition - 58

| 47 | 2005 FTC Settlement with Gero-Vita for $30 million. Tuong Nguyen signed for 10 defendant corporations. Filed on March 30, 2005. *Federal Trade Commission v. Glenn Braswell, et al.*, Case No. CV-03-3700-DT (C.D. Cal. 2003). |
| 48 | *Hatamian v. Robinson Pharma, Inc., et al.*, Case No. BC612422, in the Superior Court of California, County of Los Angeles (2016). Filed on March 2, 2016.  A 2016 class-action complaint re false advertising: clinical studies and health claims. Settled on October 19, 2016. |
| 49 | *Environmental Research Center, Inc., v. Robinson Pharma, Inc.*, filed in the Superior Court of California, County of Alameda, Case No. RG17862850. Filed June 5, 2017. |
| 155 | Agreement designated by Defendants as Confidential, so not attached to TAC |

<u>VERIFICATION OF THIRD AMENDED COMPLAINT</u>

I, JOSEPH C. NGUYEN, am the Chairman and Chief Executive Officer (CEO) of Plaintiffs VBS Distribution, Inc., a California corporation, and VBS Television, Inc., a California corporation, and declare under penalty of perjury under the laws of the United States and the State of California, that the facts set forth in the foregoing Complaint are true and correct based on my personal knowledge, except that where indicated to be based on information and belief, I believe them to be true and correct.

Dated: *May 11* , 2018

_____
Joseph C. Nguyen