Mark T. Kearney, State Bar No. 219707
Jason K. Smith, State Bar No. 277923
**MK Smith, APC**
9891 Irvine Center Drive, Suite 200
Irvine, California 92618
Tel: (949) 299-2500
Fax: (949) 408-1750

Daniel W. Chudleigh, State Bar No. 279564
**Chudleigh Law P.C.**
410 Broadway St., Ste. 170
Laguna Beach, CA 92651
Telephone: (949) 877-9140
Facsimile:  (949) 627-8055

Attorneys for Plaintiffs/Counter Defendants,
VBS DISTRIBUTION, INC.; and
VBS TELEVISION, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| VBS DISTRIBUTION, INC., et al.<br><br>Plaintiffs,<br><br>v.<br><br>NUTRIVITA LABORATORIES, INC.; et al.<br><br>Defendants. | CIVIL CASE NO:<br>8:16-cv-01553-CJC-DFM<br><br>Judge:  Hon. Cormac J. Carney<br><br>**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**<br><br>Date:    August 13, 2018<br>Time:   1:30 p.m.<br>Courtroom:  9B |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

I.    INTRODUCTION..................................................................1

II.   STATEMENT OF FACTS .........................................................2

    A. The Parties and Brief Background ..........................................2

    B. Defendants' Unlawful Conduct ...............................................4

III.  ARGUMENT ..........................................................................6

    A. Standard For Motion For Summary Adjudication. ...........................6

    B. Defendants' Request for Summary Adjudication On VBS Distribution's
       False Advertising Claim (Count 2) Should Be Denied...............................7

       1.   The Arthro-7 statements and advertisements are literally false.............8

       2.   The Statements Are Material And Caused Actual Deception.............15

       3.   Damages Caused By Defendants' False Advertising.........................15

       4.   There Is No Merit to Defendants' New Unclean Hands/Estoppel
          Defense. ........................................................................18

    C. Defendants' Request for Summary Adjudication On VBS Distribution's
       Antitrust Claims (Counts 8 and 9) Should Be Denied. ...............................18

    D. Defendants' Request for Summary Adjudication On VBS Television's
       Trade Dress Claims (Counts 6 and 7) Should Be Denied..........................19

    E. Defendants' Request for Summary Adjudication On VBS Television's
       Misappropriation Of Trade Secrets Claims (Counts 4 and 5) Should Be
       Denied.............................................................................23

    F. Defendants' Request for Summary Adjudication On VBS Television's
       Interference With Contract Claim (Count 10) Should Be Denied. ............27

    G. Defendants' Request for Summary Adjudication On VBS Television's
       Interference With Economic Advantage Claim (Count 11) Should Be
       Denied. ..........................................................................29

H. Defendants' Request for Summary Adjudication On Plaintiffs' Unfair Competition Claim (Count 1) Should Be Denied. .........................................30

I. Defendants' Request for Summary Adjudication On Plaintiffs' Claims Against Tom Nguyen and Jenny Do Should Be Denied. ............................30

IV. CONCLUSION..........................................................................................31

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION

# TABLE OF AUTHORITIES

**Cases**

*Abba Rubber Co. v. Seaquist,* 235 Cal.App.3d 1 (1991) ...................................... 23

*Adray v. Adry-Mart, Inc.*, 76 F.3d 984 (9th Cir. 1995).................................... 15, 18

*Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781 (9th Cir. 1996)........................... 18

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ......................................... 7

*Art Attacks Ink, LLC v. MGA Entertainment, Inc.* 581 F.3d 1138
   (9th Cir. 2009) ............................................................................................. 21

*Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145 (7th Cir. 1994) ................... 17

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ................................................. 6, 7

*Click Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252 (9th Cir. 2001)............. 22

*Courtesy Temporary Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990)...... 23

*Davis v. Progressive Cas. Ins. Co.,* 220 Fed.Appx. 708 (9th Cir. 2007)............. 10

*Earthbound Corp. v. Mitek United States*, 2017 U.S. Dist. LEXIS 174209
   (C.D. Cal. Feb. 10, 2017) ........................................................................ 27, 29

*Emco, Inc. v. Obst*, 2004 U.S. Dist. LEXIS 12118 (C.D. Cal. May 7, 2004)....... 18

*Facebook Inc. v. Power Ventures, Inc.,* 2016 WL 3741956 (9th Cir. 2016) ........ 31

*First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378 (9th Cir. 1987) ........ 20, 21

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119
   (9th Cir. 2014) ............................................................................................. 27

*FTC v. Braswell,* CV 03-3700 DT, 2005 U.S. Dist. LEXIS 42976
   (C.D. Cal. 2005) ...................................................................................... 12, 13

*FTC v. SlimAmerica, Inc.,* 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ....................... 13

*Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989).......... 15

*K&N Eng'g, Inc. v. Spectre Performance*, 2012 U.S. Dist. LEXIS 196138 (
   C.D. Cal. Aug. 2, 2012)................................................................................. 17

*Lexmark Intern, Inc. v. Static Control Components, Inc.,* 134 S.Ct.1377 (2014). 16

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993) ............. 15, 16, 17

*Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117
(9th Cir. 1968) ......................................................................... 16

*McGlinchy v. Shell Chem. Co.,* 845 F.2d 802 (9th Cir. 1988) .............................. 19

*Mexican Food Specialties, Inc. v. Festida Foods, Ltd.* 953 F.Supp. 846
(E.D. Mich. 1997)..................................................................... 22

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
316 U.S. 203 (1942) ................................................................ 16

*Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514 (1997)................................. 23

*Mutual Pharm. Co. v. Ivas Pharms., Inc*., 459 F. Supp. 2d 925 (C.D. Cal. 2006) . 8

*Nissan Fire & Marine Ins. Co. v. Fritz Co*., 210 F.3d 1099 (9th Cir. 2000) .......... 7

*Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016)... 19

*Playboy Enters. v. Baccarat Clothing Co.*, 692 F.2d 1272 (9th Cir. 1982).... 16, 17

*PPX Enterprises v. Audio Fidelity Enterprises,* 818 F.2d 266 (2d Cir. 1987)...... 17

*R&R Partners, Inc. v. Tovar*, 2007 U.S. Dist. LEXIS 29819
(D. Nev. Apr. 23, 2007) ........................................................... 15

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997)........ 8, 17

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) ................................. 18

*TrafficSchool.com, Inc. v. Edriver Inc*., 653 F.3d 820 (9th Cir. 2011)................. 17

*Two Pesos v. Taco Cabana,* 112 S. Ct. 2753 (1992) ............................................. 20

*U.S. v. Carter,* 506 Fed.Appx. 853 (11th Cir. 2013)............................................. 11

*U.S. v. Johnson,* 594 F.2d 1253 (9th Cir. 1979)...................................................... 10

*Vacco Indus., Inc. v. Van Den Berg*, 5 Cal.App.4th 34 (1992)............................... 23

*VBS Distribution, Inc. v. Nutrivita Laboratories, Inc.* 697 Fed.Appx. 543
(9th Cir. 2017) ................................................................. 9, 11, 20

*Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609 (9th Cir. 1989)..................... 22

*Waits v. Frito–Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) ........................................ 7

*Yeti Enters. v. Tang*, 2017 U.S. Dist. LEXIS 128779 (D. Or. Aug. 14, 2017) ..... 16

**Statutes**

15 U.S.C. § 1117(a) ................................................................................. 15

15 U.S.C. § 1125 ........................................................................................ 7

15 USCS § 1117 ....................................................................................... 16

Cal. Civ. Code § 3426.1(b) ...................................................................... 23

Cal. Civ. Code § 3426.1(d) ...................................................................... 23

**Rules**

Fed. R. Civ. P. 56(c)(2) ............................................................................. 6

Fed. R. Evid. 602 ...................................................................................... 10

**Treatises**

W. Levin, <u>Trade Dress Protection</u> § 13:19 (2d ed. Rel. 8

    Thomson Reuters 2016) ................................................................... 21

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendants have fallen far short of meeting their burden to establish that Plaintiffs' claims are susceptible to summary adjudication.  Every material fact is clearly in dispute as evident from Defendants' Motion itself, thus requiring denial of Defendants' Motion.

Generally, there are two sets of claims in this case: (1) VBS Distribution, Inc.'s causes of action against the "Supplement Defendants" (defined below) relating to the numerous false statements contained in their packaging and advertising of the herbal supplement, Arthro-7; and (2) VBS Television, Inc.'s causes of action against the "Show Defendants" (defined below) for stealing trade secrets and mirroring VBS Television, Inc.'s auction program (trade dress) to the point where consumers can't even tell the difference between the two programs. The actions of Defendants on which the claims are based are only part of Defendants' grand scheme to unlawfully bully their competition out of business.

There is no question in this case that Defendants' advertising contains numerous literally false material statements[1] that, as supported by Plaintiff's expert's consumer survey, caused (and continues to cause) substantial confusion to the consuming public.  It is Plaintiff who is entitled to judgment on its false advertising claims as a matter of law.  There are certainly material facts in dispute that, alone, precludes summary adjudication as sought by Defendants.

So too is there no question that the Show Defendants deliberately copied VBS Television, Inc.'s program.  This is obvious from a simple comparison of the unique and non-functional aspects of the show that have been blatantly copied.

---

[1] Plaintiff has identified at least 12 separate distinct false advertising statements made by Defendants, not just the 7 addressed by Defendants in their instant Motion.  Defendants' request for summary adjudication as to the false advertising claims must be denied for the sole reason that Defendants have not even addressed all of the false advertising claims, including false statements by Defendants regarding the existence of lead in Arthro-7 that resulted in a prior consumer Proposition 65 lawsuit against Defendants.

The Show Defendants went so far as to poach Plaintiff's employees (including the host of Plaintiff's show) and steal Plaintiff's trade secrets (customer lists, vendor information, etc.).  Again, it is Plaintiff who is entitled to judgment on these claims as a matter of law.  There can be no question that there are material facts in dispute that precludes summary adjudication in favor of Defendants.

This Court previously denied Defendants' request for summary adjudication based on Defendants' failure to participate in good faith settlement discussions and their previous refusal to continue further mediation as ordered. (Dkt. 196, 191.)  Defendants have continued to refuse to engage in good faith settlement discussions notwithstanding what is believed to be clear liability and substantial damages in this case.  This is consistent with Defendants' general pattern and practice.  Defendants essentially view themselves as "above the law," even claiming at deposition that they are not required to comply with a permanent injunction previously obtained by the Federal Trade Commission enjoining the very false advertising, etc. that Defendants continue to engage in to this day to the harm and detriment of consumers.

Plaintiffs' lawsuit aims to hold Defendants responsible for their persistent and cavaliere disregard for the law and fair competition.  Defendants' Motion only highlights the existence of material facts that are in dispute in this case, requiring a trial on the merits.  Defendants' Motion must be denied.

II.   **STATEMENT OF FACTS[2]**

A.   **The Parties and Brief Background**

Plaintiff VBS Distribution, Inc. ("VBS Distribution") is a distributor of nutritional supplements formed and started in or about 2008 by Joseph Nguyen. VBS Distributions' primary and most successful product is JN-7 Best, an herbal arthritis joint compound product.

---

[2] Please see the Declaration of Joseph Nguyen, the founder and Chief Executive Officer of Plaintiffs VBS Distribution, Inc. and VBS Television, Inc. for further detail on the general facts set forth herein.

Defendants Nutrivita Laboratories Inc., Nutrivita, Inc., US Doctors Clinical, Robinson Pharma, Inc., Tuong Nguyen, and Jenny Do (collectively the "Supplemental Defendants") also distribute nutritional supplemental products. The Supplemental Defendants distribute Arthro-7, a competing product to VBS Distribution's JN-7 Best.  Defendant Tuong Nguyen ("Tuong") owns and controls Defendants.

Defendants have a long history with claims relating to its Arthro-7 product and deceptive and abusive business practices.  The Federal Trade Commission previously obtained an injunction (along with a $30 Million fine) against the Supplement Defendants based on Defendants' false advertisement of the product.[3] A consumer lawsuit was also filed against Defendants relating to elevated amounts of lead contained in Defendants' Arthro-7 product, which, according to one of Defendants' employees during deposition, resulted in Defendants paying a six-figure settlement.  Numerous other lawsuits have been filed against Defendants relating to their unfair and deceptive business practices.

When VBS Distribution emerged as a competitor in the herbal supplement market, Defendants immediately targeted VBS Distribution in a clear attempt to put them out of business.  Defendants strategically employed illegal tactics to gain an edge over VBS Distribution, including false advertising, unfair competition, unfair and deceptive trade practices.

Plaintiff VBS Television, Inc. ("VBS Television") produces and broadcasts a popular auction style television program in the Vietnamese market ("VBS Show").

After the VBS Show became successful, Defendants KVLA, Inc., Tram Ho, and Jenny Do aka Ngoc Nu, and Tuong (collectively the "Show Defendants") started producing and airing a copy of the VBS Show as more fully described below ("Infringing Show").

---

[3] Defendants admit that they have failed to comply with the FTC's injunction.

**B.      Defendants' Unlawful Conduct**

Immediately when VBS Distribution entered the market to compete with the Supplement Defendants' Arthro-7 product, Defendants launched their campaign to use all legal and non-legal[4] means to put Plaintiffs out of business. According to Defendant Tuong, the person who owns and controls Defendants, and Jenny Do, Defendants' intention has been to put Plaintiffs out of business. To start, Defendants immediately filed a frivolous lawsuit against Plaintiffs that they eventually dismissed just prior to trial and after they had accomplished their actual goal of distracting Plaintiffs from growing their business and requiring Plaintiffs to spend considerable money and resources on defending frivolous claims.

Defendants' scheme also included the unlawful competitive acts that form the basis for Plaintiffs' claims in this case.  Defendants set out to destroy VBS Television by making a copy of VBS Television's popular auction style Vietnamese television show that airs from 5:00 p.m. to 7:00 p.m. on Tuesdays and Thursdays, even going so far as to poach VBS Television's host of the show and other VBS employees.  Defendants used VBS Television's confidential information (customer list, employees, trade secrets) to copy the program.  To capitalize off the success of the VBS Show and to confuse the viewing public, the Show Defendants copied[5] the VBS Show and aired the show on Mondays, Wednesdays, and Fridays from 5:00 p.m. to 7:00 p.m.  Basically, the Show Defendants wanted the viewing pubic to think they were watching the VBS Show

---

[4] Plaintiffs welcome legal competition in the market, and believe that fair competition helps the industry as a whole by increasing consumer exposure and furthering innovation.  It is Defendants' illegal competitive activity that can not be tolerated in any civilized society.

[5] Defendants used the same host, the same concepts, the same format, the same unique camera techniques invented by Plaintiff, the same camera angles, the same unique lighting and shading, the same camera filter effects, the same studio arrangement, the same products, the same product displays, the same pictures of products, the same number of products per show, the same product price ranges, the same pattern of auctioning off lowest priced products first, the same time slots, the same customers (using customer lists that they stole from Plaintiff), the same vendors (again, stolen from Plaintiff), etc.

(which aired on Tuesdays and Thursdays from 5:00 p.m. to 7:00 p.m.) when they were really watching the Infringing Show.  VBS Television has received calls from confused viewers thinking they were watching, and ordering products from, the VBS Show when they had actually watched Defendants' copycat show. Defendants even set up their television studio operation just down the street from VBS Television.

Since the beginning of the VBS Show, VBS Television has been collecting, analyzing, and organizing various types of information to help gauge and evaluate different aspects of the program.  Some of the information collected included vendor information lists, employee information lists, and customer information lists.  VBS Television maintained contact information as well as financial information.  VBS Television tracked customer purchase details, employee performance, pricing guidelines, concepts, and other confidential information. The information collected by VBS Television is highly confidential.  Few people have access to the information, which is maintained on secure computers that require unique passwords to access, and access is generally limited only to those key employees who need such access and who have agreed to maintain the confidentiality of the information.  All employees with access to the information are required to sign confidentiality agreements.

The confidential information maintained by VBS Television derives significant value from not being known to competitors.  The information may be used in countless ways to compete with VBS Television.  For example, competitors could use the pricing guidelines to undercut VBS Television's profit margins or negotiate better prices with suppliers; and competitors could use the customer lists to selectively target the most valuable customers, identify potential customers, and solicit customers for similar products (which is exactly what the Show Defendants have done with the unlawfully obtained trade secrets).

Defendants have also—and most importantly for purposes of this lawsuit— engaged in unfair competition with VBS Distribution, including by way of falsely

advertising the Arthro-7 product to the severe detriment of consumers.

Both JN-7 Best (VBS Distribution's product) and Arthro-7 (Supplement Defendants' product) are dietary nutritional supplement pills (joint compounds) marketed and sold primarily to the American-Vietnamese marketplace.

JN-7 Best is available for purchase mainly through VBS Television's home shopping program, where customers call and place orders directly. The product is advertised on the VBS Show. However, VBS Distribution also sells JN-7 Best in stores. JN-7 Best and Arthro-7 Best are sometimes sold in the same stores, displayed for sale next to each other on the shelf.

Defendants have made numerous false advertising statements in connection with the advertising and sale of Arthro-7 with the specific intention of deceiving consumers. For example, while Supplement Defendants advertise their Arthro-7 product as 100% herbal and containing no animal byproducts, it is undisputed in this case that their Arthro-7 product contains animal byproducts, including chicken collagen and gelatin. The Supplement Defendants have made numerous other false advertising statements on their labeling and in their advertising for Arthro-7, which are discussed and detailed further below.

## III.   ARGUMENT

## A.   Standard For Motion For Summary Adjudication.

Summary judgment is appropriate only where the record, read in the light most favorable to the nonmoving party, establishes that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  (Fed. R. Civ. P. 56(c)(2); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).)  The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. (*Celotex*, 477 U.S. at 323.)   If the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and show a genuine

1   issue of material fact.  (*See id.* at 322–23; *Nissan Fire & Marine Ins. Co. v. Fritz*

2   *Co.*, 210 F.3d 1099, 1103 (9th Cir. 2000).)

3       Material facts are those necessary to the proof or defense of a claim, and

4   they are determined by reference to substantive law.  (*Anderson v. Liberty Lobby,*

5   *Inc.*, 477 U.S. 242, 248 (1986).)  In evaluating and deciding a motion for

6   summary judgment, "[t]he evidence of the nonmovant is to be believed, and all

7   justifiable inferences are to be drawn in his favor."  (*Anderson*, 477 U.S. at 255.)

8   **B.    Defendants' Request for Summary Adjudication On VBS**

9       **Distribution's False Advertising Claim (Count 2) Should Be Denied.**

10      VBS Distribution's false advertising claims are the most significant and

11   strongest claims in this case (both on liability and from a damages standpoint), so

12   those claims will be addressed first.

13      The Supplement Defendants only addressed 7 of the many more false

14   advertising statements that are alleged to have been made by Defendants in their

15   marketing and sale of Arthro-7.  In a desperate attempt to trick this Court into

16   disposing of the false advertising claim, Defendants falsely claim that Plaintiffs

17   have somehow "abandoned" all but 4 of the false claims.  This is simply untrue

18   and unsupported.  While Plaintiffs' expert addressed consumer confusion with

19   respect to 4 of the claims, there was no need (nor any legal requirement) for an

20   expert to address other claims that are *literally false*.  There is other non-expert

21   evidence that establishes beyond a shadow of a doubt the claims are literally false.

22      "Section 43(a) of the Lanham Act (15 U.S.C. § 1125), prohibits the use of

23   false designations of origin, false descriptions, and false representations in the

24   advertising and sale of goods and services."  (*Waits v. Frito–Lay, Inc.*, 978 F.2d

25   1093, 1106 (9th Cir. 1992) (citing *Smith v. Montoro*, 648 F.2d 602, 603 (9th Cir.

26   1981)).)  The elements of a §43(a) Lanham Act claim are: (1) a false statement of

27   fact by the defendant in a commercial advertisement about its own or another's

28   product; (2) the statement actually deceived or has the tendency to deceive a

substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill of its products. (*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).)

A plaintiff can establish the falsity of a statement *either* by showing that, in context, the statement "was literally false, either on its face or by necessary implication," or by showing that although the statement was "literally true" it was nonetheless "likely to mislead or confuse consumers." (*Id.* at 1139–40.) "Where the advertisement is literally false, a violation may be established without evidence of consumer deception." (*Mutual Pharm. Co. v. Ivas Pharms., Inc.*, 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006) (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002)).) "If the advertising claim is literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." (*Id.* (quoting *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997)).) Only when the statements are not literally false (*i.e.* the statements are truthful but misleading), is the plaintiff required to establish that the statements "tend to mislead or confuse consumers." (*Id.* (quoting *Scotts*, 315 F.3d at 273).) "The reason for this difference in proof is that, while 'a court may find on its own that a statement is literally false,' whether a representation is impliedly misleading is not something that is readily susceptible to being evaluated absent 'evidence [showing] actual consumer deception.'" (*Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 14 (7th Cir. 1992)).)

### 1.    *The Arthro-7 statements and advertisements are literally false.*

First, a consumer can be "misled" by an advertising statement that is either misleading or literally false. Defendants' argument that Plaintiffs' expert's use of

the word "misled" somehow means that Plaintiffs are only claiming that statements were misleading, as opposed to being literally false, is entirely misplaced and nonsensical.  Consumers can be misled by either misleading statements *or* literally false statements.

As to the seven false advertising statements Defendants chose to address, Defendants baldly contend that VBS has "no evidence that any of the . . . statements about Arthro-7 are false."  (Memo, p. 21, lines 24-25.)  Defendants' argument ignores the substantial evidence of falsity and even the Ninth's Circuit's prior ruling in this matter.  (Response to SDF ("SDF") 15, 16;  Ex. 92, Verified Third Amended Complaint ("TAC"), 42-54) (DKt. 39).

When Defendants claim, for example, that the "over 8 million bottles sold" and "100% herbal ingredients" advertising statements are "neither false nor misleading," they ignore the content of their own labels[6], the law of the case, and common sense.  An expert is not needed to tell us that those statements are false.  When less than 8 million bottles have been sold and the product is not "100% herbal," the statements have been proven false with or without an expert.  Moreover, the Ninth Circuit's previous ruling in this matter has already established the literal falsity of the statements:

> First, Nutrivita's advertising claim that Arthro-7 was '100% herbal' was contradicted by Arthro-7's own ingredient list, which includes animal products; there is no evidence in the record that 'herbal' means something other than 'of, relating to, or made of herbs," Webster's New International Dictionary 1058 (3rd ed. 1993) in the supplement industry.  (*VBS Distribution, Inc. v. Nutrivita Laboratories, Inc.* 697 Fed.Appx. 543 (9th Cir. 2017) (unpublished).)

With respect to the false advertising statement that "over 8 million units sold," the Ninth Circuit stated:

> Second, VBS's claim that Nutrivita's advertising statement, '8 Million Bottles Sold,' is literally false is

---

[6] Defendants' own ingredient list identifies the collagen as "from chicken," leaving no question that Defendants' advertising claims of "100% herbal" is literally false.

essentially undisputed by Nutrivita; indeed, its CEO admitted there was no basis for this claim. (Dkt. 83). (*VBS Distribution, Inc. v. Nutrivita Laboratories, Inc.* 697 Fed.Appx. 543 (9th Cir. 2017) (unpublished); See also ASDF Para 41.)

Defendant US Doctors' own marketing director, Mina Shariff, even testified that holding out Arthro-7 as 100% herbal would constitute false advertising and would mislead customers. (Shariff Decl.) Ms. Shariff confirmed that Arthro-7 contains animal products, contrary to the 100% herbal claim. (*Id.*) Ms. Shariff went on to testify that consumers would be less likely to buy the Arthro-7 product without the false 100% herbal claim. (*Id.*)

Defendants' assertion that its "sales records" support the claim that over 8 million units have been sold not only conflicts with all of the other evidence, but there are a host of other reliability issues with Defendants' "sales records." The so called "sales records" are highly suspicious on their face and are contrary to Defendants' prior admissions that (1) they do not have any actual sales or purchase records to back up this claim, and (2) they never saw such records and do not know if they even ever existed. (SDF 86.) Defendants rely solely on an unauthenticated "database" of information input by some unknown person(s) before Tuong bought the Arthro-7 company, and Defendants' current database of Arthro-7 sales is based on that same earlier database over which they had no control. (*Id.*) Defendants have admitted that they have no personal knowledge as to the previous database on which the current database is based. (SDF 77, 86.) The purported annual sales summaries themselves (Ex. 88) were only produced toward the end of the deposition of Miranda though the documents had been requested five months earlier. (Dkt. 126-4, Doc. Req. Nos. 55 through 59.)

Defendants have failed to authenticate and establish proper foundation for the database or its accuracy[7], and numerous mistakes in the database and its

---

[7] Fed. R. Evid. 602; *U.S. v. Johnson*, 594 F.2d 1253, 1254-56 (9th Cir. 1979) (improper foundation had been provided for a summary chart and it should not have been admitted when the party offering it had not proven the admissibility of the underlying documents); *Davis v. Progressive Cas. Ins. Co.*, 220 Fed.Appx. 708, 711 (9th Cir. 2007) (unpublished decision) (trial court properly excluded a summary

1    reports were admitted by Defendants.  (*Id.*; Ex. 176; Miranda Dep., e.g. pp. 42:14

2    "I'm thinking there's a discrepancy, yeah," pp. 47: 20-22.)  The purported sales

3    jump from about 120,000 to over 2 million in a single year, then another year or

4    so from 1.2 million down to half a million, then plunge back down again to their

5    normal levels.  (Ex. 88.)  The "sales records" mysteriously withheld from

6    production for months after they were requested are unauthenticated, unreliable,

7    false on their face, and contrary to all of the other evidence.  In any event, even

8    with Defendants' unreliable "sales records," the falsity of the 8 million units sold

9    is still, quite clearly, a disputed fact.

10        Defendants have been making the false claim of "over 8 million units sold"

11   since as early as 2012[8], and have admitted numerous times that they had no proof

12   of the claim.  (See, e.g., Ex. 131, Tuong I dep., pp. 57-58; *VBS Distribution, Inc.,*

13   *supra,* 697 Fed.Appx. 543; SDF No. 86; ASDF No. 41.)  In opposing VBS'

14   preliminary injunction request earlier in this case, Defendants asserted, "Arthro-7

15   entered the market in 1998 but Defendants did not purchase it until 2005.  Many

16   of the bottles were sold before Defendants purchased Arthro-7 and therefore

17   Defendants do not claim to possess knowledge of the actual amounts sold before

18   they acquired it."  (Dkt. 40, pp. 19.)

19        Defendants advertising "Dr. Hahn," a paid endorser who is not a doctor, as

20   an independent doctor who endorses Arthro-7 is certainly misleading if not false

21   on its face.[9]  While Defendants argue that its Arthro-7 product is "endorsed by a

---

exhibit when the party relying on the exhibit failed to tender the underlying documents after being requested to do so); *U.S. v. Carter,* 506 Fed.Appx. 853, 859 (11th Cir. 2013) (unpublished decision) (chart that was conclusory and was not supported by actual records was inadmissible.)

[8] Defendants have also made significant formulation changes to their Arthro-7 product through the years, which would be another basis for the falsity of the 8 million units sold claim.  There is also a factual dispute as to whether the 8 million units sold claim pertains to each separate distributor's sales, as the packaging suggests, or the overall sales of the product.

[9] FTC Regulation, Section 255.3, Example 2 (Ex. 82) prohibits just what Defendants and Dr. Hahn have done.  Moreover, Cal. B&P. Code Sections 651, 2274, and 2278 provide that a podiatrist cannot hold themselves out to the public as a medical doctor.  (Ex. 185.)

panel of 42 medical professionals, including 23 medical doctors" ("not just endorsed by Dr. Hahn"), that is not what Defendants' product package indicates. (Ex. 5, 120.)  Instead, Defendants only hold out "Dr. Hahn," a purported podiatrist[10] and not a doctor[11], as the endorser.  And the product packaging, and advertisements, don't just say "clinically tested formula," they say that at least four specific health claims are "CLINICALLY PROVEN," but the studies are grossly insufficient to make such claims.  (See *FTC v. Braswell,* CV 03-3700 DT, 2005 U.S. Dist. LEXIS 42976 (C.D. Cal. 2005))

Defendants admitted in their answer to the complaint in this matter that Hahn is a compensated "spokesperson" for Arthro-7, which is not disclosed on their product packaging.  Dr. Hahn has a contract to develop products for Defendants and he gets a percentage of Defendants' profits, none of which is disclosed on Defendants product packaging (Ex. 120) or advertisements (Ex. 3, 4, 5, 60-65, 67, 71, 72, 74, 79, 124); SDF 15, 16.).  Instead, Defendants hold "Dr. Hahn" out as an independent medical doctor.  (Exs. 501 and 502.)  The expert survey provided in Dr. Klein's expert report establishes that consumers of Arthro-7 are misled because they do not know of this compensation and material connection, which, if they knew, would substantially decrease their likelihood of buying Arthro-7.  (SDF 15, 16, 17; Ex. 175, Mina Depo., at pages 55-60)  To the extent that Defendants' advertising statement, "Doctor Recommended," is not literally false, Plaintiffs have submitted expert Dr. Klien's survey establishing consumer confusion and that the statement is misleading.

Dr. Klein's expert report also establishes that the "Clinically Proven" claim is misleading, as the false on its face or misleading message is that the studies

---

[10] It turns out that "Dr." Hahn is not even a licensed podiatrist.  (Exs. 182 and 183.)

[11] Even some members of Defendants' marketing team did not know what the initials, like DPM, meant on the advertising in small letters, or that a podiatrist is not a medical doctor.  If some of Defendants' own Arthro-7 marketing team members don't know that Dr. Hahn is not a medical doctor, surely a reasonable jury could find that consumers are misled by Defendants' advertising.

were conducted at UCLA, or by a UCLA researcher, not in China among a very, very small sample of patients.  Defendants' advertising is also misleading because it fails to disclose that the "Clinical Proof" was "published" in a pay-to-play online "journal."  The law is clear that such issues as how clinical studies are conducted, and then the results marketed, must comply with numerous strict scientific and other requirements in order not to constitute false advertising.  For example, courts have consistently found that double-blind, randomized, placebo-controlled trials ("RCTs") are required to provide adequate substantiation for the truthfulness of health-related claims.  (*See, e.g., Direct Mktg. Concepts, Inc.,* 569 F.Supp. 2d at 303; *FTC v. Braswell,*  CV 03-3700 DT, 2005 U.S. Dist. LEXIS 42976 at *35.) (C.D. Cal. Sept. 26, 2005); *FTC v. SlimAmerica, Inc.* 77 F. Supp. 2d 1263, 1274 (S.D. Fla. 1999) (requiring a "double blind study of the combination of ingredients used in the defendants' weight loss product for claim substantiation.)

VBS has introduced credible evidence on the falsity of Defendants' advertising claims[12], the materiality of such claims, and the damage resulting from the false claims, including by way of the expert report and opinions of Dr. Robert Klein.  (Dkt. 147-4.)  Defendants have failed to even address many of the false advertising statements, including:

- *Arthro-7 is safe and effective.*  There are toxic lead levels in the Arthro-7 product.[13]

[12] See SD 15-16, 86-89, including: (1) Dr. Klein's survey (Ex. 524); (2) articles showing the bad reputation of Chinese studies of this type (Ex. 55, 56), which Defendants spin as being more based on the work of a UCLA researcher (Ex. 3) FTC's rules and regulations, and FDA restrictions, prohibiting dietary supplement manufacturers and distributors from making these kinds of claims.  (Ex. 82, 187; SDF, 15, 16.)

[13] Defendants were sued by a consumer group in 2017 for failure to warn consumers of that Arthro-7 contained excessive levels of lead.  According to that lawsuit, which the Arthor-7 marketing manager had never been informed of, the consumer group had Defendants' products tested by leading independent laboratories.  (Ex. 76.)  VBS' own lead testing of Defendants' products also confirmed an improper, and non-disclosed, level of lead, which is clearly false.  (Ex. 123.) Defendants' marketing

- *Arthro-7 contains no heavy metals.*  (See Ex. 51 -- While the whole video is quite incriminating, the spokesperson for Defendants claims that Arthro-7 contains no heavy metals, etc. at minute 7:19 to 8:05.)

- *Stating that their health claims have been CLINICALLY PROVEN by alleged studies.*  The only studies that have been conducted were not independent in any way, but actually designed, financed, influenced, and controlled by Defendant Tuong and his companies.[14]  These types of health claims are also prohibited by the FTC.  (SDF15, 16.)

- *Stating health claims without disclosing the underlying "clinical studies" are not legally or factually sufficient to support the claims.*[15]

- *Stating that Arthro-7 is GMP compliant.*

     If anyone is entitled to judgment as a matter of law on the false advertising claims, it is Plaintiffs.  In any event, there are a plethora of material disputed facts that require denial of Defendants' Motion.

---

manager even admitted that knowledge of excessive lead would be critical to consumers' buying decision.

Defendants tried to hide the existence of the consumer lawsuit by failing to disclose in discovery despite Magistrate McCormick's order that such documents be produced.  But Defendants sought to hide these 2016 and 2017 lawsuits, just as they had done from their own employees in charge of marketing Arthro-7.  (ASDF 57, 58.)

[14] Defendants Tuong or Robinson, the manufacturer, controlled or influenced the clinical studies, through DRM, merely another Tuong controlled entity.  (Ex. 140, page 19: Tuong is the CEO and owner of DRM; SDF Paras. 15, 16.)  DRM's role in the "clinical studies" in China is confirmed by other sources also.  An article (Ex. 56) on the Supplement-Geek.com website states in part: "Both the placebo and Arthro-7 were provided by Robinson Pharma, the maker of Arthro-7.  The study mentions that 3 of the researchers "are current previous employees of DRM Resources which sponsored the project."  DRM Resources is a marketing company in California that appears to specialize in the health and wellness industry.  Their website is DRMResources.com.  According to Whois.com, Tuong Nguyen registered the DRM Resources website, as well as both the US Doctors Clinical site and the Robinson Pharma site.  Robinson sponsored the study.  (Ex. 148, 32.)  Defendants denied during depositions that DRM is part of Robinson, and claimed that they didn't know who owned it, despite overwhelming evidence that Tuong does (Ex. 140, page 19) and its affiliation with Robinson.  (SDF Paras. 15, 16.)

[15] Why and how the "clinical studies" do not support Defendants' claimed benefits is discussed in detail in the class action case against Defendants, *Aren Hatamian et al. v. Robinson-Pharma et al.*, against Defendants in 2016 (Ex. 75).

---

**2.    *The Statements Are Material And Caused Actual Deception.***

Defendants engage in circular reasoning to argue that the false advertising statements are "immaterial" because, as Defendants claim, they are not literally false.  (Memo, p. 24, 1. 6-8.)  As discussed above, many of the statements are literally false.  All of the statements are material and caused consumer confusion, as further supported by Dr. Klein's consumer survey.  (Ex. 524; SDF 15, 16; Ex. 175, Mina Shariff's Dep. Pp. 55-60.)

**3.    *Damages Caused By Defendants' False Advertising.***

Defendants make the entirely unsupported claim that no damage has resulted from their false advertising.  This position is contrary to the evidence, the law, and the damage expert report submitted by Plaintiffs.

A plaintiff on a false advertising claim is entitled to recover as damages, "subject to the principles of equity, . . . (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  (15 U.S.C. § 1117(a).)  A plaintiff is entitled to all of the aforementioned damages regardless of whether the offense was willful or not. (*R&R Partners, Inc. v. Tovar*, No. 03:04-CV-00145-LRH-PAL, 2007 U.S. Dist. LEXIS 29819, at *3 (D. Nev. Apr. 23, 2007).)  Even in false advertising cases where monetary damages cannot be proved or are unavailable, a false advertising claim survives summary adjudication because "a competitor need not prove injury when suing to enjoin conduct that violates section 43(a)."  (*Harper House, Inc. v. Thomas Nelson, Inc*. 889, F.2d 197, 210 (9th Cir. 1989).)  As such, Plaintiffs' false advertising claim would survive summary adjudication in this case even if there were no damages.  Plaintiffs have, however, shown substantial damages from Defendants' false advertising.

A plaintiff can be awarded defendant's profits either as, (1) a measure of plaintiff's own damages (lost sales), or as (2) defendant's profits on the theory of unjust enrichment. (*Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1407 (9th Cir. 1993); *Adray v. Adry-Mart, Inc*., 76 F.3d 984, 988 (9th Cir. 1995); *Lexmark*

*Intern, Inc. v. Static Control Components, Inc.* 134 S.Ct.1377, 1392 (2014).)  A plaintiff does not need to show willfulness if the profits are a measure of plaintiff's own damages, but is generally required to show willfulness in the latter situation. (*Id.* (*Adray)*).

"In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." (15 USCS § 1117.)  "The plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty."  (*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993).)  Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity.  (*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-07 (1942).)

The Ninth Circuit mandates "that the trial court's primary function should center on making any violations of the Lanham Act unprofitable to the infringing party."  (*Playboy Enters. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir. 1982).)  "To impose on the infringer nothing more serious than an injunction when he is caught is a tacit invitation to other infringement."  (*Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968) (citing *Admiral Corp. v. Price Vacuum Stores, Inc.*, 141 F. Supp. 796, 801 (E.D.Pa.1956).)

### i.   *Defendant's Profits As Damages (lost profits)*

"[A] claim for damages for false advertising under the Lanham Act does not require "empirical quantification nor expert testimony."  (*Yeti Enters. v. Tang*, 2017 U.S. Dist. LEXIS 128779, at *44 (D. Or. Aug. 14, 2017) (citing *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012).)  Courts have recognized that quantifying damages in false advertising cases can be difficult, and have moved towards the preferred approach of allowing "the district court in its discretion to fashion relief, including monetary relief, based on the totality of

1  the circumstances." (*Lindy Pen Co. v. Bic Pen Corp.* (9th Cir. 1993) 982 F.2d

2  1400, 1411 (quoting *Bandag, Inc. v. Bolser's Tire Stores*, 750 F.2d 903, 919 (Fed.

3  Cir. 1984)]; see also *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157

4  (7th Cir. 1994) (stating that, even if a plaintiff is unable to demonstrate damages

5  resulting from the defendant's § 43(a) violation, § 1117 allows the district court to

6  award the plaintiff any just monetary award so long as it constitutes

7  'compensation' for the plaintiff's loses or the defendant's unjust enrichment and

8  is not simply a 'penalty' for the defendant's conduct.) (*Southland Sod Farms,*

9  108 F.3d 1134, 1146 (9th Cir. 1997).)  In cases involving statements that are

10  literally false, monetary damages can be awarded even without a showing of

11  consumer confusion.  (*PPX Enterprises v. Audio Fidelity Enterprises,* 818 F.2d

12  266, 272-73 (2d Cir. 1987))   Plaintiff is entitled to actual damages in the form of

13  disgorgement of Defendants' ill-gotten profits.

14                     ii.    *Defendant's Profits As Unjust Enrichment*

15       "[A] court may — subject to equitable principles — award a plaintiff the

16  defendant's profits on the theory that the defendant should not be permitted to

17  keep its ill-gotten gains, without regard to whether its gains are equal to the

18  plaintiff's damages." (*Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d

19  1272, 1274 (9th Cir. 1982) (citing *Maier Brewing Co. v. Fleischmann Distilling

20  Corp.*, 390 F.2d 117, 121-23 (9th Cir. 1968) *K&N Eng'g, Inc. v. Spectre

21  Performance*, 2012 U.S. Dist. LEXIS 196138, at *18 (C.D. Cal. Aug. 2, 2012).)

22  Additionally, the Ninth Circuit provides that profit awards are appropriate where

23  ordinary damages won't deter unlawful conduct.  (*TrafficSchool.com, Inc. v.

24  Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011).)

25       Even in the absence of evidence that the Plaintiff was damaged, Plaintiff

26  can still obtain an award of defendant's profits by showing that defendant's

27  conduct was willful. (*Emco, Inc. v. Obst*, 2004 U.S. Dist. LEXIS 12118, at *11

28

(C.D. Cal. May 7, 2004); *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995).)

### 4. There Is No Merit to Defendants' New Unclean Hands/Estoppel Defense.

Defendants throw in a one-sentence claim that Plaintiffs should be estopped from asserting that the Supplement Defendants falsely advertise their product. (Memo pg. 23, lines 3 - 4.)  This argument, advanced for the first time in one sentence in Defendants' summary adjudication motion, fails for many reasons. There has been no showing whatsoever that Plaintiff's products have been falsely advertised.  There has been no counterclaim filed by Defendants for false advertising.  Defendants did not assert this claim as an affirmative defense, despite having asserted 29 different affirmative defenses.

### C. Defendants' Request for Summary Adjudication On VBS Distribution's Antitrust Claims (Counts 8 and 9[16]) Should Be Denied.

To prevail on a cause of action for violation of Section 1 of the Sherman Act, a plaintiff must show that: "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce."  (*Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996); *see also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001).)

To establish a Sherman Act § 2 violation for attempted monopolization, a private plaintiff seeking damages must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of

---

[16] Defendants' Motion as to the state law claim fails for the same reasons as the federal claim.  The same also applies to Counts 5 and 7 discussed below.

1  achieving "monopoly power"; and (4) causal antitrust injury.  (*McGlinchy v. Shell*

2  *Chem. Co.,* 845 F.2d 802, 811 (9th Cir. 1988).)

3       "Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of

4  damage' that results from a violation of the antitrust laws."  (*Nitsch v.*

5  *Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 292 (N.D. Cal. 2016) (quoting

6  *In re DRAM Antitrust Litig.*, 2006 U.S. Dist. LEXIS 39841 at *7).)  "It is the

7  causal link between the antitrust violation and the damages sought by

8  plaintiffs."  (*Id.* (quoting *In re New Motors*, 522 F.3d at 19 n.18.).)

9       Defendants admit that the parties are direct competitors: "Both Arthro-7

10  and JN-7 are joint-relief dietary supplements sold to consumers.  Both are

11  marketed to the same set of consumers and are sometimes even sold side-by-side

12  in certain stores."  (Ex. 500, ¶16.)

13       Supplement Defendants supply Show Defendants with free Arthro-7 in

14  exchange for marketing it to the Vietnamese market.  (Ex. 155.)  Defendants

15  conspired and agreed to frivolously sue VBS purely as an unlawful competitive

16  practice.  (Ex. 173, page 226:7 - 227:18.)  There can be no question that

17  Defendants Jenny Do and Tuong Nguyen, personally and through their various

18  Defendant companies, have conspired to force VBS out of business through

19  unlawful anti-competitive practices.  (*Id.*; Ex. 180, page 161: 1-3, and Ex. 173,

20  pages 66:21 - 69:25, and Ex. 174, page 85: 3-10; Ex. 155; cf. Ex. 174, pages

21  72:21 - 75:19.)  Defendants admit to price-fixing.  (Ex. 178, page 553:21-554:5.)

22  The relevant market is defined clearly.  (SDF, 77.)  There are material disputed

23  facts as to the anti-trust claims, and Defendants' Motion should be denied with

24  respect to such claims.

25  **D.    Defendants' Request for Summary Adjudication On VBS Television's**

26  **      Trade Dress Claims (Counts 6 and 7) Should Be Denied.**

27       To prevail on a claim of trade dress infringement a plaintiff must

28  demonstrate that (1) its trade dress is non-functional, (2) the trade dress is

inherently distinctive or has acquired secondary meaning in the relevant community, and (3) that defendant's imitation of the dress is likely to cause confusion.  (*See, e.g., First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir. 1987); *Two Pesos v. Taco Cabana,* 112 S. Ct. 2753 (1992).)

First, the Ninth Circuit, earlier in this case, already rejected Defendants' claim that all of the trade dress at issue is functional:

> The district court erred in holding that because the overall configuration of VBS's live auction television show was functional, VBS failed to carry its burden of showing a likelihood of success on the merits of its trade dress infringement claim.  As with restaurants' trade dress infringement claims, VBS can claim protectable trade dress in the overall look and feel of VBS's live auction show, regardless of whether individual elements that constitute part of the claimed trade dress are functional. *See Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1259 (9th Cir. 2001).

(*VBS Distribution, Inc. v. Nutrivita Laboratories, Inc.* 697 Fed.Appx.543 (9th Cir. 2017) (unpublished).)

Deceptively, Defendants rely on this Court's preliminary injunction, but fail to address the Ninth Circuit's ruling.  For each reason that Defendants argue certain elements of the trade dress are functional, there is contrary evidence—like that the overall combination is non-functional as held by the Ninth Circuit.

Second, a genuine issue exists as to whether the Infringing Show's trade dress serves a source-identifying role, which would eliminate the need to establish proof of a secondary meaning.  (*Two Pesos, Inc. v. Tacto Cabana, Inc.* 505 U.S. 763 (1992) (stating "We agree with the [Ninth Circuit] that proof of secondary meaning is not required to prevail on a claim under §43(a) of the Lanham Act where the trade dress at issue is inherently distinctive.").)  Again, the Ninth Circuit's prior ruling in this matter confirmed that the trade dress at issue here can be inherently distinctive similar to packaging or restaurants.

Considerable evidence has been submitted showing that VBS Television's Show's trade dress is inherently distinctive, which includes all of the declarations

1  in support of the preliminary injunction.  Consumers uniquely identify the Show
2  with VBS Television.  Indeed, customers from the Infringing Show have even
3  called VBS Television out of confusion.  There is substantial evidence that the
4  Infringing Show is basically an intentional copy of the VBS Television Show.
5  Defendants don't even address whether the trade dress at issue is inherently
6  distinctive (which would eliminate the need for a showing that there is a
7  secondary meaning).  Defendants ignore this issue, and instead go directly to
8  arguing that there is no secondary meaning.  For this reason alone, Defendants'
9  request for summary adjudication on the trade dress claims must be denied.

10        Even if the trade dress was not inherently distinctive, there is nevertheless a
11  genuine issue as to secondary meaning.  A consumer survey is not necessary to
12  establish secondary meaning.   "Whether a particular trade dress has acquired
13  secondary meaning is a question of fact. . ."  (*First Brands Corp. v. Fred Meyer,*
14  *Inc.* 809 F.2d 1378, 1383 (9th Cir. 1987); also see generally, W. Levin, <u>Trade</u>
15  <u>Dress Protection</u> § 13:19 (2d ed. Rel. 8 Thomson Reuters 2016 ("usually held to
16  be a question of fact, one which requires careful weighing of the relevant facts
17  and evidence.")(citations omitted).)  In the Ninth Circuit, "[s]econdary meaning
18  can be established in many ways, including (but not limited to) direct consumer
19  testimony; survey evidence; exclusivity, manner, and the length of use of a mark;
20  amount and manner of advertising; amount of sales and number of customers;
21  established place in the market; and proof of intentional copying by the
22  defendant."  (*Art Attacks Ink, LLC v. MGA Entertainment, Inc.* 581 F.3d 1138,
23  1145 (9th Cir. 2009).)  Importantly, there is an inference of secondary meaning
24  where it is shown that the trade dress was deliberately copied.  (*See Cybergun,*
25  *S.A. v. Jag Precision*  2012 WL 4868104 (D. Nev. 2012), *6; W. Levin, <u>Trade</u>
26  <u>Dress Protection</u> § 13:14 at 13 - 31 (2d ed. Rel. 8 Thomson Reuters 2016 ("In the
27  Ninth Circuit, proof of intentional copying of trade dress is sufficient to establish
28  secondary meaning, and such evidence will defeat a motion for summary

judgment on the issue of secondary meaning."), *citing, inter alia, Vision Sports, Inc. v. Melville Corp.* 888 F.2d 609 (9th Cir. 1989); *Click Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1264 (9th Cir. 2001) (reversing the trial court's entry of summary judgment on secondary meaning, likelihood of confusion, and functionality, and collecting authorities on intentional copying of trade dress being sufficient to show secondary meaning.).)

VBS Television has introduced uncontradicted evidence establishing secondary meaning, including over 5 years of exclusive use, extensive advertising on television of the trade dress, the amount of its sales, over 5000 registered auction customers for its show, its unique standing as the only such use prior to the infringement, proof of intentional copying, and recognition by consumers of the source association with VBS and its show.

Nor is a consumer survey necessary to establish likelihood of confusion. (*See Mexican Food Specialties, Inc. v. Festida Foods, Ltd.* 953 F.Supp. 846, 852 (E.D. Mich. 1997) ("That argument, however, is misguided as circuits that have addressed the issue have held that survey evidence is not a requirement.") *citing, inter alia, Committee for Idaho's High Desert, Inc. v. Yost*, 93 F.3d 814 (9th Cir. 1996).) Application of the *AMF v. Sleekcraft* factors establishes a likelihood of confusion in this matter. At the very least, there is a genuine factual dispute with respect to this issue.

The Show Defendants started their Infringing Show after the VBS Show had become successful and popular. The Infringing Show was designed to mirror VBS's Show to confuse consumers. All aspects of the shows are the same. As VBS Television airs its Show on Tuesdays and Thursdays, the Show Defendants purposely air the Infringing Show in the same time slot on the other weekdays— Monday, Wednesday, and Friday—so that consumers are confused into thinking they are watching the VBS show. The fact that at some point during the Infringing Show the Defendants identify the show with KVLA is immaterial, as

consumers may not even see such a one-time source identifier and may not even know what channel they are watching.  All the consumer see is a show that is an exact duplicate of the VBS Show, as intentionally designed by Defendants.  The evidence establishes that there is a definite likelihood of consumer confusion.

## E.   Defendants' Request for Summary Adjudication On VBS Television's Misappropriation Of Trade Secrets Claims (Counts 4 and 5) Should Be Denied.

To prevail on this claim, VBS must show that it has a legally protectable trade secret that has been misappropriated by Defendants.  (See Cal. Civ. Code § 3426.1(b); *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1520-21 (1997); *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal.App.4th 34, 50 (1992).)

A legally protectable trade secret is any "information, including a formula, pattern, compilation, program, device, method, technique, or process" that derives economic value from not being generally known to the public, and that is the subject of reasonable efforts to maintain its secrecy. (See Cal. Civ. Code § 3426.1(d).)  Misappropriation is defined, *inter alia*, as the:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: (A) Used improper means to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .  (Cal. Civ. Code § 3426.1(b).)

It is well-established that customer list may constitute protectable trade secrets.  (See, e.g., *Morlife,* supra, 56 Cal. App.4th at 1521; *Abba Rubber Co. v. Seaquist,* 235 Cal.App.3d 1, 19 (1991); *Courtesy Temporary Serv., Inc. v. Camacho*, as: 222 Cal. App. 3d 1278, 1286 (1990).)

Defendants' sole argument as to the misappropriation of trade secrets claims is that each of the alleged trade secrets is not secret.  This position is

1  directly contrary to all of the evidence submitted on this issue.  The trade secrets

2  at issue include: customer lists and information, employee information, vendor

3  information, and VBS Television's "jewelry photographic technique."  The

4  evidence establishes that Plaintiffs derive substantial commercial value from these

5  trade secrets.  Plaintiffs have put great effort into acquiring the trade secrets -

6  customer information, buying habits, etc.  Plaintiffs kept all of the trade secrets at

7  issue strictly confidential and secret, even requiring employees to sign

8  confidentiality agreements.  The secrecy of Plaintiffs' trade secrets is, at the very

9  least, a disputed material fact.

10      The fact that Defendants may have acquired some customer information

11  from other legitimate sources ("from the customers of its own 'Happy Hour'

12  show" or otherwise) does not, as Defendants mistakenly argue, foreclose the fact

13  that Defendants also acquired customer information illegally through the

14  misappropriation of Plaintiffs' trade secrets.  Tram Ho, the former host of the

15  VBS Show who was taken by Defendants to host their copycat show, admitted

16  that she kept somewhere between 1800 and 2000 of VBS Televisions' customers'

17  contact information on her cell phone, gave the customer information to

18  Defendants, and Defendants used VBS Television's customer information to text-

19  message their own advertisements to VBS Television's customers.  Tram Ho

20  produced VBS' customer lists in discovery, which proves she took them when she

21  went to work for Defendants.  (e.g. Ex. 166.)  Jenny Do testified that Tram Ho

22  was the sole creator of the Infringing Show, and that she made all of the decisions

23  concerning the show.  (Ex. 174, at 128:2-16; SDF 38.)

24      There is no merit to Defendants' claim that the customer information

25  somehow loses trade secret protection simply because VBS Television provided

26  customer information to its own vendors *as necessary* to deliver the items sold to

27  its customers.  The items sold on the Show necessarily need to be delivered to

28  customers.  Delivery to customers is a business necessity under the circumstances,

1   and vendors are provided with customer information to the extent necessary.

2   Each vendor doesn't get a complete list of all customer information; they are

3   provided with the select customer information that is required to complete the

4   business transaction.  Moreover, and though not necessary, there are

5   confidentiality agreements in place with the vendors.  (Ex. 160.)  The vendors are

6   well aware that customer information is confidential and required to be kept

7   confidential.  There is no support for the claim that such necessary business

8   disclosures eliminate the trade secret protection.

9        Defendants try to rely on Tram Ho's self-serving and perjurous deposition

10  testimony to argue that the customer lists were not acquired unlawfully.  Tram Ho

11  blatantly lied during her deposition by stating that she did not obtain VBS

12  customer information while working at VBS.  This false testimony is belied by all

13  other evidence, including her very own testimony that she kept VBS customer

14  information on her phone and provided the information from her phone to

15  Defendants.  Tram Ho's lies do not provide a basis for summary adjudication

16  when there is other substantial evidence conflicting with her testimony.  At best,

17  her lies would create a genuine issue of material fact.

18       Tram Ho is a proven pathological liar.  During her deposition she even

19  admitted to lying after getting caught in lie after lie.  (Ex. 170 is her deposition in

20  full - pages 65-68 for one admission.)  Tram Ho testified under penalty of perjury

21  that she had access to the customer lists as part of her job duties as VP of

22  Marketing at VBS.  (Ex. 159, Paras. 7, 8; SDF 44.)  There are clearly genuine

23  issues of material fact precluding summary adjudication as to the

24  misappropriation of VBS' customer lists.

25       Tram Ho's own document production in this matter proves she wrongfully

26  kept Plaintiffs' employee information.  (Ex. 190; SDF 52.)  Armed with VBS'

27  confidential employment information, Defendants poached numerous VBS

28  employees through promises of higher compensation (as they knew what VBS

1    was paying its employees) if they left VBS and went to work for Defendants.

2    Defendants went as far as terminating many of the employees shortly after

3    convincing them to leave VBS.

4         Defendants assert, right after they list the vendor information that Plaintiffs

5    claim was misappropriated, that Plaintiffs have not explained what vendor

6    information was misappropriated.  As admitted by Defendants, the

7    misappropriated vendor information includes "vendor names, personal contact

8    information such as email addresses and cell phone numbers, and individual

9    contacts at vendor companies, wholesale prices for products purchased, profit

10   margins, discounts for volume or otherwise, and private terms of vendor contracts

11   or relationships." (Motion, Pg. 10, Lines 4 - 8; SUF 36.)  The misappropriated

12   vendor information further includes vendor contract information and the terms of

13   the contracts, vendor commissions, rates, sales, historical vendor data, bank

14   account information, invoices, money owed, money paid, interest percentage

15   rates, total revenue, etc.  Exhibits 161 through 166 are just a few examples of the

16   confidential information that Tram Ho and the Show Defendants misappropriated

17   from VBS's confidential databases.  Defendants' own contracts define this same

18   type of information as confidential and proprietary.  (Ex. 44; Ex 543, page 13,

19   lines 14-16; SDF 6.)  The information was acquired through improper means -

20   Tram Ho breached her fiduciary duties to VBS and breached her confidentiality

21   obligations.  (*Id.*; SDF 67).  The misappropriated vendor information goes far

22   beyond just the identities of the vendors that may be obtained through watching

23   the Show.  Defendants used Plaintiffs' confidential vendor information to solicit

24   vendors for their copycat Infringing Show.  Tram Ho admits to purposely going to

25   VBS' vendors to get them to work for KVLA.  (*Id.*; Ex. 170, pp. 172–173.)

26        As confirmed by the Declaration of Joseph Nguyen filed concurrently

27   herewith, the Infringing Show is basically an exact copy of VBS's show from top

28   to bottom.  VBS developed a unique technique to display and photograph the

1    jewelry sold on the VBS show.  The Infringing Show uses that same unique and

2    proprietary technique.  The visual appearance of the shows and the items

3    displayed are identical, and there exists genuine issues of material fact.

4    **F.    Defendants' Request for Summary Adjudication On VBS Television's**

5         **Interference With Contract Claim (Count 10) Should Be Denied.**

6         Under California law, there are two distinct causes of action for tortious

7    interference: one relates to existing contractual relationships and the other deals

8    with prospective business or contractual relationships.  (*See Fresno Motors, LLC*

9    *v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).)  The former

10   requires the following elements: (1) a valid contract between plaintiff and a third

11   party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts

12   designed to induce a breach or disruption of the contractual relationship; (4)

13   actual breach or disruption of the contractual relationship; and (5) resulting

14   damage.  (*Earthbound Corp. v. Mitek United States*, 2017 U.S. Dist. LEXIS

15   174209, at *32-33 (C.D. Cal. Feb. 10, 2017) (quoting *Pac. Gas & Elec. Co. v.*

16   *Bear Stearns*, 50 Cal. 3d 1118, 1126 (1990)).)

17        The Show Defendants intentionally interfered with (1) Plaintiffs' contracts

18   with its employees, and (2) Plaintiffs' contracts with its vendors.

19        In arguing that Defendants could not have interfered with Plaintiffs'

20   contract with employee Tram Ho because Tram Ho's written contract with VBS

21   had purportedly expired, Defendants ignore the fact that a contract (verbal or

22   written) exists with every employee.  If Tram Ho's written employment contract

23   had in fact expired (which it had not as further discussed below), Tram Ho

24   nevertheless still had a verbal contract to work for VBS and get paid for such

25   work.  Defendants knew that Tram Ho was employed by VBS, thus necessarily

26   knowing that she had either a written or verbal employment contract with VBS.

27   Defendants interfered with Tram Ho's contract with VBS irrespective of whether

28   her written employment contract had expired.

1    But Tram Ho's written employment contract had not, in fact, expired when

2    Defendants poached her away with promises of owning a share of KVLA.  (Ex.

3    173, at 286: 12-13; Ex. 13 (showing that Tram Ho's written contract was to

4    terminate in August 2016) (SDF 7 and 59 provide ample evidence to demonstrate

5    a genuine issue of material fact on this issue).

6    The assertion that Tram Ho left VBS because she was being sexually

7    harassed is completely fabricated and nothing but a litigation tactic designed to

8    make the trier of fact look unfavorably on Plaintiffs.  The alleged sexual

9    harassment is pure fiction.  Nevertheless, this false alleged basis for Tram Ho's

10   departure from the company would certainly create a genuine issue of material

11   fact as to why Tram Ho left VBS, precluding summary adjudication.

12    The argument that Plaintiffs did not suffer any damage as a result of Tram

13   Ho's departure because VBS's sales increased even after she left ignores the

14   obvious - that Plaintiffs' sales could have increased even more if Tram Ho had

15   not been unlawfully poached by Defendants.  An increase in sales does not

16   necessarily mean no damages as Defendants illogically contend.  Moreover,

17   Defendants ignore the monetary damage caused by the disruption from VBS's

18   Show host's departure and the time and money required to replace Tram Ho.

19    As with Tram Ho, Defendants knew the other individuals they poached

20   from VBS were employees of VBS under either written or oral employment

21   contracts.  Oddly, Defendants claim that some of these individuals were

22   independent contractors rather than employees.  The point of this distinction is

23   entirely unclear, as independent contractors would, just as with employees,

24   necessarily be contracted with VBS.

25    Defendants then go on to argue that the specific employees left VBS for

26   reasons unrelated to being solicited by Defendants.  All this does is highlight that

27   there are genuine issues of material fact as to (1) Defendants' use of stolen trade

28

secrets to solicit VBS employees, and (2) whether the employees left because of the unlawful solicitation or for the other reasons put forth by Defendants.

Defendants' claim that summary adjudication is proper on the interference with contract claim as to VBS's vendors because the contract was allegedly not written again ignores basic contract law.  Contracts can be written or oral, and a Defendant can interfere with either.  Kim Cuong Jewelry was a vendor of VBS, and thus necessarily had either a verbal or written contract with VBS to provide items in exchange for payment.  In fact, the vendor did have a written contract with VBS.  However, whether the contract was verbal or written is immaterial, and Defendants interfered with the contract.  Whether the vendors had exclusive contracts with VBS is equally immaterial, as a Defendant can interfere with either an exclusive or non-exclusive contract.

## G.   Defendants' Request for Summary Adjudication On VBS Television's Interference With Economic Advantage Claim (Count 11) Should Be Denied.

"California's tortious interference with prospective economic advantage cause of action requires th[e same] elements [as intentional interference with contract (*supra*)] but adds another: proof that the defendant 'not only interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." (*Earthbound Corp*., 2017 U.S. Dist. LEXIS 174209, at *32-33 (internal citations omitted).)

Defendants assert that there is no independent wrongful act to support the interference with economic advantage claim.  This argument ignores Defendants' stealing of confidential information, which Defendants used to interfere (e.g. employees - knowing what VBS' employees were being paid to allow Defendants to lure them away; vendors - knowing the vendors contract terms with VBS, volume of business with VBS, etc.). (SDF 65, 67, 68, 70 et seq.)  Aside from a reduction in VBS' business and sales as a result of the interference, VBS had to

1  spend time, resources, and money in replacing the employees and vendors stolen

2  by Defendants.  VBS was substantially damaged by Defendants' interference, and

3  summary adjudication cannot be granted.

4  **H.    Defendants' Request for Summary Adjudication On Plaintiffs' Unfair**

5  **Competition Claim (Count 1) Should Be Denied.**

6        Defendants provide a one-line argument to support their request for

7  summary adjudication on the unfair competition claim: "The unfair competition

8  claims fail as a matter of law for the reasons that the above claims fail."

9  Defendants' one-line statement is hardly sufficient to justify summary

10 adjudication on this separate cause of action.  Moreover, none of Plaintiffs' other

11 claims fail as addressed above, so Defendants are not entitled to summary

12 adjudication on this cause of action.

13 **I.    Defendants' Request for Summary Adjudication On Plaintiffs' Claims**

14 **Against Tom Nguyen and Jenny Do Should Be Denied.**

15       Without engaging in any effort to meet and confer on this new argument,

16 Defendants for the first time argue that Jenny Do and Tuong Nguyen cannot be

17 personally liable on VBS's claims.  This new argument, with no meet and confer,

18 should be denied out of hand.

19       Nevertheless, the facts clearly establish individual liability of these

20 defendants, who personally participated in all of the tortious conduct, made the

21 decisions, controlled other parties' actions, and, though not required for liability

22 because of their own personal participation, are the alter egos of their companies.

23 When an individual personally participates in the infringement and other

24 wrongful conduct, he/she is liable regardless of whether he/she is the alter ego of

25 another corporate defendant.

26       As the Ninth Circuit has held:

27            We affirm the district court's holding that Vachani is
             personally liable for Power's actions.  A 'corporate officer
28            or director is, in general, personally liable for all torts

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION

which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf.' *Comm. For Idaho's High Desert, Inc. v. Yost* (9th Cir. 1996) 92 F.3d 814, 823.  (internal quotation marks omitted).  Cases finding 'personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct, or the 'central figure' in the challenged corporate activity.' *Davis v. Metro Prods., Inc.* (9th Cir. 1989) 885 F.2d 515, 523 n.10.  (*Facebook Inc. v. Power Ventures, Inc.* 2016 WL 3741956, *9 (9th Cir. 2016).)

While these two individual defendants try to distance themselves from the other defendants in this case for purposes of advancing this argument, it is interesting that Defendants took the exact opposite position in arguing elsewhere that an anti-trust conspiracy can not exist because the Defendants are all one and the same.  In any event, Defendants Tuong and Jenny Do have failed to establish entitlement to summary adjudication.

## IV.   CONCLUSION

The one thing that is obvious from Defendants' Motion is that there are significant and substantial genuine issues of material fact as to each of the claims in this matter.  The Motion should be denied in its entirety.

Dated:  July 23, 2018                MK Smith, APC


By:_____*/s/ Mark T. Kearney*_____
                Mark T. Kearney
                Jason K. Smith
                    Attorneys for Plaintiffs